# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| COMMON CAUSE GEORGIA, as an organization,<br><br>*Plaintiff*,<br><br><br><br>v.<br><br>BRIAN KEMP, in his official capacity as Secretary of State of Georgia<br><br><br>*Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 18-cv-05102-AT<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND EXPEDITED DISCOVERY

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................ 1

II.    FACTUAL BACKGROUND .............................................................................. 4

   A.   The Georgia My Voter Page System Has Been Vulnerable to Attack ............................ 4

   B.   There Is Significant Evidence That These Vulnerabilities May Have Been Exploited ... 6

   C.   The Secretary of State Has Long Known About These Vulnerabilities and Has Politicized and Exacerbated, Rather than Remedied, Them. ...................................... 7

   D.   Provisional Ballots ......................................................................................... 8

III.   ARGUMENT ..................................................................................................... 9

   A.   Common Cause Is Likely to Prevail on the Merits of Its Claims ................................. 11

   B.   Plaintiff Will Suffer Irreparable Harm Absent Preliminary Injunctive Relief ............. 13

   C.   The Balance of the Equities Weighs Heavily in Favor of Plaintiff ............................. 15

   D.   The Requested Preliminary Injunctive Relief Would Be in the Public Interest ........... 16

   E.   Common Cause's Request for Expedited Discovery Should Also Be Granted ............ 17

IV.    CONCLUSION ................................................................................................ 18

Plaintiff Common Cause Georgia ("Common Cause"), by and through counsel, hereby files this Memorandum of Law in Support of its Emergency Motion for a Temporary Restraining Order and Expedited Discovery.

## I.  INTRODUCTION

Voting in the general election has now closed and it seems clear that there are a significant number of eligible Georgia voters who, within the next three days, may very well be disenfranchised through no fault of their own.  These eligible voters may be denied their fundamental right to vote as a result of malfeasance or tampering with Georgia's voter registration system.  In fact, Defendant readily admits that the system has been vulnerable to security threats.  Yet, instead of remedying those issues, Defendant politicized and exacerbated the issue, increasing the likelihood that bad actors would seek to exploit the vulnerabilities.  This, in turn, exacerbated an already-present risk that eligible voters would be required to cast provisional ballots that would ultimately be rejected because the county executives would not be able to find voters' information in the county database.

This is not a purely hypothetical threat.  In the last two years, more than one in ten names were purged from the Georgia voter rolls.  There is no way at this time to know whether these individuals were legitimately removed from the

rolls or were removed as a result of tampering with the vulnerable voter

registration system.  What we do know, however, is that there are public reports of

large number of voters being required to use provisional ballots in this election—

some as a result of issues such as addresses not matching, some because of more

general problems with the poll books, and some because of problems with the

voting machines—and that without the relief requested, there is a very real risk that

eligible voters will not have their votes counted.[1]  At this time, Common Cause

---

[1] *See, e.g.*, Mark Niesse, *Long Lines and Equipment Problems Plague Election Day in Georgia*, Atlanta J.-Const. (Nov. 6, 2018), https://politics.myajc.com/news/state--regional-govt-- politics/long-lines-and-equipment-problems-plague-election-day-georgia/ l7NUidWbMetr5OFdGcb5ZM/; *Live Voting Updates: Polls Are Closed – At Least Most of Them*, Atlanta J.-Const. (November 6, 2018), https://www.ajc.com/news/state--regional-govt-- politics/live-updates-georgians-head-the-polls/DtYWWHcxngbl4SdVaDAyDL/; *About a Dozen US States Encounter Problems with Voting Machines*, Reuters (Nov. 7, 2018), https://www.theepochtimes.com/a-dozen-u-s-states-see-problems-with-voting-machines_ 2709724.html; Jamie Ducharme, *Stacey Abrams Is Refusing to Concede the Georgia Governor's Race. Here's What Could Happen Next*, Time (Nov. 7, 2018), http://time.com/5447595/stacey- abrams-brian-kemp-georgia-governor-runoff/; *Broken Voting Machines, Long Lines Under Scrutiny in Georgia*, Associated Press (Nov. 7, 2018), https://www.apnews.com/ a2b641d6f03f41f28b2645a20200951f; Amy Gardner & Beth Reinhard, *Broken Machines, Rejected Ballots and Long Lines: Voting Problems Emerge as Americans Go to the Polls*, Wash. Post (Nov. 6, 2018), https://www.washingtonpost.com/politics/broken-machines-rejected- ballots-and-long-lines-voting-problems-emerge-as-americans-go-to-the-polls/2018/11/06/ ffd11e52-dfa8-11e8-b3f0-62607289efee_story.html?utm_term=.c3087e6aa0f5; Tyler Estep & Amanda & C. Coyne, *Extended Hours Ordered at 3 Gwinnett Precincts*, Atlanta J.-Const. (Nov. 6, 2018), https://politics.myajc.com/news/local-govt--politics/machines-down-hundreds-wait- one-gwinnett-voting-precinct/nNdh2wuAvjinnomVB5Oq9M/; Greg Bluestein, *A 4 a.m. Dispatch: Why Abrams Refused to Concede*, Atlanta J.-Const.: Pol. Insider (Nov. 7, 2018), https://politics.myajc.com/blog/politics/dispatch-why-abrams-refused- concede/x0sSN5ObEIVERjQCR3y7SO/https://politics.myajc.com/news/state--regional-govt-- politics/long-lines-and-equipment-problems-plague-election-day- georgia/l7NUidWbMetr5OFdGcb5ZM/; Ontaria Woods, *We waited almost 5 hours to vote in my Georgia precinct. How convenient for Kemp.* (Nov. 6, 2018),

seeks to enjoin the rejection of provisional ballots related to the 2018 general election on the ground that the voter's name is not found on the voter registration list, pending a decision on the permanent relief sought on this case.[2]  Common Cause also seeks immediate discovery of the number of provisional ballots cast per county, and the reason for each, as well as any guidance provided by the Secretary to county officials regarding, and all coding sheets or similar documents used in connection with, reviewing provisional ballots or assessing the eligibility of voters who voted by provisional ballots, in order to facilitate a hearing on the permanent relief sought in this action.

The right to vote is a fundamental right repeatedly recognized by the Courts.  We respectfully submit that in order to protect this fundamental right, the Court should grant the relief requested in this motion, so that no eligible voter is denied her fundamental right as a result of the Defendant's actions or inactions.

---

https://www.washingtonpost.com/outlook/2018/11/07/we-waited-almost-hours-vote-my-georgia-precinct-how-convenient-kemp/?utm_term=.593021a6f5be.

[2] In the event the Defendant does not plan to count all provisional ballots cast by voters because of voting machine failures or ballot shortages, Plaintiff will respectfully move the Court to amend our complaint and request for relief to prevent the Defendant from rejecting provisional ballots cast by those voters.

3

## II.   FACTUAL BACKGROUND

### A.   <u>The Georgia My Voter Page System Has Been Vulnerable to Attack</u>

My Voter Page, a website of the Georgia State Government, is a public interface where voters can check their voter registration status, poll locations, and view sample ballots for upcoming elections.  The registration records used at the polls to determine whether voters are eligible to vote are created from data in the My Voter Page system.  As Secretary of State, the Defendant is responsible for the security of voter information, including information on the My Voter Page.

It appears that at the very least for a significant period of time prior to the November 6, 2018 general election, My Voter Page and the state's voter registration server were vulnerable to multiple security breaches.  For example, it has been reported that an individual could access My Voter Page and click on a link to get to an insecure page, which allowed the individual to view any file on the My Voter Page server simply by typing the file name into the web browser.[3]  An individual could then access any document, configuration files for the network, or

---

[3] *See* Jordan Wilkie & Timothy Pratt, *Kemp's Aggressive Gambit to Distract from Election Security Crisis*, Who. What. Why. (Nov. 4, 2018), https://whowhatwhy.org/2018/11/04/kemps-aggressive-gambit-to-distract-from-election-security-crisis/ [hereinafter Wilkie & Pratt, *Kemp's Aggressive Gambit*].

cryptographic keys.[4]  An attacker could also take advantage of this vulnerability and download every Georgia voter's personally identifiable information and change or cancel the voter registrations and data housed on the system.[5]  It is believed that an attacker could potentially automate this process to change the registration of multiple voters at once.[6]

It has also been reported that several computer security and election system experts looked at the code underlying the My Voter Page website and concluded that voter data could be easily accessed and changed.  The My Voter Page system does not have the capability to track changes made to voter data so it is not possible to determine the extent to which voter information was changed.[7]

Because voter history, absentee voting data, and early voting data are public records available on the Secretary of State's website, this publicly-available information could be used to target certain demographic groups and manipulate their data and change or cancel their registrations.

---

[4] *Id.*

[5] *Id.*

[6] Matt Bernhard, *Serious Vulnerabilities in Georgia's Online Voter Registration System*, Medium (Nov. 4, 2018), https://medium.com/@mattbernhard/serious-vulnerabilities-in-georgias-online-voter-registration-system-cc319cbbe3d8.

[7] Wilkie & Pratt, *Kemp's Aggressive Gambit*, *supra* note 2.

**B.** **There Is Significant Evidence That These Vulnerabilities May Have Been Exploited**

While we do not know how long these vulnerabilities have been in place, we do know that over the last two years, the number of names removed from Georgia's rolls was 10 percent of all names on the voter list.  (By contrast, the median jurisdiction in the nation had a purge rate of 7.8 percent from 2014 to 2016, the last year for which we have national data.)[8]  When paired with the fact that Georgia voters, throughout the run up to this general election, reported being assigned to the wrong precinct, being issued the wrong ballot, and not showing up in the poll books, this is highly suggestive of tampering with the system.  In other words, while it is not known how long the vulnerabilities described above have been in place or whether they definitively have been exploited in any way, the evidence strongly suggests that the vulnerabilities were exploited to change or delete voter information, thus leading to the possible disenfranchisement of thousands (if not more) of eligible voters.[9]

---

[8] *See* Jonathan Brater et al., Brennan Center for Justice, *Purges: A Growing Threat to the Right to Vote* at 12 n.1 (2018), *available at* https://www.brennancenter.org/sites/default/files/publications/Purges_Growing_Threat_2018.1.pdf.

[9] Jordan Wilkie & Timothy Pratt, *Georgia's Voter Registration  System Like 'Open Bank Safe Door,'* Who. What. Why. (Nov. 4, 2018), https://whowhatwhy.org/2018/11/04/exclusive-georgias-voter-registration-system-like-open-bank-safe-door/.

**C.**     <u>The Secretary of State Has Long Known About These</u>
<u>Vulnerabilities and Has Politicized and Exacerbated, Rather than</u>
<u>Remedied, Them.</u>

As early as 2015, one of the Defendant's own employees sent out

personally-identifiable information to twelve media and political organizations.[10]

The Defendant was aware of this breach and claimed that "all voter information is

secure and safe."[11]

In August 2016, a computer researcher accessed the entire Georgia

voter registration database and all personally identifiable information on the

database.  He found that the system was not password protected and could be

rewritten.  The State was notified.[12]  In February 2017, a security engineer joined

this researcher in finding that the problem persisted, and that voter information

remained unprotected.[13]

In the last week, the Defendant has been specifically alerted to the

vulnerabilities and, rather than using the resources of the State to address and fix

---

[10] Wilkie & Pratt, *Kemp's Aggressive Gambit, supra* note 2.

[11] *Id. See also* Kristina Torres, *Georgia: "Clerical error" in data breach involving 6 million voters*, Atlanta Journal-Constitution (Nov. 18, 2015), https://www.ajc.com/news/state--regional-govt--politics/georgia-clerical-error-data-breach-involving-million-voters/pf3GlsIFyuF5ifgRYy5GAJ/.

[12] Declaration of Logan Lamb ¶¶ 13–15, *Curling* v. *Kemp*, No. 17 Civ. 2989 (N.D. Ga. Aug. 3, 2018), ECF No. 258-1; *see also* Wilkie & Pratt, *Kemp's Aggressive Gambit, supra* note 2.

[13] Declaration of Logan Lamb, *supra* note 10, ¶ 15; Wilkie & Pratt, *Kemp's Aggressive Gambit, supra* note 2.

the problems, the Defendant has instead waged a political attack against the Georgia Democratic Party.[14]  For example, on November 3, 2018, the Defendant's office issued a press release announcing they had opened an investigation into the Georgia Democratic Party for potential criminal cyber activity.[15]  And the next day, they issued another press release about this investigation.[16]

The Defendant's approach to the State's security issue has not only failed to remedy the problem, but has advertised the vulnerability of the system to those who may want to interfere with voters' exercise of their right to vote.

### D.    Provisional Ballots

If a voter cannot be found on the rolls, the voter is asked to cast a provisional ballot.  After the close of the polls, poll officers count the provisional ballots and send them, with other information, to the election superintendent. The superintendent by no later than 9:00 am on the day following an election, provides the relevant materials to the board of registrars, who must promptly determine the

---

[14] Richard Fausset & Alan Blinder, *Brian Kemp's Office, Without Citing Evidence, Investigates Georgia Democrats over Alleged 'Hack*,*'* N.Y. Times (Nov. 4, 2018), https://www.nytimes.com/2018/11/04/us/politics/georgia-elections-kemp-voters-hack.html.

[15] Press Release, Ga. Sec'y of State, *After Failed Hacking Attempt, SOS Launches Investigation into Georgia Democratic Party* (Nov. 3, 2018),  http://sos.ga.gov/index.php/general/ after_failed_hacking_attempt_sos_launches_investigation_into_georgia_democratic_party_.

[16] Press Release, Ga. Sec'y of State, *SOS Releases More Details over Failed Cyberattack, Officially Requests FBI to Investigate* (Nov. 4, 2018),  http://sos.ga.gov/index.php/general/ after_failed_hacking_attempt_sos_launches_investigation_into_georgia_democratic_party_.

eligibility of each person that voted a provisional ballot.  The registrars must finish

this work by the third business day after an election (in this case, b*y November 9,*

*2018*).  If during that three-day period, the registrars are unable to determine

whether the person was eligible to vote, the ballot will not be counted.  *See*  Ga.

Code § 21-2-419(c)(3).  Accordingly, absent the relief sought by this motion, the

registrars will likely finish their task of determining eligibility—and eligible voters

will likely be disenfranchised—before this case can be heard on the merits.

In order to determine exactly how many eligible voters are being

disenfranchised as a result of these issues, Common Cause seeks discovery

concerning the number of provisional ballots cast in this year's general election in

each county and, to the extent ascertainable, the reason why each such provisional

ballot was cast.  Common Cause further seeks discovery on any guidance provided

by the Secretary to county officials regarding, and all coding sheets or similar

documents used in connection with, reviewing provisional ballots or assessing the

eligibility of voters who voted by provisional ballots.  This information will greatly

facilitate a hearing on the permanent relief sought in this action.

## III.    ARGUMENT

Common Cause seeks a Temporary Restraining Order ("TRO")

pursuant to Fed. R. Civ. P. 65(b) to enjoin the county registrars from rejecting any

provisional ballot relating to the 2018 general election on the ground that the

voter's name is not found on the voter registration list, pending a decision on the

permanent relief sought in this case.

      To prevail on a motion for a TRO, a movant must establish:   (1) a

substantial likelihood of success on the merits; (2) that the movant will suffer

irreparable injury in the absence of the requested injunctive relief; (3) that the

threatened harm outweighs the harm that the nonmovant would suffer if the

injunctive relief is issued; and (4) that the injunctive relief would not be adverse to

the public interest.  *See Winter* v. *NRDC, Inc.*, 555 U.S. 7, 20 (2008) (setting out

the standard for a preliminary injunction); *Windsor* v. *United States*, No. 09-13998,

2010 WL 1999138, at *4 (11th Cir. May 10, 2010) (noting that the standard for a

temporary restraining order is identical to the standard for a preliminary

injunction).

      "The purpose of a preliminary injunction is to prevent irreparable

injury so as to preserve the court's ability to render a meaningful decision on the

merits." *United States* v. *Alabama*, 791 F.2d 1450, 1459 (11th Cir. 1986)

(affirming grant of a preliminary injunction).  Therefore, a "substantial likelihood

of success on the merits" requires a showing of only "*likely* or probable, rather than

*certain*, success." *Schiavo ex rel. Schindler* v. *Schiavo*, 403 F.3d 1223, 1232 (11th

Cir. 2005).  Moreover, when the balance of equities weighs heavily in favor of granting preliminary relief the movant need only show a "substantial case on the merits" in order to prevail.  *Garcia-Mir* v. *Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986) (quoting *Ruiz* v. *Estelle*, 650 F.2d 555, 565 (5th Cir. 1981) (per curiam)).

### A.   Common Cause Is Likely to Prevail on the Merits of Its Claims

Common Cause has asserted federal and state constitutional and statutory claims.  Although each is slightly different, at their core, these claims all come down to the question of whether the Defendant can impede an eligible voter's fundamental right to vote by failing to remedy—and indeed exacerbating—security vulnerabilities that make it likely that the State's voter registration system has been tampered with.  Plaintiff is likely to succeed on these claims, and establish that the Defendant's actions violate the U.S. and state constitutions, the federal Help America Vote Act, and Georgia state law.

Just by way of example, the Due Process Clause prohibits states from engaging in activities "that render the voting system 'fundamentally unfair.'"  *Ne. Ohio Coalition for Homeless* v. *Husted*, 696 F.3d 580, 597 (6th Cir. 2012) (quoting *League of Women Voters of Ohio* v. *Brunner*, 548 F.3d 463, 478 (6th Cir. 2008)). A voting system may be unfair, and federal court intervention appropriate, when "the fairness of the official terms and procedures under which the election was

conducted" is in question, *Griffin v. Burns*, 570 F.2d 1065, 1078 (1st Cir. 1978), or

when practices "significantly depart[] from previous state election practice." *Warf*

v. *Bd of Elections*, 619 F.3d 553, 559 (6th Cir. 2010) (citing *Roe* v. *Alabama*, 43

F.3d 574, 580–81 (11th Cir. 1995)).

Courts have likewise held that it is fundamentally unfair to

disenfranchise voters whose only error was relying on the actions and instructions

of state actors.  *See Ne. Ohio Coalition for the Homeless*, 696 F.3d at 597  (quoting

*League of Women Voters of Ohio*, 548 F.3d at 478) (finding that it was

"fundamentally unfair" to disenfranchise voters due to improper instructions by

poll-workers at no fault of the voters); *Hunter* v. *Hamilton Cty. Bd. of Elections*,

635 F.3d 219, 243 (6th Cir. 2011) (same).

Defendant's actions have significantly increased the likelihood that

eligible voters were unjustifiably disenfranchised through no fault of their own.

Defendant's knowing maintenance of an unsecure voter registration database and

his amplification of public attention to the security vulnerabilities inherent in the

database just prior to the election recklessly exposed voters to potential tampering

with their voter registration records.  Defendant's actions materially increased the

risk that otherwise eligible voters would be unlawfully removed from the State

voter registration or would have their official information altered in such a manner

that would force them to cast a provisional, rather than a regular, ballot.  The increased risk to voters coupled with the State's existing provisional ballot counting scheme, *see* Ga. Code §§ 21-2-418, -419, under which provisional ballots are not counted when the voter names do not appear on the rolls, risks denying the right of eligible Georgia citizens to vote in violation of the Fourteenth Amendment's Due Process Clause.

### B.   Plaintiff Will Suffer Irreparable Harm Absent Preliminary Injunctive Relief

"An injury is irreparable if it cannot be undone through monetary remedies." *Scott* v. *Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (internal quotation marks omitted).  Here, there would be no remedy—monetary or otherwise—that would cure the harm suffered by eligible voters if, upon being unable to vote through the regular election processes because their registrations were altered or removed as a result of Secretary Kemp's reckless maintenance of Georgia's voter registration database, registrars are unable to prove that the voters were properly registered, and their provisional ballots are presumed invalid and ultimately not counted.  That harm would be irreversible in the absence of the requested injunctive relief because Georgia law provides no opportunity for the re-adjudication of election results once they are certified.  *Martin* v. *Kemp*, No. 1:18-CV-4776-LMM, 2018 WL 5276242, at *2 (N.D. Ga. Oct. 24, 2018), *appeal filed*,

No. 18-14503 (11th Cir. Oct. 29, 2018); *see also Hoblock* v. *Albany Cty. Bd. of Elections*, 422 F.3d 77, 97 (2d Cir. 2005) (recognizing that certification of election results without counting certain absentee ballots would constitute irreparable harm).

The likelihood of irreparable harm is greater where, as here, the claims implicate voting, a "fundamental political right . . . [that is] preservative of all rights." *Yick Wo* v. *Hopkins*, 118 U.S. 356, 370 (1886). "It is simply not possible to pay someone for having been denied a right of this importance," and therefore, monetary remedies "would obviously be inadequate." *Dillard* v. *Crenshaw Cty.*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986). As one court in this Circuit put it, "[o]nce the election comes and goes, 'there can be no do-over and no redress.'" *Madera* v. *Detzner*, 325 F. Supp. 3d 1269, 1282 (N.D. Fla. 2018) (quoting *League of Women Voters of N.C.* v. *North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)).

Accordingly, courts routinely recognize that state actions that infringe upon the right to vote constitute irreparable injury for preliminary injunction purposes. *See, e.g.*, *Ga. State Conference of the NAACP* v. *Fayette Cty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1347–48 (N.D. Ga. 2015) (Batten, J.) (finding irreparable harm where plaintiffs would be forced to vote using an election system

14

that would dilute their votes); *Charles H. Wesley Educ. Found., Inc.* v. *Cox*, 324 F. Supp. 2d 1358, 1368 (N.D. Ga. 2004) (same where defendant refused to accept plaintiff's voter registration in her precinct of residence, preventing her from voting), *aff'd*, 408 F.3d 1349 (11th Cir. 2005); *Dillard* v. *City of Greensboro*, 870 F. Supp. 1031, 1035 (M.D. Ala. 1994) (denying stay pending appeal of an injunction, noting that in a constitutionally defective election, "monetary remedies would be inadequate compensation for the plaintiffs").

### C.   <u>The Balance of the Equities Weighs Heavily in Favor of Plaintiff</u>

The balance of equities tips heavily in Plaintiff's favor.  In the absence of the requested injunctive relief, the likely injury to the interests of Georgia's voters is significant and irreparable, as explained above.  As the Supreme Court has stated, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.  Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry* v. *Sanders*, 376 U.S. 1, 17 (1964).  To forestall this harm, Common Cause has already expended, and will continue to expend, considerable resources and volunteer-time it would otherwise devote to its other organizational activities.  *See* Compl. ¶ 5.

Although the requested injunctive relief may "require additional efforts" from Secretary Kemp at an administrative level, postponing the certification of the election results until the merits of Plaintiff's claims are addressed would not be "impossible or unduly burdensome." *See Fayette County*, 118 F. Supp. 3d at 1348.  Whatever costs, burdens, and inconveniences may fall on Secretary Kemp, such burdens "cannot begin to compare with the further subjection of [Georgia's voters'] to denial of their right, to full and equal political participation." *Crenshaw County*, 640 F. Supp. at 1363.[17]

### D.    The Requested Preliminary Injunctive Relief Would Be in the Public Interest

"[T]he protection of 'franchise-related rights is without question in the public interest.'" *Fayette County*, 118 F. Supp. 3d at 1349 (quoting *Cox*, 408 F.3d

---

[17] When confronted with balances of equities like this one, courts routinely grant preliminary injunctions.  *See, e.g.*, *Fayette County*, 118 F. Supp. 3d at 1350; *Crenshaw Cty.*, 640 F. Supp. at 1373; *Cox*, 324 F. Supp. 2d at 1369;  *see also United States* v. *Berks County*, 250 F. Supp. 2d 525, 541 (E.D. Pa. 2003) ("Although these reforms may result in some administrative expenses for Defendants, such expenses are likely to be minimal and are far outweighed by the fundamental right at issue."); *Johnson* v. *Halifax Cty.*, 594 F. Supp. 161, 171 (E.D.N.C. 1984) (granting preliminary injunction upon finding that administrative and financial burdens on defendant were not undue in light of the irreparable harm caused by unequal opportunity to participate in county election); *North Carolina State Conference of the NAACP v. N.C. State Bd. of Elections*, No. 1:16CV1274, 2016 WL 6581284, at *10 (M.D.N.C. Nov. 4, 2016) ("Any additional burden that may result from restoring voter registrations that were improperly canceled should fall on the State, not on the voter.").

at 1355).  Plaintiff's requested injunction would protect the franchise-related rights of eligible Georgia voters who cast provisional ballots following the unlawful removal or alteration of their voter registration records, facilitated by the Secretary's reckless actions.

Additionally, the requested injunctive relief would serve the public interest because it would bolster public confidence in the election process.  *See Casarez* v. *Val Verde County*, 957 F. Supp. 847, 865 (W.D. Tex. 1997) ("The public must have confidence that the election process is fair.  Those who have studied history and have observed the fragility of democratic institutions in our own time realize that one of our country's most precious possessions is the widespread acceptance of election results." (ellipses omitted)).

### E.   Common Cause's Request for Expedited Discovery Should Also Be Granted

In order to determine the full extent of the relief necessary, it is necessary to know how many people cast provisional ballots in Georgia in this election, per county, and to know the reason why each such provisional ballot was cast.  It is also necessary to know how provisional ballots are reviewed and how the eligibility of voters who voted by provisional ballots is determined.  This information is all in the possession of the Secretary, or of local election officials under the supervision of the Secretary in his capacity as the State's chief election

official.  This discovery should be provided on a rolling basis, but no later than

November 9, 2018, in order to provide the Court and the parties an opportunity to

brief what further relief would be appropriate.

## IV.    CONCLUSION

For the foregoing reasons, we respectfully request that Plaintiff's

Motion be granted.

This 7th day of November, 2018.

DLA PIPER LLP

By:    /s/ Christopher Campbell

Christopher G. Campbell
One Atlantic Center
1201 West Peachtree Street, Suite 2800
Atlanta, GA 30309-3450
(404) 736-7808
christopher.campbell@dlapiper.com


PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Robert A. Atkins
    (*pro hac vice* application pending)
    NY Bar No. 2210771
Farrah R. Berse
    (*pro hac vice* application pending)
    NY Bar No. 4129706
Makiko Hiromi
    (*pro hac vice* application pending)
    NY Bar No. 5376165
William E. Freeland
    (*pro hac vice* application pending)

18

NY Bar No. 5450648
Melina M. Meneguin Layerenza
(*pro hac vice* application pending)
NY Bar No. 5559240
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
ratkins@paulweiss.com
fberse@paulweiss.com
mhiromi@paulweiss.com
wfreeland@paulweiss.com
mmeneguin@paulweiss.com


BRENNAN CENTER FOR JUSTICE AT NEW YORK
UNIVERSITY SCHOOL OF LAW
Myrna Pérez
(*pro hac vice* application pending)
NY Bar No. 4874095
Lawrence D. Norden
(*pro hac vice* application pending)
NY Bar No. 2881464
Wendy R. Weiser
(*pro hac vice* application pending)
NY Bar No. 2919595
Maximillian Feldman
(*pro hac vice* application pending)
NY Bar No. 5237276
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310
perezm@brennan.law.nyu.edu
nordenl@brennan.law.nyu.edu
weiserw@brennan.law.nyu.edu
feldmanm@brennan.law.nyu.edu


*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLAINCE

I hereby certify that the foregoing PLAINTIFF'S MEMORANDUM OF

LAW IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING

ORDER AND EXPEDITED DISCOVERY was prepared double-spaced in 14-

point Times New Roman pursuant to Local Rule 5.1(C), and is in compliance with

the 25 page length limitation set forth in Local Rule 7.1(D).


*/s/ Christopher Campbell*
Christopher G. Campbell
DLA Piper LLP