IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

COMMON CAUSE GEORGIA, AS AN ORGANIZATION,

PLAINTIFF,

vs.

BRIAN KEMP, IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE OF GEORGIA,

DEFENDANT.

DOCKET NUMBER 1:18-CV-5102-AT

**TRANSCRIPT OF HEARING ON MOTION FOR TEMPORARY RESTRAINING ORDER**

**PROCEEDINGS**

**BEFORE THE HONORABLE AMY TOTENBERG**

**UNITED STATES DISTRICT JUDGE**

**NOVEMBER 8, 2018**

**2:15 P.M.**

***MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED TRANSCRIPT PRODUCED BY:***

***OFFICIAL COURT REPORTER:*** ***SHANNON R. WELCH, RMR, CRR***
***2394 UNITED STATES COURTHOUSE***
***75 TED TURNER DRIVE, SOUTHWEST***
***ATLANTA, GEORGIA 30303***
***(404) 215-1383***

**A P P E A R A N C E S O F C O U N S E L**

**FOR THE PLAINTIFF:**

MYRNA PEREZ
BRENNAN CENTER FOR JUSTICE
NEW YORK UNIVERSITY SCHOOL OF LAW

FARRAH R. BERSE
PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP

JODY RHODES
DLA PIPER, LLP

**FOR THE DEFENDANT:**

JOSH BELINFANTE
KIMBERLY K. ANDERSON
RYAN TEAGUE
ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD LLP

BRYAN P. TYSON
STRICKLAND BROCKINGTON LEWIS, LLP

**I N D E X T O P R O C E E D I N G S**

| | PAGE |
|---|---|
| SUBSTANTIVE ARGUMENT by Ms. Perez | 7 |
| **WITNESS** | **PAGE** |
| CHRIS HARVEY | |
| Direct Examination by Mr. Tyson | 32 |
| Cross-Examination by Ms. Perez | 52 |
| Redirect Examination by Mr. Tyson | 65 |
| Redirect Examination (Further) by Mr. Tyson | 70 |
| Recross-Examination by Ms. Berse | 71 |
| SANFORD MERRITT BEAVER | |
| Direct Examination by Mr. Tyson | 73 |
| Cross-Examination by Ms. Berse | 79 |
| Redirect Examination by Mr. Tyson | 83 |
| Redirect Examination (Further) by Mr. Tyson | 86 |

* * *

| | |
|---|---|
| CLOSING ARGUMENT | |
| by Mr. Belinfante | 92 |
| by Mr. Tyson | 106 |
| by Ms. Perez | 109 |
| CERTIFICATE | 124 |

**P R O C E E D I N G S**

**(Atlanta, Fulton County, Georgia; November 8, 2018.)**

THE COURT: Good afternoon. Please have a seat.

Good afternoon, Counsel. We are here on Common Cause Georgia as the plaintiff vs. Brian Kemp, defendant, Case Number 18-CV-5102.

Counsel, would you introduce yourself.

MS. RHODES: Thank you, Your Honor. My name is Jody Rhodes with DLA Piper. I filed a late notice of appearance just before the hearing began. I am here for DLA Piper as my colleague, Chris Campbell, was out of state when the hearing was set. I appreciate you allowing me to make my appearance.

THE COURT: Thank you.

MS. RHODES: Will you allow me to introduce my colleagues?

THE COURT: Yes.

MS. RHODES: I have Farrah Berse with me today from Paul Weiss. I also have Ms. Myrna Perez from the Brennan Center for Justice.

THE COURT: I'm sorry. Would each of you stand up when you are introduced. Thank you.

MS. BERSE: Good afternoon, Your Honor. Farrah Berse from Paul, Weiss, Rifkind, Wharton & Garrison.

THE COURT: All right. Thank you.

MS. PEREZ: And Myrna Perez from the Brennan Center

for Justice at NYU School of Law.

THE COURT: All right.

MS. RHODES: Your Honor, we have filed pro hac applications for Ms. Perez and Ms. Berse. They are pending. We would respectfully request if the Court would so allow that they allow -- that you allow them to proceed to make the substantive arguments today.

THE COURT: Yes. That is permitted.

MS. RHODES: Thank you.

MR. BELINFANTE: Good afternoon, Judge. I'm Josh Belinfante from the Robbins Firm here on behalf of any-minute-now Secretary Crittenden. Secretary Kemp has resigned effective noon today.

I am joined by Bryan Tyson and also by Ryan Germany with the Secretary's office. We have Ryan Teague and Kimberly Anderson from our office, the Robbins Firm, as well.

We are prepared, Your Honor, after substantive argument presumably at that point to put on substantive evidence for the Court in response to both your order and in response to some of the issues.

THE COURT: Thank you. Would you mind telling me again and give us the spelling of the officer in the Secretary of State's office who has assumed the functions of Mr. Kemp.

MR. BELINFANTE: It is Secretary Crittenden, C-R-I-T-T-E-N-D-O-N {sic}. I believe that is correct, but we

will -- I believe it is correct. It is correct.

THE COURT: Because I had understood that Mr. Kemp's resignation was effective at midnight or something. So I wasn't quite prepared for the name.

All right. Thank you.

MR. BELINFANTE: Thank you, Judge.

THE COURT: All right. Thank you. And I gather now the defendants have received all of the affidavits filed; is that right?

MR. BELINFANTE: Yes, Your Honor.

THE COURT: Very good.

MR. BELINFANTE: And, Your Honor, I should say for the record we have filed a brief that contains some declarations as well. They were being filed as we were on the way here. They may have them or should have them electronically.

Two of the declarants are here and will be providing testimony consistent with their affidavits.

THE COURT: All right. I don't think I have read it yet or have seen it yet.

So do you happen to have a copy or not?

MR. BELINFANTE: We don't because there were changes being made literally as we were on our way here.

THE COURT: Is it appearing up on the docket right now?

LAW CLERK COLE: It is now.

THE COURT: If we could just maybe make -- have you received it?

MS. BERSE: We have not, Your Honor.

THE COURT: So let's be sure that we have a copy for -- two copies for plaintiff's counsel at least and a copy for me and also for Ms. Cole.

Is there any reason we need to stop and read this before we begin?

MR. BELINFANTE: No, Your Honor. It is argument that will be made orally today.

THE COURT: All right. Very good. Thank you.

All right. Who is going to be presenting argument or be lead counsel?

MS. PEREZ: Certainly. May I approach?

THE COURT: Yes, Ms. Perez.

SUBSTANTIVE ARGUMENT

MS. PEREZ: Good afternoon. I am Myrna Perez from the Brennan Center. And as mentioned, I'm joined by my colleague, Farrah Berse, from Paul Weiss. We will have other counsel come join us. They are busy trying to make copies. Our client, Sara Henderson from Georgia Common Cause, is also in the room, Your Honor.

I first want to start off by saying thank you so much for hearing us so quickly. We understand there is quite a lot

going on and a lot of things are in a lot of flux. But what we are here to ask you today, Your Honor, especially given your order of this morning that they present information that is relevant, is for very, very limited relief precluding the defendants from effectively mooting out our case before we are able to provide the evidence that we need to be able to argue it.

We are specifically asking for a very, very narrow order preventing the final rejection of provisional ballots for the narrow class of persons who had registration problems until we can all feel a little bit more confident that there was not widespread manipulation of the voter registration database.

I want to be crystal clear about this. We are not asking for a halting of the processing of provisional ballots. We are not precluding defendants from accepting provisional ballots. And we are not precluding defendants from rejecting provisional ballots for other reasons, like they didn't submit the appropriate ID.

We respectfully submit that this is a modest and necessary relief that is appropriate, and the Court would be on solid grounds ordering it. I know I don't need to belabor the standard for a TRO. So if the Court permits me to, I will move on.

THE COURT: It is fine. You may proceed.

MS. PEREZ: So with respect to the first prong, the

substantial likelihood of success on the merits, one of the --

THE COURT: Before you go on, I just want to understand what you're looking for as a remedy because that is -- that was one of my sources of confusion.

MS. PEREZ: Yes, ma'am.

THE COURT: I read the complaint, and I see one -- one proposed remedy, and I'm hearing something different.

MS. PEREZ: Yes, ma'am. Yes, ma'am. So the two peaceably coexist.

We believe that if we go and have a merits hearing we will unfortunately be in a position of showing that there was too great of a likelihood of manipulation of the voter registration database to proceed with the status quo in terms of counting provisional ballots.

And as such, we proposed a method -- and we're open to other methods. Certainly we would be happy to work with defendants or the Court in fashioning something else. But we proposed a method that was very similar to what we used in the State of Colorado when something similar happened, just merely setting rules and review for provisional ballots.

Because we do not have the evidence yet to know whether that manipulation has been widespread, we want narrow relief just to prevent people from being rejected in the interim while we figure it out. So right now --

THE COURT: So what is the time frame you are

conceiving of? Because as you have pointed out, that typically -- that under law it normally is three days and Friday is --

MS. PEREZ: Part of that will depend upon the kind of information that we're able to get today from the defendants in terms of the numbers that they have, what we know statistically from examining them, and any other discovery that we may do.

But we are -- we at this point in time are not anticipating -- and I will represent to you as an officer of the court we're going to do everything we can to avoid that certification date that is coming up in two weeks. There is two different periods. There is a part where the county has to certify, and there is the part where the Secretary has to certify. And we believe we would need the entirety of that period.

THE COURT: What is the time -- what are the time frames that you believe apply here?

MS. PEREZ: I believe that we need a day or two after we get information.

THE COURT: First of all, what are the time frames that you think the certification is to occur here --

MS. PEREZ: My understanding -- and the defendants are likely to correct me if I'm mistaken, and we can work with them -- is that the counties have until Tuesday and the Secretary has until the following Tuesday. So it is a two-week

period.

Is that correct?

MR. TYSON: Your Honor, as for Secretary Kemp -- or Secretary Crittenden -- I'm sorry -- as a matter of law, that is correct that that's the maximum time periods allowed. When we have runoff elections in Georgia, as a practical matter, the Secretary of State's office normally certifies the day after the county certifies to enable a quick processing of absentee ballots for people who have already applied for those and for overseas voters to allow that election to happen as quickly as possible. Given the runoff on December 4th, the timelines are very tight for a state runoff.

MS. PEREZ: We understand, Your Honor. But there is a lawful period. The two-week certification generally exists to be able to handle things like this that can't be decided next day. And, again, we believe that if we are able to get some data pretty soon and we're able to work collaboratively -- and I have no reason to believe that we couldn't -- we are in no danger of missing that deadline. And that is certainly not what we want to do.

THE COURT: Right.

MS. PEREZ: So is that clear?

THE COURT: So you are saying Tuesday for the counties to submit their certification. And I know that the State's preference normally is to do the next day under these

sorts of circumstances.

But the State agrees that you have another week after the Tuesday; is that right?

MR. TYSON: Yes, Your Honor. That is correct.

THE COURT: All right. Technically.

MS. PEREZ: There would be no requirement for this Court to extend deadlines. We could work within that two-week period.

So what we would submit, Your Honor, is until -- until we -- for the time being, we are seeking emergency relief to make sure that in those three days that counties like to certify that counties are counting provisional ballots that they are not rejecting the very voters that we think are at risk of manipulation, until we are able to have some confidence that we can proceed as usual. So that is the difference between the relief we have sought on the merits and what the relief we're asking for today is.

So I don't -- I'm going to just jump in. I think that we would have a likelihood of success on the merits if we made it that far. And that is because we have amply proven that Georgia's registration list is highly vulnerable to manipulation. We would at a merits hearing be able to produce information from numerous computer scientists, technologists, and cyberterrorists -- cyberterrorist experts who would testify that not only has the voter registration system had gaping

holes that have been indeed accessed but that it can continue to be breached.

As two exemplars of this, we submitted a declaration from Josh Geltzer, who is a cyberterrorist expert, and from Dan Wallach, who is a computer scientist. And both of them had said under penalty of perjury that there is a credible risk of manipulation and that this Court and the Secretary of State needs to take extra measures to ensure that voters are not going to be wrongly impacted by this.

They also both testified that the recent publicity in the last -- over the weekend, which was what spurred our concern, was effectively an open invitation to exploitation from miscreants.

I would also note that this Court can obviously take judicial notice of the evidence introduced in the *Curling* case of the vulnerabilities. I have no doubt that the defendant's counsel is going to explain that this hole has been patched.

I would say two things in response. One, we don't know that. That needs to get assessed and examined by computer scientists and the like, and we have not had the opportunity to do that. But even if it is true, that does not address prior breaches and prior manipulations.

THE COURT: Let me stop you for a second. In looking at the affidavits I have in front of me right now, I don't think I have Mr. Wallach's or Dr. Wallach's.

MS. BERSE: Your Honor, my understanding is that Mr. Wallach's was the last of the set to be filed. If it -- it may not have appeared on the docket yet. It is certainly in the works.

THE COURT: That is fine. I just --

MS. PEREZ: It has been signed. It has been executed.

So right now we are in a position to come in in good faith with this concern. The available information that we have is that there has been an unusual amount of increase in provisional ballots. In a hearing, we would explain that provisional ballots, especially in the circumstances that we are in, are a decent proxy for manipulation.

We did not come in asking for an autopsy of the files. We understand that a lot of things have to happen. And to do a one-by-one assessment would be impractical. But academics, researchers, election officials use provisional ballots as an indicia of the fact that something was going wrong or different with the registration system because people showed up at the polls expecting to be able to vote and they didn't.

We are concerned that the database has been manipulated such that people who should have been registered or believe that they were registered showed up and found something wrong with their records requiring them to be cast by a

provisional ballot.

The evidence that the Secretary issued -- and you have a declaration from my colleague, Mr. Morris, who is a Ph.D. student. He has already got a master's associate. Really good with statistics -- in which he examined the information that was provided. And according to what Georgia is providing online, there has been about 22,000 outstanding provisional ballots. And in prior years, the numbers were like 7600, 6900, 9300.

And I would say that even with the substantial variation among those three years you can be about 99 percent confident at a -- from a statistical method that that kind of variation is not attributable to random or natural fluctuations.

And part of the thing that I think especially warrants care is that there seems to be some discrepancy as to the number of provisional ballots. When we were originally assessing this case, we were looking at data that had been provided by Georgia to the Election Assistance Commission. And as the declaration of Mr. Morris' notes, there is wide variation. So we don't even actually know the numbers that we're talking about.

We are hoping that we will get limited discovery that will shed some light on it, but we're going to need to examine that and be able to reconcile some things that don't make sense

to us. So I do think given those -- those -- that body of evidence, we would likely succeed on the merits.

And I would like to move on to the fact that my client and the voters of Georgia will suffer irreparable injury. Again, we're only seeking something very limited, which is that they cannot finally reject a very narrow class of voters whose registration eligibility has been questioned in part because of the database that we believe may have been manipulated.

If the database has been manipulated and if they continue to rely on the information in that database as a determination of whether or not someone was properly registered or not, then you will have voters receive a denial of their fundamental right to vote.

I would like to note that my client, Common Cause, has already been injured by this. Ms. Henderson and Ms. Flanagan have submitted affidavits indicating the work they have had to do up until this point already because of the vulnerability and because of the fears of addressing voters' concerns as to the vulnerability. And they both indicated under oath that they are going to have to do more work should these vulnerabilities arise.

And that kind of injury means that they are not able to do the other work that they do, getting voters' information, getting voters engaged. It also frustrates their mission

because they are in the business of getting people participating. And if the people that they are trying to get participating are either deterred because they are worried about manipulation or if they simply got on the rolls but then they were manipulated off then that is resources and waste of time that causes injury to them.

I would note that I believe that the harm outweighs to the harm of the defendants because we are not asking them to do anything except for wait on a decision that they have a full two weeks to make. We are asking them to give us the opportunity to do our due diligence, give us the opportunity to examine the scope of the problem. And if it turns out that there is not evidence of an indication, they can reject those provisional ballots later. This is not --

THE COURT: So are you asking the State to in turn direct the county registrars not to -- not to count at this point and to wait -- to defer acting on the review of the provisional ballots?

MS. PEREZ: Well, Your Honor, I can imagine multiple ways that would be sensible and very comfortable working with defendant's counsel to try and find the one that is most workable. But at this point in time, we're only asking this Court to prevent the final rejection of a very narrow class of people who got provisional ballots. And that is the class of people who had to cast a provisional ballot because there was

something wrong with their registration.

It is our worry that Putin or some other criminal was messing with the voter registration database and messing up their registration so that it wrongfully and improperly indicated that they were not eligible to vote. And we need the opportunity to be able to explore that so they can continue accepting anybody that they think they have evidence to accept. They can continue to reject all of the ballots for other reasons, someone didn't have an ID, someone is casting out of precinct, all of those other things. It is the very narrow class of people that got ballots because of a registration -- provisional ballots because of a registration issue.

THE COURT: I don't know that it is such an easily segregatable question as you posed at least. I mean, this came to me as a related case. And I was looking -- and related to the *Curling* case, which is Case 17-CV-2989.

I mean, the registration issues that were presented, for instance, by -- I'm not clear whether you are excluding or you are including something like this, like the declaration of Ms. Aderholt Mitchell who appears at Document 258-1 in that case. And in her case, her husband was sent to one precinct. She was to another precinct. I don't know whether somebody ultimately was harmed with Ms. Mitchell. There were then letters from other people also indicating other sorts of issues.

MS. PEREZ: So the question --

THE COURT: So I'm just trying to figure -- and then there were also issues that were brought to the attention of the Court in Document 258-1 in some of the attachments about differences in the number of -- that were unreconcilable between the electronic polling where they basically indicate the number of people who were supposed to have appeared and been identified as voters versus the number of people actually who cast votes.

MS. PEREZ: Okay. So what I would say, Your Honor, is that I think the evidence is pretty good that there was a lot of things that went wrong in the election, that there were a lot of problems with the voter registration database that was subject to manipulation, including people given the wrong information.

We are not at this time seeking relief for all of it. What we are seeking relief for are those groups of people that had to mark on their provisional ballot that they are getting a provisional ballot because there was a registration problem because they --

THE COURT: Well, I'm saying: The registration problem, does that include somebody who is being told you are at the wrong precinct or we don't know where you are, you are not appearing on our precinct list? It is just our precinct -- you're not on our precinct list, so you are going to have to

fill out a provisional ballot if you want to vote.

Is that what it is intended to capture?

MS. PEREZ: If the database suggested that a person's address was different than what it was supposed to be, then we would capture it. If the database merely had a bad programming so it was spitting out the wrong polling locations, then it would not.

THE COURT: Why do you think that it is you're going to know that? I'm just trying to poke at the pragmaticalities -- after I sat through one case and looking at that data and being too old and having voted too many times probably, I'm just trying to -- I'm not sure that all of that is differentiated. Certainly I don't know why you think that we're going to know what is Putin versus ineptitude.

MS. PEREZ: I would say two things. At worst, we're underinclusive in the situation that you're doing, which would be problematic but still more than what the status quo would allow. Part of that underinclusivity was attempting to try and find something that was workable given the time frame.

THE COURT: And I appreciate that. I'm just trying to figure out is it workable. That is all.

MS. PEREZ: Right. And so the concern that you are raising that there was a manipulation such that people's addresses were incorrect and it may not be reflected in the right way on the reason why they got a provisional ballot, we

might miss those and that would be a shame.

But right now the status quo would have people relying on that very database to be able to indicate whether or not someone was registered. If they are going to --

THE COURT: I don't understand what you -- what group of people you think this is going to capture. I mean --

**(Unintelligible cross-talk.)**

MS. PEREZ: If I went and showed up at the polls and I know that I registered and I have been voting there forever and I was told by the poll worker I wasn't on or I was told that I was dead, something that indicates manipulation -- we actually have a number of affidavits of persons who are either people who are affected in that way or encountered people.

There was a very material number of people who cast provisional ballots, and it was understood by them and the poll worker to be a problem with their registration. It either didn't take, it didn't get updated, it didn't get processed, it got deleted. And we won't actually know that, which is why we want a -- which is why ultimately, not today -- which is why ultimately we're asking for a process that requires the State to have evidence that is not based on evidence in the database alone for determining someone is ineligible.

For this particular moment, we're asking for something narrower and just those folks don't get rejected in a final way. And I do hear your concern that this problem is

widespread and may manifest itself in different ways. And voters and poll workers may experience it in a different way. So we may not capture everybody. But we needed to make a call that we could fairly represent to you and to the other side about how this would be limited and what we might be able to find areas of agreement on.

I didn't want us to be tangled up in every potential thing. I mean, someone could have gotten rejected because they didn't have a photo ID and someone marked the wrong ballot, like marked the wrong clock. The permutations are inevitable.

But I feel like we will do our job and do our due diligence of protecting as many voters as we reasonably can given the time frame with the relief that we have proposed. And certainly if Your Honor wanted to expand that relief, we believe --

THE COURT: I'm not trying to expand it. I'm just trying to figure out what the marker is for what --

MS. PEREZ: The marker --

**(Unintelligible cross-talk.)**

THE COURT: I mean, I just am trying to figure out what --

MS. PEREZ: The marker would be did that -- on the codes -- and we requested those codes. We haven't seen them yet -- there will be something that will be like registration problem or not registered. There will be some sort of code.

 And we did request -- that was something we requested in terms of discovery.

I know from other states there will be like six reasons, and it will say -- one of them will say voter not registered.

THE COURT: All right. So I'm not having just an abstract conversation that is of no value to me at least, maybe someone from the State could tell me are there such codes and what are the codes.

MR. TYSON: Your Honor, we are getting the codes right now. There are codes that are entered into the eNet database, which is the ultimate voter registration database. We're checking now. Mr. Harvey is here, the Director of Elections. He can testify about that process and how it works.

THE COURT: But there are codes?

MR. TYSON: There are codings, but I'm not sure if those will take place after the Elections Boards have made decisions or before.

THE COURT: All right. Well, I'll hear from Mr. Harvey.

MS. PEREZ: Well, like in other states, the code is on the provisional ballot itself for the poll worker to check the reason.

THE COURT: All right. Let me -- hold off on this conversation because it all may be -- it might just not be the

way it is done in Georgia for all I know. So then we have a whole other situation to be addressing.

MS. PEREZ: Right. So --

THE COURT: I would -- I guess the thing -- I am concerned that -- and it may be there is a different code, there is something else. But I am concerned about obviously people -- it looks like you're just looking for somebody who is not on the registration -- who is not registered at all versus people who are just sent away because that precinct doesn't have them on the list, which may be all that that precinct has. And I'm not sure that it is a difference.

MS. PEREZ: I fully agree that there are almost for certain people that are in that circumstance that I would like to cover. I just don't know how workable that is, and we were trying to come up with something reasonable.

THE COURT: All right. Well, I just don't know because I don't know enough --

MS. PEREZ: Well --

THE COURT: -- about it to be able to say. But I will just -- I'm going to put a pin in it. We don't need to talk about it any longer. We'll return to it. But that is the most frequent thing that we have heard to date was just being -- the precinct has the list of its voters. It is not going to look for where you might be someplace else.

MS. PEREZ: Your Honor, that is important. And I

think that also speaks to the scope of the problem. Like by us looking at provisional ballots, it is actually going to be an underrepresentation of the problem because people are being turned away.

THE COURT: I got that. I got that from what you were saying, that it would be an underrepresentation.

You have got one of your colleagues standing up behind you, which you can't see.

MS. BERSE: Your Honor, if I may just for one moment just add something that may when we get back to this help you to put an exact pin in it. It is our understanding that in Georgia when someone votes by provisional ballot that the polling officer has to check off the reason on the envelope. And I just want to, you know, make sure when we're talking about coding and then, you know, the defendants are going to put up some evidence, those are the reasons -- that is the information we would be looking for.

MS. PEREZ: It is a segregatable and identifiable category for at least that one. That may be underinclusive, but it is identifiable.

And then, Your Honor, I would note that an injunctive relief would not be adverse to the public interest. Obviously I don't need to tell this Court that courts have repeatedly held that protecting the fundamental right to vote is in the public interest. I would explain that eligible voters are at

real risk in this instance through no fault of their own. We're worried about voters that did everything right and were subject to manipulation.

It would also bolster confidence in the system by knowing that these provisional ballots were not effectively empty placebos but were actually going to go through a process where they got reasonable review.

Given the amount of widespread media reporting about the security issue in the registration database, I think this is a good time for the defendants to be able to make a strong statement that they are using provisional ballots as the method by which Congress intended it to, which was a fail-safe.

And I think halting the provisional balloting process via an injunction for a very short period of time for a very narrow class of groups cannot be -- it can be undone. Right. They can proceed, and we can still make it within the two-week window.

THE COURT: All right. Thank you very much.

MS. PEREZ: Thank you.

THE COURT: And are there any -- are you anticipating filing other affidavits, as well, or what I have is -- other than the one that has not been filed yet as far as I know?

MS. PEREZ: Ma'am, we are getting voter affidavits rolling in. We asked for folks with stories. We asked for poll observers in response to your order. We would in a merit

hearing be able to bring a bigger claim in terms of the risk and the security. But right now we think you have enough to understand --

THE COURT: So in your envisioning of things, I would have a merits hearing when in this process?

MS. PEREZ: In like three days, four days. I mean, part of it depends upon when we get the data from -- and what it tells us.

MS. BERSE: Your Honor, if I may just add one thing, we do have two other declarants who told me on the phone that they have signed the declarations. There has been some issues with them finding fax machines to get it to us on time. We are happy to submit those as soon as we do get them.

And if it is helpful for the Court in terms of the timeline of Your Honor's consideration, I would be happy to summarize what I understand is in them having seen the versions that they were executing.

THE COURT: Why don't you summarize them and tell me who they are.

MS. BERSE: Sure. Your Honor, so we intend to file a declaration from Dr. Suzanne Barrett. That is B-, as in boy, -A-R-R-E-T-T. She is a retired psychologist who has lived in Georgia since 1972. She currently lives in Decatur. She was a poll monitor at the Stone Mountain polling place in Dekalb County and was there --

THE COURT: Dekalb.

MS. BERSE: -- all day on Election Day, in which she -- what I understand will be in her declaration is that she spoke with two individuals who received -- were told to vote by provisional ballot. One of those individuals told her that the reason they were given a provisional ballot was because they showed up and they were not -- they were told they were not on the rolls.

She also saw a number of other people vote provisional ballot but did not have an opportunity to speak with them so doesn't know the reasons.

The other declarant is a woman, Ms. Jordan Barry, B-, as in boy, -A-R-R-Y. Ms. Barry is an intern at the Joseph & Evelyn Lowery Institute where she focuses on civil engagement. As part of that work, she really focuses on encouraging millennials to engage in the political process and to get out and vote.

And what Ms. Barry's declaration will state is it will explain, first, her own efforts to locate her information on the My Voter Page in the Georgia voter registration database. She was frequently accessing it in the weeks leading up to the election in order to become more familiar with the database so she could help the millennials who she was encouraging to vote.

Most of the times when she checked, her information

was there and she was listed as an active voter. But she will testify that at one point she checked again and her name was no longer there. She spoke with local election officials and was told that they were able to find her by looking her up by her address and did not have an explanation why she could not find herself on the database by looking up her name.

She was able to ultimately vote. She will also talk about the time that she spent two days during early voting and then one day on Election Day at two different polling places. In total, she spoke with a couple dozen voters who showed up and were told they had to vote provisional ballots. And the reasons that they were telling her that they were given had to do with either not being found on the rolls or their gender was listed differently from in the rolls as to what they presented.

So, Your Honor, we will continue to work with Dr. Barrett and Ms. Barry to get those declarations. They did tell me they have executed them, and we'll file them as soon as we are able to get them.

THE COURT: All right. Thank you.

MS. PEREZ: And then if I may, Your Honor, this -- we haven't seen the brief of the defendant. But having been in this line of work for a long time, I am expecting the Secretary to maintain that they had no authority or control over what the counties do with respect to provisional balloting.

I would respectfully submit that we are happy to

brief this at length. But that is on its face wrong. Provisional balloting is a creature of federal law. It was created by federal law. It was an amendment to the other federal law that said that election -- the Secretaries of State or each state needs to designate a chief election officer. And Georgia's chief election officer is the Secretary of State.

They do have the authority in the area of provisional balloting to be able to tell the counties these are the rules by which you need to use, provided that they are not contrary to state law. And they aren't in this instance. It is a measure that neatly overlays to this.

It would not be practical to be able to ever come into court and argue for a statewide resolution if every 169 counties needed to get involved in this. And the fact that we do have election contests and the fact that the Secretary of State is a defendant I think is proof enough that he has the authority to do this. And, again, we're very, very happy to brief this if this is something that is concerning the Court.

THE COURT: Thank you.

MS. PEREZ: Thank you.

MR. BELINFANTE: Mr. Tyson will be calling the witnesses and putting on the evidence. Then we'll have argument after that.

THE COURT: All right. Thank you very much.

MR. TYSON: Thank you, Your Honor. Bryan Tyson on

behalf of Secretary Crittenden. I would like to call Mr. Harvey -- he is the Director of Elections for the Secretary of State's office -- to the stand.

MS. BERSE: Your Honor, would it be possible for us to take maybe just a two-minute recess for us to read the witness' affidavit before he testifies?

THE COURT: Sure. Mr. Harvey, why don't we get you to sit down so you are not stranded here for a minute, and we'll take the break for that purpose, or you can sit here and just twiddle your thumbs, too. That is fine.

MR. TYSON: Thank you very much, Your Honor.

THE COURT: Who is going to be your other witness?

MR. TYSON: I'm sorry, Your Honor?

THE COURT: Who is going to be your other witness so somebody -- at least they can read that one as well.

MR. TYSON: Yes, Your Honor. The other witness will be Merritt Beaver. Mr. Beaver is the Chief Information Officer for the Secretary of State's office.

Then we also have an additional affidavit for our cybersecurity expert we would like to file under seal. It discusses the security measures related to the voter registration database. That is an out-of-town contractor, so she is not able to be here. But we have a declaration from her as well.

THE COURT: All right. I see that Mr. Harvey's is

roughly 14 pages. Do you know -- how long is the other one?

MR. TYSON: The other one is just maybe five or six pages. It is relatively short. I think the bulk of Mr. Harvey's is going to be reporting on the absentee ballots by county that you had requested.

THE COURT: Why don't we all just take a look for a minute then.

MR. TYSON: Certainly, Your Honor.

**(There was a brief pause in the proceedings.)**

MS. BERSE: Thank you, Your Honor. We are ready whenever the Court is.

COURTROOM DEPUTY CLERK: Please stand and raise your right hand.

**(Witness sworn)**

COURTROOM DEPUTY CLERK: Please have a seat. Loudly and clearly state your name and spell your name for the record.

THE WITNESS: My name is Chris Harvey, C-H-R-I-S H-A-R-V-E-Y.

Whereupon,

CHRIS HARVEY,

after having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. TYSON:

**Q.** Thank you, Mr. Harvey. Can you also give your title for the record?

**A.**    Yes.  I'm the Elections Director for the Georgia Secretary of State's office.

**Q.**    Were you able to get much sleep this week?

**A.**    Not much.

**Q.**    Can you explain for the Judge your role as the Director of Elections for the Secretary of State's office?

**A.**    As the Director of Elections, I coordinate -- I work with the counties to make sure that elections occur legally, voter registration is done legally, the voter registration database is maintained, and basically all things to do with elections and voter registration.

**Q.**    To begin, let's begin with provisional ballots as has been a point of discussion already.  Can you explain to the Court what the process is for provisional ballots in Georgia?

**A.**    Yes.  In Georgia if you show up to vote and have some type of impediment that would keep you from voting, rather than turn the voter away, the voter can be offered a provisional ballot. There are several reasons why somebody might be offered a provisional ballot, including not having proper photo ID, having questions about citizenship, not being listed as a registered voter, being out of precinct, having a judge order extended hours for a polling place.  I believe those are the reasons that would trigger a provisional ballot.

**Q.**    And so one of those reasons you gave was when polls are held open late.  Can you explain what happens with that process

for voting after 7:00?

**A.** Yes, sir. In Georgia, the polls are open from 7:00 A.M. to 7:00 P.M. If an event happens that delays voting at some point, whether it is a poll opening late due to somebody not getting there with a key or if it has to be evacuated for a fire alarm or there is some type of error with equipment, some kind of problem, then anybody can go to a superior court judge and petition for the hours to be extended. It happened several times on Tuesday.

**Q.** So it happened several times in this election in 2018?

**A.** Yes, sir.

**Q.** So any voters who voted after 7:00, how do they then vote once the court extends the time?

**A.** Any voter who voted after the -- during the extended hours had to vote by provisional ballot.

**Q.** So if voting hours were extended across -- in a number of places across the state, would you expect to see an increase in the number of provisional ballots that year?

**A.** Yes, I would.

**Q.** After a voter votes a provisional ballot, what is the process that the local elections board goes through to handle and process that provisional ballot?

**A.** Once a voter votes a provisional ballot, the ballot outer envelope is marked with a code that indicates why the voter is voting it, the circumstances I mentioned before. Then the

election superintendent maintains custody of the provisional ballots. It is up to the county registrar to determine whether or not the voter should have that ballot counted.

If it is an issue with somebody not being on the voter registration list, the first thing the county would generally do would be to check the voter registration database to see if the person is registered. If they find out that the person is registered for whatever reason, they would instruct the election superintendent to count the ballot.

They may find that the voter is registered in a different county. Perhaps they lived in a neighboring county and had never transferred their voter registration. If somebody is voting out of precinct, they would look up and find out where they are actually registered to vote and make sure that their ballot got duplicated and the votes for which they were eligible got counted.

If it was an ID issue, they would have until the close of business on Friday after the election to come down and produce -- either come down or send in photo ID to validate their ballot.

THE COURT: Where would they send it in?

THE WITNESS: The county registrar's office.

**Q. (BY MR. TYSON)** And so after the county board of -- county registrar goes through that process, when is the -- what is the determination period for when provisional ballots have to be

counted?

**A.** By Friday. By Friday after the election is the deadline to determine the validity of provisional ballots.

THE COURT: Is that by 5:00 P.M., or is there a time for that?

THE WITNESS: It just says Friday. It doesn't give a specific time. Generally offices would stay open as late as they needed to to make sure they handled all provisional ballots.

**Q.** **(BY MR. TYSON)** Mr. Harvey, in preparation for this hearing, did you and your office prepare a report on the number of provisional ballots --

**A.** Yes.

**Q.** -- that are outstanding?

MR. TYSON: If I may approach, Your Honor?

THE COURT: Yes.

**Q.** **(BY MR. TYSON)** I'm going to hand you what we have marked as Defendant's Exhibit 1. I'll ask you if you can identify that document for the Court.

**A.** This is a list of provisional ballots by county. We have got three dates issued for 2018, 2016, and the 2014 general elections listed by county. We also have at the end active registered voters, turnout, ballots cast, and some additional information.

**Q.** Mr. Harvey, what did your office have to go through to

assemble this document?

**A.** For this document for the 2018 election, we had to poll each county. We had to ask each county to provide us their number of provisional ballots, which is what we did in the previous years. Although we already had that information from previous years. So we just had to recall 2016 and 2014.

But one of the first things we did Wednesday morning was gather this -- gather these numbers from each county.

**Q.** And this is not information the Secretary of State's office would have through any sort of automatic system? You would have to contact each county?

**A.** That is correct.

**(There was a brief pause in the proceedings.)**

**Q.** **(BY MR. TYSON)** So, Mr. Harvey, if you could go to the last page of Defendant's Exhibit 1. What is the current total number of provisional ballots outstanding for the 2018 election?

**A.** Well, the total number that were -- that were issued is 21,190.

**Q.** And the number at the bottom there, the percentage of the ballots cast, is that out of the total number of ballots cast? 21,190 into 3.9 million approximately?

**A.** Yes, sir.

**Q.** And are the numbers to the other columns the total number of provisionals for 2016 and 2014?

**A.** Yes, sir, they are.
**Q.** And those percentages are also indicated there?
**A.** Yes.
MR. TYSON: Your Honor, we would tender Defendant's Exhibit 1.
THE COURT: Any objections?
MS. BERSE: No, Your Honor.
THE COURT: Exhibit 1 is admitted.
Is this the only copy for the Court? I just want -- do you have one for the -- you might give for the record so I could mark this one up if I end up having to? Thank you.
MR. TYSON: Thank you, Your Honor.
**Q.** **(BY MR. TYSON)** Mr. Harvey, let's talk next about Georgia's voter registration databases.
In your role as the Director of Elections, do you work with the computer systems used by the Secretary's office for voter registration?
**A.** Yes, I do.
**Q.** And what are those computer systems?
**A.** The primary computer system for the voter registration database is called eNet.
**Q.** Is that -- is there also a system called the My Voter Page?
**A.** That is a -- yes, there is. That is a separate application that voters have to access their voting

information.

**Q.** So let's start with the eNet system. You regularly interact with the eNet system in your role?

**A.** I do.

**Q.** Can you start by explaining to the Court what is included in the eNet system for the State of Georgia?

**A.** The eNet system is the total list of registered voters in Georgia. It includes their residence information, their biographical information, their PII. It also includes their districting information, House, Senate, Congress. All that information. It includes their voting history. It includes audits that have been made -- changes that have been made to their voter registration. And it shows -- as I mentioned, in the history, it shows in what elections they participated.

THE COURT: So when you say voting history, that is what elections they have participated in?

THE WITNESS: That is correct.

THE COURT: Does it indicate whether they asked for a Democratic or Republican ballot?

THE WITNESS: For primaries it does, yes, ma'am. It also indicates how they voted, if they voted by absentee, if they voted provisionally, or if they voted in person, et cetera.

**Q.** **(BY MR. TYSON)** Does eNet ever interact with the DRE machines that are used for voting?

**A.**    It does not.

**Q.**    What do you have to do as a user to log in to eNet?

**A.**    In order to log in to eNet, first you have to have an account created.  That is created by -- in our office by our office administrator.  In a county, the county administrator would create the accounts.  You are assigned a user name and password.  And you would then go in and personalize your user name and password.  And after you did that, you would be eligible to log in at various levels.

**Q.**    And what kind of security features accompany or are included with eNet?

**A.**    There's two-factor authentication, which requires somebody logging in beyond the user name and password to verify through a second source, usually through a text message or an email which provides a code, which you then authenticate.  You have changing passwords.  You have automatic logout if there is lack of activity.  You have anti-brute force protection, which disables the account if more than five incorrect attempts are made.

       You would have what are called odd hour alerts.  Where if somebody is accessing the system at nonbusiness hours, it sends an alert to our office and to the county administrator.  I think that is -- that is most of the security.

**Q.**    Are there levels of access on eNet?

**A.**    There are, yes.

**Q.**   And so what are some examples of some of those levels?

**A.**   You have a super state user level, which would be a very high level, my level, and some of the people in our office, which can do pretty much anything in eNet.  You have a county administrative level, which a county election director or county registrar would generally have where you could pretty much do anything within your county but you would be limited to within the county.  And then you have a mid level that could do some things, and then you would have a lower level, which is essentially just entry only.

**Q.**   So if you logged in and looked up a voter on eNet, you have described some of the information that would be displayed.  Is there an audit trail or an audit log associated with the voter's record?

**A.**   There is for every voter.

**Q.**   What does that audit trail or audit log include?

**A.**   It includes whatever was done, whether it is a transfer, whether it is somebody updating their address, whether it is somebody changing their name.  It shows the date and time it was done.  And it also shows who did it, which user or what -- what system was used to change -- make the change.

**Q.**   So can you explain to the Court then what the difference between the eNet system and the My Voter Page systems are?

**A.**   The My Voter Page, MVP, is an application that a voter can access -- anybody can access.  And they would put in their

first initial, their last name, their county of registration, and their date of birth. And it would populate a screen that would show their name, the address where they are registered. It would show their polling place. It would show their assigned districts, like I say, Congress, State House, State Senate. It would show their polling place where they are supposed to vote. You could access sample ballots. You could check the status of your absentee ballot. You could see who your elected representatives are. It is sort of a one-stop-shop to check your voter registration.

**Q.** To your knowledge, is there any direct connection between the My Voter Page system and the eNet system?

**A.** There is not.

**Q.** Are you familiar with what leads --

THE COURT: So is the data though that is in the -- entered in the eNet system -- is it used to populate the My Voter Page --

THE WITNESS: It is.

THE COURT: -- application?

THE WITNESS: Yes, ma'am.

THE COURT: So there is an interface in that way?

THE WITNESS: There is a reflection of the data from eNet on to the My Voter Page.

THE COURT: So it is drawn up from some sort of database in eNet? Would that be fair to say?

THE WITNESS: Mr. Beaver could probably explain it a lot better than I could.

THE COURT: That is fine. Thank you.

THE WITNESS: There is certainly a relationship.

THE COURT: All right. Thank you.

**Q.** **(BY MR. TYSON)** Mr. Harvey, are you familiar with what leads to a runoff in the State of Georgia?

**A.** Yes, I am.

**Q.** And what is that?

**A.** A runoff is triggered when no candidate receives 50 percent or -- I'm sorry -- a majority of the votes cast in the election.

**Q.** Have you reviewed the current vote counts for the governor's race in Georgia right now?

**A.** Yes, I have.

**Q.** And are those totals currently sufficient for there to be a runoff in that race?

**A.** No, they are not.

**Q.** Has your office prepared a summary of the current counts in the governor's race?

**A.** We have.

THE COURT: Thank you.

**Q.** **(BY MR. TYSON)** I'm handing you what has been marked as Defendant's Exhibit 2. Can you describe this document for the Court?

**A.**   This is current vote totals as of a little bit earlier this afternoon showing us Brian Kemp, Stacey Abrams, and Ted Metz with their vote totals, their relative percentages, and then in the second column vote totals needed for runoff.

And you see Mr. Kemp's current numbers.  And then the -- to the right on the third column is the number of votes that would be needed by Ms. Abrams to bring Brian Kemp's numbers down to the point where a runoff would be triggered.

**Q.**   And that number is approximately 25,000 votes that would be needed to trigger a runoff?

**A.**   At the time we created this, it was 25,628.

**Q.**   And there are currently -- I believe Defendant's Exhibit 1 showed there were a little bit over 21,000 provisional ballots outstanding?

**A.**   That is correct.

**Q.**   So if all the provisional votes that are currently outstanding were counted and all went to Ms. Abrams, is the difference -- would that change whether there is going to be a runoff in Georgia or not?

**A.**   It would not.

THE COURT:  Does that consider absentee -- that all absentee ballots have been counted and that all -- assuming that you have actually gotten all of the veterans -- not veterans -- but the -- anyone in the armed services votes?

THE WITNESS:  We believe we have got all the absentee

ballots counted now. It does not include what you would call the overseas ballots, which would be -- which many of them have returned. I think realistically we would be talking about a pretty small number from now until then. Maybe -- maybe low hundreds.

But to answer your question, it does not. There is a small variation.

THE COURT: What typically -- tell me where those -- I know that Judge Jones knows this inside and out. But where do those -- are they sent back to the state or to the counties -- those --

THE WITNESS: The overseas ones?

THE COURT: The overseas ones.

THE WITNESS: They are supposed to be sent back to the county registrar. I have gotten a couple of them mailed to me this week, which I then immediately transferred to the counties.

THE COURT: And in an off year such as 2014, what was -- what was the total number?

THE WITNESS: I don't have the data for 2014. I can tell you --

THE COURT: What about in 2016, which is obviously --

THE WITNESS: I can tell you for 2018 approximately how many we sent out. Because in Georgia when we send out the -- we have to send the UOCAVA ballots at 45 days. When we

sent them out, there were approximately 1000 that were sent out to voters.

Now, there have been again a small number more that have been maybe requested since then. But I think we're talking about a relatively modest number. But I don't have the exact number.

**Q.** **(BY MR. TYSON)** Mr. Harvey, how many county registrars are under your supervision?

**A.** None.

**Q.** How many county election superintendents report to you?

**A.** None of them.

**Q.** It was referenced earlier that there were varying numbers of provisional ballots in the past. Do you recall one of the attorneys arguing about or explaining that from one of the declarations?

**A.** I'm sorry. Could you repeat the question.

**Q.** I'm sorry. There were numbers thrown out earlier from some of the declarations about 7600 provisional ballots in past years.

Are those numbers -- do you know the source of those numbers or how that would square with the analysis that your office performed?

**A.** I don't think I know specifically where that would have come from. These are the best numbers we have from our system.

**Q.** Mr. Harvey, if you could now maybe just walk us through

where we are in the process. The election has taken place. We are through the absentee balloting period. We're now into the counting and certification processes.

Can you explain to the Court what the local elections officials are doing right now in preparation for certification?

**A.** Well, they are -- at this point they have completed their election date ballots with the memory cards from the DREs. And every county we believe has completed tabulating their absentee -- scanning and tabulating their absentee ballots.

At this point they are generally working on their provisional ballots. They are going through the process of trying to determine whatever the issue was or in some cases maybe simply waiting for the voter to come.

If a county only had, say, a small number of provisional ballots for three people who didn't provide ID, they are simply waiting until the close of business Friday to see if that person shows up. If they show up and provide ID, they count the ballot. If they don't, it doesn't get counted.

So in the counties where you have a lot of provisional ballots, they are actively working on them. They are doing research trying to find out on a registration issue, for example, if the person is registered.

In some cases, the counties have completed the process completely and are not doing anything. It varies widely.

**Q.** Would a county registrar ever use the MVP system in

determining whether a provisional ballot should be counted?

**A.** No, they wouldn't.

**Q.** What system would they use?

**A.** They would use eNet.

**Q.** There was some discussion earlier about certification. When is the deadline for county certification?

**A.** In this year, it is on Tuesday -- this coming Tuesday. Normally it would be the Monday after the election. But because of Veterans Day, it is moved to Tuesday.

**Q.** And when does the Secretary of State certify the statewide totals after county certification is complete?

**A.** We have until the following Tuesday. But in elections where there are runoffs, we like to do it as soon as possible.

**Q.** And historically how soon has as soon as possible been?

**A.** The next day is optimal assuming we can get everything in.

**Q.** Do you anticipate there being statewide runoffs in any elections in 2018?

**A.** Yes, we do.

**Q.** And do you recall what those elections would be?

**A.** One is for Secretary of State we believe. The other is for a Public Service Commission seat, which would be statewide.

**Q.** And when can absentee ballots begin going out for the December 4 runoff?

**A.** The law requires absentee ballots to go out for a runoff as soon as possible. Before ballots could go out, you have to

have a certified election so you knew definitely who the candidates were.

**Q.** And so what would happen if there was a delay in certification from next Wednesday through the date that is in the statute?

**A.** Well, it would just take that much more time for the counties to get ready. It would take longer to create the databases, which are then given to counties. The counties would have to proof the databases. Once they were satisfied with them, they would have to send them to the printer, get the paper ballots back, and then turn around and get them out to the voters.

So when you are talking about a four-week runoff period, every day is important.

**Q.** Are there other things that happen after certification timelines that are also relevant beyond absentee ballots?

**A.** Yes. The certification is the trigger for election -- both election contests and recount requests.

**Q.** So if there is a delay in certification, will there be a delay in getting absentee ballots out?

**A.** Yes, there will be.

**Q.** There was some testimony earlier about what information was contained in the ExpressPoll when someone shows up at a precinct.

What information is contained in the ExpressPoll check-in

machines at each precinct? Is it limited to that precinct, or is it a statewide list?

**A.** It is statewide. It has each voter, their name, their address. I believe it has their date of birth.

**Q.** So if a voter was on the registration list and showed up at a precinct, would the election official be able to direct them to the correct precinct if they showed up at the wrong one?

**A.** They should, yes.

THE COURT: Would it be fair to say that if the voter had to get to work that he or she might not be able to go to a different precinct, particularly if there were delays in the voting? You don't get up to the station until you are -- typically until you are almost about to get a card?

THE WITNESS: Right. No. I understand. That could happen. In that case, the practice is if the voter essentially declares that they want a provisional ballot they receive a provisional ballot at that point.

Does that answer your question?

THE COURT: Yes.

So some of the people -- some of the provisional ballots may be people who are in that circumstance?

THE WITNESS: That would be out of precinct.

THE COURT: Right. And then is there a code for out of precinct?

THE WITNESS: Yes, ma'am.

THE COURT: And are those routinely then you get to vote for anyone who -- if you vote in that precinct, obviously your votes aren't counted if you have a different representative. But any statewide officers, you would be -- your vote would count?

THE WITNESS: What they do is they duplicate your ballot. They duplicate it down to the point where you have a common thing. As soon as you go below the level -- like I say, county commissioner or city commissioner, you live in a different area, it would stop there. They would stop duplicating votes.

But yeah. In this case for any statewide or federal office, it would -- they would duplicate that.

**Q. (BY MR. TYSON)** Mr. Harvey, I wanted to clear up one thing that I thought may not be quite clear.

If there is a delay in certification from -- the statewide certification from, let's say, next Wednesday through the date that plaintiff's counsel has proposed next Tuesday, will that also mean there is a delay in being able to get early voting started and other processes started for voters?

**A.** If there is a delay, advanced voting -- it generally will take place the week before a runoff. Anything that shortens that window is more difficult. The database will be created. It would be another burden on the county to make them -- they

have got to do logic inaccuracy testing on their machines. They have to set up the database. They have to set up their DREs. It would put an extra burden on them if that were the case.

MR. TYSON: Your Honor, I believe I failed to exhibit -- to tender Exhibit 2 into evidence.

THE COURT: All right. Are there any objections to the introduction?

MS. PEREZ: No.

THE COURT: It is admitted.

MR. TYSON: I have no further questions.

CROSS-EXAMINATION

BY MS. PEREZ:

**Q.** Good afternoon, sir.

**A.** Good afternoon.

**Q.** I'm just going to ask a few questions of you if --

THE COURT: Can you walk a little bit -- walk back from the mic?

MS. PEREZ: Sorry. Better?

THE COURT: That is better. Thank you.

**Q.** **(BY MS. PEREZ)** Can you go through the codes that a poll worker or voter might see on the provisional ballot envelope?

**A.** Yes, ma'am. If somebody has difficulty or is not showing up on the voter registration database, it would be PR. So provisional registration.

**Q.** And what are the other codes on the provisional ballot?

**A.** It would be EH for extended hours. And the Court -- I think I mentioned before, OOP would be out of precinct. Citizenship could also be marked. I believe that is CZ. Let's see. ID -- PI would be if somebody didn't have photographic ID.

**Q.** Do you have any others?

**A.** Off the top -- I believe that is it --

**Q.** Okay.

**A.** -- to the best of my recollection.

**Q.** And how are these codes used to sort?

**A.** They are -- well, you create a list of provisional voters. You indicate what the code is on the list. And that is what gives the registrar, you know, the information they need to verify or what the problem is. Because obviously the provisional ballot means there is a problem. Something is not right.

**Q.** So it would be possible for a canvassing board to be able to segregate the ones that got PR?

**A.** Absolutely.

**Q.** Okay. If a voter showed up and was told that their name was not found on the rolls, would that mean that their name was not in the system generally or just that they would be in the wrong precinct?

**A.** It could be a couple of things. You could have -- two

scenarios come to mind immediately. One, it could be poll worker error. They look up the wrong person, or they just make a mistake.

Secondly, they could be on the supplemental list of voters. When you have the voter registration deadline approximately 30 days before the election, you have people coming in registering. They actually pull the list of voters before the election. But if counties are continuing to process late registrants, they don't get into the ExpressPoll.

So any that are held over is on a supplemental list of voters, which is a paper list. So if somebody shows up and they are not at the polls -- I'm sorry -- they are not on the ExpressPoll, it could be that the poll worker made a mistake.

If that is not the case, they could check the supplemental list and say, oh, here you are in the supplemental list. You must have registered. At that point, you would be able to vote just like anybody else. You wouldn't need to vote on a provisional ballot.

But if none of that is the case, then you would -- every ExpressPoll contains the entire state file. So you could look -- expand beyond the precinct, beyond the county to the state, and maybe find that the voter is registered in Savannah instead of Atlanta because they didn't update their registration. Or if you can't find them at all, you would say you would have to vote a provisional ballot. That would be a

PR ballot.

THE COURT: Do you have any information that, in fact, all of the people -- I realize they may get some pay -- but basically quasi volunteers for working as poll workers actually -- when there is a long line actually would do that? Go through that whole hunting process if they don't find you?

THE WITNESS: Well, it is not that complicated. In counties, they scan driver's licenses. Driver's license is far and away the most common way to find it. So in many, many cases, they would scan the license, which would bring up the voter. They verify that it is the right voter, and that takes care of it.

But they could -- if for some reason they didn't have a scanner, they would just type it in. And if they don't find it in the precinct, they essentially just hit another button and expand, expand to county and then expand to state.

It would do that. It is not a terribly long process. But it is also not impossible for, you know, some of these quasi volunteers to make a mistake.

**Q. (BY MS. PEREZ)** If I may, in the last few days, the Secretary's office issued a press release arguing or alleging that the Democratic party tried to hack a system.

Was it the eNet system or the My Voter system that was the subject of that allegation?

MR. TYSON: Your Honor, I would object that that is

beyond the scope of the direct testimony. There was no testimony about any hacks.

MS. PEREZ: I am merely trying to ascertain the differences between the two systems. And they made it a point of saying that My Voter Page was one system and the eNet is another system. I'm just trying to figure out which one was the subject of the allegations.

THE COURT: I think that is -- all right. You may proceed.

**A.** I'm sorry. Can you ask the question again?

**Q.** **(BY MS. PEREZ)** Sure. When the press release was issued accusing the Democratic party of trying to hack one of the voter registration systems, was it eNet or MVP or the My Voter Page that was at issue?

**A.** I'm not sure which one of the two.

**Q.** And the eNet database, as I read your affidavit, is frequently used to determine -- as one of the factors that could be used to determine whether or not a provisional ballot should be counted; is that correct?

**A.** That would be the primary way you would use on a PR ballot.

**Q.** Right. So if the eNet system had been hacked and incorrectly said that somebody had died or somebody had registered outside of the registration process and a county consulted that, their first inclination would be that there was

a problem with the voter's registration; is that correct? They would need additional information or additional reason to go to the paper files?

**A.** It sort of depends on what the circumstances are. If it said that somebody had died, for example -- if that was the record that somebody had died, I think that would generally trigger somebody to ask some additional questions or do some additional research.

**Q.** What about if the database had said that someone had registered out of time?

**A.** Registered beyond the deadline you mean?

**Q.** Yes.

**A.** That would be something that could then be considered by the registrar to say, hey, this person is not eligible.

**Q.** Okay. Do you know what EAVS is?

**A.** Yes, ma'am.

**Q.** Can you please describe it for the Court?

**A.** It is -- the EAVS report is a very comprehensive report that is done by the Elections Assistance Commission that basically takes a lot of data from each state in terms of absentee ballots, turnout, registered voters, population. It is kind of a snapshot of elections in a year. It has to be done in years with federal elections.

**Q.** And does Georgia contribute information to EAVS?

**A.** We do.

**Q.** And how would you explain the difference in the number of provisional ballots submitted to EAVS versus the testimony and numbers that you provided today?

MR. TYSON: Your Honor, I'll object. I don't think there is a foundation for what the number from EAVS is in evidence at any point that I'm aware of.

**Q.** **(BY MS. PEREZ)** I will rephrase and ask: What are the various ways in which provisional ballots might be counted and corrected? So when you are coming up with your numbers, what are the potential discrepancies?

**A.** I don't understand. Could you ask it again.

**Q.** Yes. Is there more than one source of information for how one gets the number of provisional ballots that were cast? Does the Secretary have its own list? Are you entirely dependent on the county reporting?

**A.** Yeah. Yes, ma'am. We're -- the counties report provisional ballots back to our office in terms of the numbers.

**Q.** And who submits the information to EAVS? Is it the county directly? Or is it the State?

**A.** No. It is the State.

**Q.** Okay. Have you seen my -- were you able to see the declaration of Kevin Morris?

**A.** No, ma'am.

MS. PEREZ: May I?

THE COURT: Yes.

Let me just ask you a preliminary question. There is data on the Secretary of State's website about -- about the election cycle like going from 2014 that reflects total number of votes by -- that you can sort. And you can sort it by, among other things, provisional ballots.

Is that the EAVS report that is posted on the Secretary of State's office or do you -- website, or is that some -- or do you know? Because I didn't see that 12,000 figure when I looked just to try to understand the ball park we were dealing with here myself.

THE WITNESS: I don't believe so, ma'am, is the answer. The EAVS report is pulled essentially out of eNet and provided to the EAC.

THE COURT: All right. Go ahead. I'm sorry. I interrupted you.

**Q. (BY MS. PEREZ)** Part of what I'm trying to understand -- and I don't want to belabor it because I actually don't think it matters that much. But we -- Mr. Morris reviewed the Georgia Secretary of State's data on provisional ballots. The spreadsheet that was available on the website had different numbers. And the numbers that we're seeing today now match the EAC data.

So he was able to pull a spreadsheet that looked like 9000, 6000, and 7600. And I don't think it matters that much. But what I do want to be able to figure out is what are the --

how do we know with any sort of reliability what is the number of provisional ballots?

THE COURT: Do you have an objection?

MR. TYSON: Your Honor, with Ms. Perez's permission, I think I'm able to ask one question that may clear this up.

Mr. Harvey, is there a difference between the total number of provisional ballots submitted and the total number of provisional ballots that were actually counted in the election?

THE WITNESS: As opposed to cast by the voters and then accepted?

MR. TYSON: I think that is the distinction.

**Q. (BY MS. PEREZ)** Is that the distinction?

**A.** Yes, that would be a different number.

**Q.** So that helps a lot. You mentioned earlier that --

THE COURT: I'm sorry. It doesn't help me very much.

So are you saying that the total number here in exhibit -- that is listed in Exhibit 1 that the defendant has submitted is the total number that were cast versus the total number that were actually counted; is that right?

THE WITNESS: Yes, ma'am.

MR. TYSON: Yes, Your Honor.

THE COURT: Okay.

**Q. (BY MS. PEREZ)** So high percentages are --

THE COURT: So when it said total provisional ballots in 2014, which was 12,151, that is the total number of ballots

that were cast but not counted?

THE WITNESS: Correct.

THE COURT: On your web page, you might have -- you more likely put what was actually counted? It is a smaller number.

THE WITNESS: Yeah. I haven't looked at that specifically. But that certainly sounds right.

**Q.** **(BY MS. PEREZ)** So all this to say: Is it true to say that -- let me ask it another way.

What would you estimate would be the rate of provisional ballots that are ultimately counted --

**A.** I think it is roughly just based on -- I have not analyzed it. I think it is roughly about 50 percent.

**Q.** So about 50 percent of them. Okay.

You were able to get the data or it was -- you testified that this data in this particular exhibit was not one that was readymade? You actually had to call the counties and get the information from them; is that correct?

**A.** For 2018.

**Q.** For 2018?

**A.** Yes, ma'am.

**Q.** And they complied with that request?

**A.** Yes, ma'am.

**Q.** Okay. You were able to put together this information in pretty short order?

**A.** I think it took about a day, day and a half.

**Q.** Okay. Prior to -- let me ask one last question on this. It is not your testimony today, is it, that there's not a statistically significant difference between the number of ballots cast in 2018 and the others; is that correct?

MR. TYSON: Your Honor, I'll object to that. It calls for expert testimony.

MS. PEREZ: I'm clarifying that that is not his testimony.

**Q.** **(BY MS. PEREZ)** It is not your testimony today that there's no statistic -- you are not opining on whether or not there is a statistically significant difference between the number of ballots that were cast in 2018 and the other years?

**A.** I am not -- I'm not sure what statistically significant would be.

**Q.** Prior to November 3rd, had anybody raised any concerns about the security of Georgia's eNet?

**A.** November 3rd?

**Q.** Of 2018.

**A.** 2018. Was that -- help me. What day was that? Was it Friday, Saturday?

**Q.** Saturday. I'm talking about like in 2015 and 2016.

**A.** You know, there have always been -- you know, since 2016 the EAC, Department of Homeland Security has always raised issues about cybersecurity for elections both the voter

registration system. We get regular updates from law enforcement and Homeland Security about possible issues, about possible things we need to be aware of for election security.

So to the extent that we regularly get alerts and concerns about various things -- it may not be specific to us in Georgia, but it affects the voting registration system in general -- that has been happening very regularly since about 2016.

There -- as far as security of eNet, I'm not aware of any specific issues that -- specific allegations that have been brought about with that. I know that in the litigation that the Judge mentioned previously there are talks about security.

So I guess I want to be careful to say that nobody has ever said anything about any system being insecure. It is a regular concern of ours. People call my office regularly and ask is the voting system secure. So -- but I don't consider that an alert about that.

**Q.** Okay. Mr. Lamb did not inform you that there was some vulnerabilities?

**A.** Not with eNet. That was a different system. That was a system at Kennesaw State University.

**Q.** Did DHS encourage Georgia to take measures to harden eNet?

**A.** I don't -- I'm not aware of any specific measures to take to harden eNet. But, again, maybe Mr. Beaver would be better able to testify. He handles the cybersecurity system.

**Q.**    Did Georgia accept DHS money and help to harden eNet?

**A.**    Georgia accepted DHS assistance.

**Q.**    Can you describe that assistance?

**A.**    Mr. Beaver could -- I'm sorry -- could explain it better than I could.

**Q.**    Okay.  What are some of the reasons why polling places would be open longer?

**A.**    As I mentioned before, it could be that they opened late. It is not unusual that the custodian of the church, for example, that is opening it shows up an hour late.  They forget that it is Election Day.  And so it is an hour late opening, and they extend it by an hour.

There could be a fire alarm.  During advanced voting -- the last week of advanced voting up in north Georgia, there was a storm that came through and there were tornado warnings and they had to evacuate the polling places for half an hour.

Any of those things that really cause a significant break in voting could cause -- could be the basis for extending hours.

**Q.**    When a voter believes that they are on the rolls and they show up and try to present themselves and a poll worker indicates that they are not on the rolls, is that faster or typical of what it takes to usually process the average voter? Does the exchange take more time or less or equal as if the voter actually was on the roll?

**A.**    It probably takes a slightly longer time.

**Q.**    If the voter is upset, might it take even longer than that?

**A.**    It might.  Although usually if it is -- if it turns into a situation like that, a poll manager would come over and would kind of move them to the side and work with them so that other people can continue voting.

**Q.**    And if there were numerous voters who found themselves unregistered and believe that that was wrongful, might it have a cumulative effect?

**A.**    Anything -- anything could happen, I suppose.

**Q.**    I love election administrators.  And one of the things that always impresses me is their ability to do a tremendous job under tight timelines and scarce resources.

     Do you believe that your local election administrators if given an order of the Court would figure out a way to abide by a court ruling?

**A.**    You know, I believe that the election officials would absolutely do their absolute best to obey any judge's order or any court order for any circumstance.

             MS. PEREZ:  Okay.  Thank you.

                         REDIRECT EXAMINATION

BY MR. TYSON:

**Q.**    I apologize, Mr. Harvey.  Just a couple of brief follow-ups.

Ms. Perez asked you about the codes that appear on provisional ballots. Do you have a central database of those codes right now?

**A.** Essential database of the codes?

**Q.** Or some central collection of those codes.

**A.** The State Election Board rules would have the codes.

**Q.** I apologize. So the individual ballots, the 21,000 provisional ballots that are out, does the Secretary of State's office have the codes that go with each one of those?

**A.** So do we have it broken down by code?

**Q.** Correct.

**A.** We do not. No, sir.

**Q.** Who has that information right now?

**A.** Each county would have their own information.

**Q.** Just to clarify, I think there was a little confusion earlier that the ExpressPoll check-in machines show the entire statewide registration? Is that your testimony?

**A.** They contain the entire statewide registration. They are set up to normally search the precinct. Then they can be expanded out. Because it keeps the process -- it is much more efficient to search a precinct rather than the whole county versus the whole state.

**Q.** Ms. Perez asked you about registrars using the eNet system to determine if someone is a properly registered voter. Is that the only way that registrars make that determination or

are there other methods?

**A.** They can use other methods, as well. That would be the primary method.

**Q.** What are some other methods they would use?

**A.** They could use information from the Department of Driver Services. If the voter said, for example, that they had -- they had registered to vote when they got their driver's license two months ago, they could check with the Department of Driver Services. And they would actually be able to show the documentation that the voter checked or signed saying I want to register to vote.

And in that case, that would give the registrar an indication that, hey, this person did attempt to register to vote. Don't know what happened -- how it didn't get updated. But yes, they would be -- in that case, generally they would accept the vote and determine the voter is registered.

MR. TYSON: All right. Thank you. I don't have any other questions.

THE COURT: All right. So let me just get straight though about the -- the view of the individual working at the desk when a voter comes in is simply the information for the precinct basically at that level?

THE WITNESS: That is what they see first.

THE COURT: And do you have any information that people are actually -- who are sitting in those desks and

moving people that they are actually trained to go look at a broader set of fields in order to find some voter?

THE WITNESS: They are trained that way. Yes, ma'am.

THE COURT: And is that because there is, in fact, some level of statewide training that is provided?

THE WITNESS: There is some state level that is provided for county election officials. But each county is responsible for training their own people.

Now, we have -- we have training staff in our office that supplements that. But the poll worker training is generally done at the county level. We produce a training poll worker manual, and we do have a training coordinator. But the real nuts and bolts are done at the county level. It is done before every election.

THE COURT: And do we have the envelope that the provisional ballot is put in so I could see the codes, or is that -- somebody else is presenting that to me?

MR. TYSON: I don't believe we have one, Your Honor. I'm sorry.

THE COURT: All right.

MR. TYSON: It is very much like an absentee ballot. Mr. Harvey can probably explain what the exterior looks like.

THE COURT: Does it -- but it doesn't have the same codes as the absentee ballot, or does it?

THE WITNESS: No. You actually write the code. It

is not a code you check. You actually have to write the reason on it.

And the other thing I would say about provisional, in some cases they are voted without a specific code for some reason. It could be, you know, if -- a reason escapes me now. But what we essentially train the poll workers is if there is a question and a voter is standing there declaring that they are eligible to vote they should vote a provisional ballot.

THE COURT: All right. Well, is somebody able to identify each of the codes for me today?

MR. TYSON: Yes, Your Honor. I believe Mr. Harvey testified as to what they are, PR, PI --

THE COURT: PR is?

THE WITNESS: It is provisional for registration issues. EH is extended hours. OOP is out of precinct. PI is provisional for identification. The code actually escapes me, but there is a separate code for citizenship if that is the issue.

And then if there ended up being some other strange set of circumstances, they could write in the specific reason why somebody would vote a provisional ballot.

THE COURT: And sometimes people don't write anything on them, as well?

THE WITNESS: There should be some reason on every code -- I'm sorry. There should be some reason or a code on

every provisional ballot.

THE COURT: Some are coded, and some might just have something written on it without a code; is that right?

THE WITNESS: Yes. But that would -- again, that would be pretty exceptional.

THE COURT: Any other questions occasioned by mine?

MS. PEREZ: No, Your Honor.

MR. TYSON: If I could just ask one, Your Honor --

THE COURT: Yes.

MR. TYSON: -- just to clarify one additional point.

REDIRECT EXAMINATION (Further)

BY MR. TYSON:

**Q.** Mr. Harvey, in terms of the coding, there are certain categories that would definitely be counted absent some other information like an out of precinct or an extended hours provisional ballot?

**A.** Yes. Yeah. The out of precinct would be duplicated to the extent that it could be. The extended hours would be counted without any validation or any part -- anything to do on behalf of the voter. The others would require some type of research or some type of action.

MR. TYSON: Thank you.

MS. BERSE: Your Honor, may I ask one follow-up -- one follow-up question?

THE COURT: Yes.

RECROSS-EXAMINATION

BY MS. BERSE:

**Q.** Mr. Harvey, if the Court were to order that the provisional ballots with the PR code not be rejected pending some further hearing in this matter, would that at all impact the ability of the counties to continue to count and make decisions on all of the other provisional ballots with other codes or just reasons written on them?

**A.** So let me make sure I understand. If the Court were to order not to -- basically not to take action on PR ballots?

**Q.** Or not to reject any.

**A.** It would not impede the counting of other ballots. But by the same token, everything is preserved. So if they were rejected and an order were to do something else, they could go back and reevaluate them or do something else with them.

So if anything, it would -- it would delay the process to not take action on them now. And then for whatever reason if additional steps needed to be taken, you could say -- because some of the PRs are going to be accepted.

But if a PR is going to be rejected for whatever reason, frankly it would be to the benefit of the county and to the process to know that now and to be ready to go forward barring judicial action order.

THE COURT: Do you have it broken out -- in this other report that is on the Secretary of State's office, they

have everything broken out and it just says provisional ballots as one of the categories.

Is there data from the past that shows how the subcodes for -- did you ever -- is that collected, as well, or not?

THE WITNESS: I honestly -- I haven't looked at it, Your Honor.

THE COURT: Okay. Thank you.

Excuse me just one second.

**(There was a brief pause in the proceedings.)**

THE COURT: Are we through with this witness?

MR. TYSON: I'm sorry. Yes. Yes, we are finished.

THE COURT: Thank you very much.

All right. Do you want to call your next witness?

MR. TYSON: I'm sorry, Your Honor. We'll call --

THE COURT: That is all right. Go ahead.

MR. TYSON: We'll call Mr. Beaver to the stand, please.

COURTROOM DEPUTY CLERK: Please raise your right hand.

**(Witness sworn)**

COURTROOM DEPUTY CLERK: Please have a seat. Loudly and clearly state your name and spell your last name for the record, please.

THE WITNESS: My name is Sanford Merritt Beaver,

B-E-A-V-E-R.

Whereupon,

SANFORD MERRITT BEAVER,

after having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. TYSON:

**Q.** Thank you, Mr. Beaver. Can you give your title in the Secretary of State's office for the Court?

**A.** Yes. I'm the Secretary of State's Chief Information Officer.

**Q.** And what is your role as the Chief Information Officer for the Secretary of State?

**A.** So I am responsible for managing all of the agency applications and infrastructure.

**Q.** Does the management of applications and infrastructure include the management of the voter registration databases?

**A.** Yes. There's multiple of those.

**Q.** Do you have any experience in the realm of information security?

**A.** Yes, I do.

**Q.** And what is that experience?

**A.** It started probably in my prior jobs where I worked in health care. I was the vice president for software development and CIO for a health care company that manages patient records where PII is very important. And one of our big things was

being able to protect that information when sending information out on patient records.

And then within the Secretary of State's office, we have expanded actually the security envelope of our office extremely over the last five years since I have been there.

**Q.** And that was my next question. How long have you been the Chief Information Officer?

**A.** About five years.

**Q.** So are you familiar with the computer systems that operate the My Voter Page and eNet?

**A.** Yes, I am.

**Q.** Are you familiar with how the MVP and eNet systems operate?

**A.** Yes, I do.

**Q.** Can you explain for the Court what the difference is between eNet and MVP are?

**A.** ENet is an application and database system that was designed to store and manage voter registration information for the State of Georgia. That includes the ability for both state workers and county workers to have access to enter and modify state voter records.

Now, MVP -- MVP is a totally different application designed specifically to be independent of eNet for performance and security purposes. That system utilizes snapshot data from eNet that is transferred on a regular basis from eNet to the

MVP database.

And MVP is used for constituents of Georgia to review registration information. It is a read-only database. It is not designed to be modified. It does not communicate with any other system.

**Q.** Are you familiar with the term audit log?

**A.** I am very familiar.

**Q.** Can you explain to the Court what an audit log is?

**A.** There's a couple of different types of audit logs. Audit logs are at either the application layer or the system layer. We keep audit logs of transactions as they come into the system.

So if somebody signs on to a web page to access one of our systems, we have system logs that actually track the IP address and the transaction request coming into the network and onto the server. Then within the application, we keep track of the actual activity within the application that is going on.

**Q.** And does eNet also maintain audit logs?

**A.** Yes, it does.

**Q.** What kind of audit logs are located in eNet?

**A.** The same kind where -- in fact, Mr. Harvey described the application layer where we actually keep track of the activity of somebody that goes into the system and changes data or modifies data, adds data. We keep a full log of what that is and who does it.

**Q.** Using eNet, can a voter registrar see all the changes that have been made to a person's voter registration records?

**A.** Yes. There is a full log, and it is accessed frequently.

**Q.** Do you or someone in your department review the audit logs for eNet?

**A.** Yes.

**Q.** And what have you found in those logs?

**A.** We monitor those 24/7. We on a regular basis look for any alerts or changes that look out of the ordinary. Over the last 30 days, 6 months, we have not seen any adverse activity going on in the system.

**Q.** Do you contract with vendors to assist in the monitoring of eNet for security purposes?

**A.** Yes, we do. We have multiple vendors. We have a layered approach of security that gives us multiple different ways of watching the system and managing access to the system.

**Q.** Has any vendor notified you of any unauthorized access to eNet in the past six months?

**A.** No.

**Q.** If there was unauthorized access in eNet, would you be notified?

**A.** I get an alert on my phone if somebody does that immediately.

**Q.** And you haven't gotten any such alerts?

**A.** No.

**Q.** Let me ask about MVP system. Are the eNet and MVP system maintained on the same server?

**A.** No. They are on separate hardware platforms. They do not share a database. They do not talk back between each other. There is actually an application that is separate from both that pulls data from eNet and pushes it over to the MVP system.

It is all done for security purpose to protect the eNet database. That is our -- basically our crown jewels. We don't let access to it.

**Q.** Does information ever move from the My Voter Page into eNet?

**A.** No.

**Q.** It only goes the other direction?

**A.** Absolutely.

**Q.** Does the MVP system also maintain access in audit logs?

**A.** Yes, it does.

**Q.** And do you review those audit logs?

**A.** We do.

**Q.** And what have you found in those logs?

**A.** We have 24/7 monitoring of those logs. Up until recently, we did not see any activity. We have actually done forensic work in the last week to look at it. We have seen activity of people trying to actually exploit the system. We have seen no positive exploitations, meaning nobody has breached it.

**Q.** And just so I'm clear, that is of the MVP system, not of

the eNet system?

**A.** Correct. The MVP system.

**Q.** Can you explain to the Court what the static period is for MVP?

**A.** So as I said, MVP is a separate dedicated application. It sits on two servers. During normal times, two servers is enough to handle the voters of Georgia. But during election periods, the performance is not sufficient or two servers is not enough to provide the service as needed.

We actually move it out of the data center that it is in to another data center that is in a different state where we have access to -- this year, we used nine servers to run MVP to meet the peak demand for this. That static period happens a couple of days -- Sunday before election until the day after the election.

**Q.** And so during this static period, is any information moving from eNet to MVP?

**A.** No. It is specifically isolated as an island. Because it is also a high target time, we do not want to have anything to have danger of getting back to that system.

**Q.** For the MVP system's static period, what is the purpose of the static period?

**A.** The static period provides improved performance. Plus by removing it from our database, our data center, it provides additional security so that in the event that something might

happen there is no path to the voter registration database.

**Q.** Is MVP currently in a static state?

**A.** No. We have passed the time where we keep it in static.

**Q.** Do you contract with vendors to assist in the monitoring of MVP?

**A.** Yes. We have multiple.

**Q.** Has any vendor notified you about an unauthorized access to MVP?

**A.** No successful access to MVP.

**Q.** If there was unauthorized access, would you be notified?

**A.** My phone would be going off.

**Q.** You mentioned that the state contracts with vendors for cybersecurity services. Is one of those vendors Fortalice Solutions?

**A.** Yes. Fortalice.

**Q.** Fortalice. I'm sorry.

MR. TYSON: I don't have any further questions, Your Honor.

THE COURT: Thank you.

CROSS-EXAMINATION

BY MS. BERSE:

**Q.** Good afternoon, Mr. Beaver.

**A.** Good afternoon.

**Q.** This past weekend when the Secretary of State's office put out a press release that referenced a failed attempt to hack,

quote, the state's voter registration system, do you know what system that was referring to?

**A.** That was referring to the My Voter Page, MVP.

**Q.** Okay. Later in the weekend when the Secretary of State put out a second press release saying that they had opened an investigation into failed efforts to breach, quote, the online voter registration system and My Voter Page, do you know what the online voter registration system referred to there was?

**A.** Yes, I do.

**Q.** What was that?

**A.** OLVR.

**Q.** Can you explain a little bit about OLVR, please?

**A.** OLVR -- as I said earlier, we manage multiple election systems. So for security and performance, we also have a dedicated system for allowing people to register to vote online.

There are two methods or paths for doing that. One is if you have a driver's license you can go to OLVR, enter your driver's license, check to see whether you are currently registered. If you are, you can modify your registration there. If you are not, you can add yourself as a -- register yourself.

The second path is if you don't want to use your license or don't have a driver's license you can create a paper document or PDF, fill it out, and then print it locally on your

own printer and mail it in to the registration's office.

OLVR -- when those registration requests are completed, those do not go directly into eNet but go on to a dashboard system that the counties run that review each request for registration prior to passing it into eNet.

THE COURT: I'm sorry. These are referring to what? The county -- I don't know what -- what you are referring to. Are you talking about the PDFs that were sent in as documents, or what are you referring to when they were sent in?

THE WITNESS: Exactly. So if you went down the path where you have a driver's license, you have electronically filled out a form online, which will then get electronically passed to a system that the counties run they call the dashboard.

That will show up as a registration -- either new registration or modification registration event. Somebody in the county election office will review each one of those and then determine whether or not that is an appropriate registration to be put into eNet.

If it is the PDF version that they print, they actually just mail it in and the counties have a process for handling any paper applications, whether you printed it from OLVR or it went into one of many locations in the state to get a paper voter registration form. And that is handled the same way, those two types.

THE COURT: All right.

**Q.** **(BY MS. BERSE)** So OLVR is a separate system from My Voter Page?

**A.** Yes.

**Q.** Separate from eNet?

**A.** Yes.

**Q.** Are there any other online or electronic voter registration systems that the State maintains?

**A.** Voter registration systems?

**Q.** Yes. Electronic databases relating to voter registration information.

**A.** For voter registration, those are the three things that deal with voter registration.

**Q.** And so by this weekend, the State was aware of failed efforts to -- the State believed failed efforts to hack at least two of those; is that correct?

**A.** We heard through an email that someone claimed they were able to breach the MVP system. They referred to OLVR, but there was no information on that.

**Q.** But it was the State -- Secretary of State's position when they put out the press release that says a failed effort?

**A.** Yes. As I said, we were able to do forensics on the system and see the attempts that matched the -- with the email came a document that showed how you could hack into the system. And so we were able to see those -- the utilization of that

method coming at MVP. None were successful. But we were able to see them.

**Q.** Okay.

MS. BERSE: Nothing further.

THE COURT: May this -- do you have anything more?

MR. TYSON: Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. TYSON:

**Q.** Mr. Beaver, was there a successful accessing of OLVR that you're aware of?

**A.** No.

**Q.** And are you aware of the eNet information ever being in danger from outside sources?

**A.** No.

MR. TYSON: Thank you.

THE COURT: Let me just make sure I understand. You moved the data from eNet on a regular basis to the MVP page except during this short window of time around the -- the ultimate election when people -- because the election is going on for a month essentially; right?

THE WITNESS: It is only the Sunday before elections.

THE COURT: All right.

THE WITNESS: So leading up to that, it is still in what we call a dynamic mode, which is its normal state.

THE COURT: It is in a dynamic mode during the period

of time that people are -- can do early voting?

THE WITNESS: Yes.

THE COURT: And then on the Friday or so when they can't do early voting or maybe -- I think now you can do early voting on Friday. It closes around Friday or Saturday --

THE WITNESS: Uh-huh (affirmative).

THE COURT: -- then before the election day?

THE WITNESS: So on Sunday prior to the election is when we turn it from dynamic to static, which we actually move the application from the data center in Atlanta to this year it was in Kansas.

THE COURT: Then it reopens on Wednesday after the election?

THE WITNESS: Typically.

THE COURT: All right. And the pollbooks that are used by the folks at the polls, they are pulling the polls up. Those are coordinated, as I understand it, with the DRE machines?

THE WITNESS: Yes.

THE COURT: Those are based on the database -- is the database connected to those -- the --

THE WITNESS: Pollbooks are fed from extracts out of eNet.

Is that what you were looking for?

THE COURT: That is what I'm trying to find out. The

words are eluding me at this hour. But yes.

So they are -- the -- the pollbooks are based on the registration data in eNet?

THE WITNESS: Yes, ma'am.

THE COURT: So I don't know that it is relevant here except to the extent that there's some claim that the data was manipulated so somebody may not appear on the pollbooks or on the database.

So if that happened, for instance, a week earlier than the election, you would -- that manipulation would be reflected in the pollbooks, would it not be, or in the eNet database?

THE WITNESS: Are you asking if somebody modified MVP or eNet?

THE COURT: Or eNet.

THE WITNESS: So no modifications to MVP would ever affect the pollbook because there is no data that comes from MVP moving to eNet. eNet alone feeds the pollbook. Someone would have to breach eNet to affect a pollbook.

THE COURT: All right.

THE WITNESS: We have no records of anybody doing that. There's nobody making any claims that that was ever done. Prior to this, no one knew our format of how we have it.

That is one of the things that concerns me is that the best part of secrecy is people not knowing. And so

security is all about people not knowing. Bank robbers love to know what vault you have because based on brand they know how to attack it.

THE COURT: All right. Well, I don't think that there's any other information in front of me in this case right now. So I'm not going to go further at this point on that question.

MR. TYSON: Your Honor, could I ask one additional question --

THE COURT: Yes.

MR. TYSON: -- in light of the question.

REDIRECT EXAMINATION (Further)

BY MR. TYSON:

**Q.** Mr. Beaver, the judge asked you about whether the DRE machines are coordinated with the ExpressPoll machines. Are they connected technologically in any way?

**A.** No. Coordinated would strictly be from the pollbook the poll worker identifies the precinct code that they have to load on that little yellow card. So they know what ballot to give you. That is it.

THE COURT: But then you put the yellow card into the -- when you operate the DRE, you use your yellow card, don't you --

THE WITNESS: Yes.

THE COURT: -- in order to insert it into the

machine?

I just sort of think we're going beyond what the plaintiff's case is here. So I don't want to sort of be in that position. But I don't -- I don't, on the other hand, want to make any -- have us come to conclusions either way that we don't have any evidence on.

MR. TYSON: All right. Thank you.

THE COURT: Very good. All right. Then can this witness step down?

MR. TYSON: Yes.

THE COURT: Yes. All right. Thank you.

MR. TYSON: Your Honor, the only other thing we would like to offer is a declaration from Theresa Payton. Ms. Payton is the CEO of Fortalice Solutions. She is the former chief information officer in charge of information security at the White House and has conducted a full audit.

We would like to file this under seal. I have copies for the Court and for opposing counsel. But the results of the audit -- there are processes that are used that we don't want publicly disclosed about the security of the systems.

THE COURT: Are there objections?

MS. PEREZ: Not at all.

THE COURT: All right. Thank you. The request for sealing is approved.

Are you going to file this under seal on the record?

MR. TYSON: Yes, Your Honor. After the hearing today, we will.

THE COURT: All right. Very good.

MR. BELINFANTE: Your Honor, that concludes our evidence that we would put into the record and the rest would be argument.

THE COURT: All right. I would like to ask a question or two of the plaintiff's counsel about the posture of the case at this moment. In the complaint -- original complaint, it seemed to me that you were tying your request for relief in part on whether relief would make a difference and whether it would -- and whether the increase in provisional ballots was statistically significant. Though you hadn't limited it at that point to one type of provisional ballot, as I understood it.

Why -- there are a variety of reasons for a provisional ballot. And so even if the data is perhaps not complete or correct from the State as to the total number of ballots -- let's say it is 50 percent even of them, which it may not be because I would suspect that a precinct is still a major source of provisional ballots. But I have no data to support that other than listening to other cases and being a citizen myself.

Why do we think it would make a difference in the election? I mean, I realize we want every individual's vote to

count ultimately. But in terms of -- and it may make a difference for the future in terms of the way the State handles it.

But why do we -- why do the plaintiffs say that there is a basis for issuing emergency relief if it wouldn't make a difference in terms of the outcome of the election?

MS. PEREZ: Your Honor, there are two issues, I think, at play. And the first is that Georgia Common Cause is a nonpartisan organization that works on behalf of voters and the right to vote and not candidates.

And in the more than decade that I have represented them, they have never taken the position that the outcome of the election needed to turn on anything. That it is for -- the right to vote is an individual right. And when it is lost in an election, it is lost forever.

It is important to make sure that voters have their rights counted, especially as we allege that there were mistakes that were through no fault of their own.

THE COURT: And I agree with that proposition obviously. But the question really has to do with: Why is it an emergency? I mean, to the extent that I hinged it on the outcome, I think it is a fair response. But --

MS. PEREZ: It is an emergency, Your Honor, because they are certifying it in two weeks. If they had a longer certification process, as some other states do, we could do

more investigating and we could do some lobbying and we can look back and forth and we could try and mess with the process.

But it is an emergency because right now they have testified that about 50 percent of provisional ballots get rejected just because. And we have a real concern that there is a potential for manipulation that is undetected and is some of the explaining why we saw the increase that we have seen.

The other thing that I think that you mentioned that I think is worth talking about is why is our relief sought cabined to a particular segment of provisional ballots when we are trying to look at it as a whole. That, Your Honor, quite candidly was a practicality.

We thought having them go through the work of actually having to segregate it would depart and take time; whereas, if we can show within a 95 percent confidence level that there is a there there -- there is something wrong, then that would be sufficient to go, considering how modest in the end our relief requested is.

We're not asking to extend the election. We're not asking you to redo anything. We're just merely trying to set up the process for casting provisional ballots that I will submit when you allow me to sum up was made very clear in the testimony would be entirely doable and entirely consistent with the policies they make.

So I think the emergency is that the right to vote is

lost forever when it is lost in an election. And they are going to move ahead in two weeks if we don't do something before then.

THE COURT: All right. So you had additional closing comments. And I know that the State basically reserved its comments until after the evidence was presented. So are you just wanting to respond then to the State and give a closing?

MS. PEREZ: So I mean, I think there's -- there's a couple of points that I would like to make. I'm --

THE COURT: I sort of want to say let's do it once, not do it twice.

MS. PEREZ: Exactly. I'm ready to close.

THE COURT: You don't want to respond to whatever the defense counsel wants to say at this point?

MS. PEREZ: I mean, have you rested?

THE COURT: That's what I'm trying to -- I mean, I just was trying to get myself positioned to understanding the posture of the case when I asked you the question.

**(Unintelligible cross-talk.)**

THE COURT: All right. Thank you. All right. That is fine.

Go ahead.

**(There was a brief pause in the proceedings.)**

THE COURT: I'm sorry. Have a seat again. We're going a take a restroom break for five minutes and a hand break

and all else. So we'll start in five minutes.

**(A brief break was taken at 4:15 P.M.)**

THE COURT: Please have a seat. All right.

MR. BELINFANTE: Good afternoon, Judge.

THE COURT: Good afternoon.

CLOSING ARGUMENT

MR. BELINFANTE: Thank you for allowing us to kind of go forward and put forth our evidence. I think after the evidence has been shown there are at least two reasons to deny the TRO here today, the first and I think most important one you were pointing out in the exchange right at the end.

Even if the numbers showed, the uncontested numbers, every single provisional ballot, which is all they are claiming and even a smaller subsection of that -- but even if every provisional ballot went to one candidate, it does not change the outcome of the election.

Now, does that mean those votes aren't important or those votes weren't cast? No, absolutely not. But what it does mean is that there's not the need for the drastic emergency relief to halt the certification of an election, which you heard can and will have impacts on the runoffs that we suspect will take place for the Public Service Commission and for the Secretary of State's office.

Doubling -- or as a corollary to that, there's particularly no need for a TRO when the basis of standing for

Common Cause Georgia here today is associational standing. They are not suing on behalf of voters. They are suing based on the allocation of resources within Common Cause itself. Mr. Tyson will be addressing that aspect of it.

The second reason that the TRO should be denied is there is simply no evidence of an injury, in fact, that would warrant the type of extraordinary relief that they seek. The affidavits they supply, the news reports -- they are all relying on either news reports or blogs or something of that nature, most of which you heard today address the MVP voting system, which is not used at the registrar's office to determine whether a person is eligible to vote and has previously registered to vote.

What they have presented to you is concerns, fear. We have heard Vladimir Putin. But we have not heard anything -- in fact, to the contrary. We have heard affirmative evidence that there has been no hacks and no successful tampering and no successful hacks to either the MVP system but more importantly the eNet system and as a corollary to the OLVR system.

With that kind of overview in mind, the first reason and the one we set forth in the brief is they simply lack standing under the injury in fact prong. The Supreme Court has said that in order to have an injury in fact, it has to be more than an objective reasonable likelihood of injury.

At best, Your Honor, that is what we have. There is a series of news reports that have been put together about concerns on voter security. Concerns are one thing. But actual injury in fact is something different.

It is mere speculation, which the *Clapper* court we cited in our brief indicates that is insufficient to do. And if you look at the pleadings that have been filed, Paragraph 10 of the complaint, it makes clear that this is a speculative case to begin with. And they have put forth no evidence here to change that.

Paragraph 10 says it is believed that an attacker could potentially automate this process to change the registration of multiple voters at once. The evidence you heard today is that no one has done that.

The second paragraph, Paragraph 12, says, while it is not known how long the vulnerabilities described above have been in place or whether they have been exploited in any way, these mistakes could possibly be the result of vulnerabilities being exploited to change or to delete voter information.

Paragraph 31, on information and belief, vulnerabilities in the system persisted at least throughout Sunday, November 4. Your Honor, those are speculations. They are simply not sufficient to establish an injury in fact.

And *Clapper* is a case that really should control the outcome of that inquiry. *Clapper* involved human rights

organization Amnesty International. They sued claiming that they believed that some of their work in foreign countries led them to come into contact on the phone with persons who were being tapped through a FISA warrant. There were potential clients, witnesses, experts, et cetera.

As described by the Court, their argument though rested on, quote, highly speculative fear. And Justice Alito put forth five facts that he said lead to speculation. First, that the Government would target certain persons with whom they communicate. Second, that the Government would invoke authority to surveil the conversation. Third, that an independent FISA court would approve it. Fourth, the Government will succeed in its intercepting the communication. And, five, human rights groups will be parties to that communication.

Here, there is even more steps involved. It is involved that the state government database for voting would be breached. That has been factually refuted today. And the evidence again put before you on the other side has demonstrated nothing showing a breach.

The second is that the breach was actually -- that the database was actually breached. And there's affirmative evidence indicating otherwise.

Third, that that breach would somehow manipulate the information for a voter that would require that voter to vote a

provisional ballot.

Fourth, that provisional ballot may be decided that it is one that is not counted at a polling station and that the persons making that decision, the local boards of registrars, would ultimately certify an election by throwing away a ballot that somehow someone may have hacked into a system and caused to be something else.

THE COURT: Do I have any information about the standards that are used by the -- that the State agrees can be used by all counties properly?

I understand there are these codes. But that doesn't tell me how they are applied when the -- do we have the same, different standards, or is it totally discretionary so that one county can use one set of standards and look at one database or go so far in its looking versus another county?

MR. BELINFANTE: There are minimums, I believe the testimony indicated, that the counties would do. They would look at the eNet system, and they would determine if that voter is, in fact, going to cast or is eligible -- that provisional ballot should be counted.

You heard testimony that in some counties they go a little further depending on how it is being presented to the registrar at the time. It also may differ if a voter comes back into the polling location or to the county board of elections and says, that day I didn't have my ID. Here it is.

 So there are different standards that can vary based in some ways on what the voter does. But we know that what the county is to do under the law is to look at the eNet system and to determine whether that voter is listed as properly registered and timely registered to vote.

THE COURT: Well, just bear with me. If you are in Fulton County and you have got a lot more people than you do in Stephens County that you are dealing with, who is it who is doing all this checking or are they relying on the local -- what was the initial determination of the poll manager?

MR. BELINFANTE: I believe it would be -- I live in Fulton County. So I mean, you know, if I go in and I go to that first voter registration table and there is an issue and it is flagged and I say I want to vote provisional, I can then vote provisional and I can talk to the poll manager and explain what is going on.

At that point, what they should be doing -- and I believe the testimony reflects this -- is checking into the state database to determine if that person is properly registered and timely registered.

THE COURT: All right. I just found that a little hypothetical. I understand that maybe somebody should do that or that is the ideal. But I think we don't have any information about that that actually is routinely being done, especially when you have got that many people.

Basically, we had long lines. And so I'm not sure that we have information at this point that people -- the quasi volunteer is actually going through all of the stages of looking at a larger field rather than just saying, I don't see you here, and I'm marking it that way.

And so then what -- how does the State determine that the counties are, in fact, going back and looking at a larger database?

MR. BELINFANTE: Well, I think that is what is going on now in the county boards of election as we speak. That the boards of elections under the authority of the superintendents are checking all of those provisional ballots and making determinations based at least on the eNet system or if that person has come in and provided some type of information.

So even if that person were to cast a provisional ballot -- I have gone in and I say, to your example before, I have got to get to work. I have already been here an hour. I'll just cast a provisional. There is a second check on the system after the election which started, I believe, yesterday and is going through this Friday that will make that determination. And that is done at the county level under the supervision of the superintendents.

And I would suggest too, Your Honor, that to the extent that the Court considers that, you know, a critical fact, the onus and the burden would have been on the plaintiff

to show that it is not happening, that there is some issue going on at the county right now. And there has been no allegation of anything improper going on at the county levels at this point.

In fact, in order to show that immediate and irreparable harm, there should have been something showing that the process that is to address the issues that they raised through sometimes double and triple hearsay in their affidavits is failing. And there has not been any evidence to suggest that whatsoever.

In fact, one of the affidavits, Mr. Geltzer, at Paragraph 5 when he talks about all of the concerns with the Georgia voting system acknowledges and testifies he has never looked at it. He read news reports on MSNB or NBC and concluded that yes, this could be an issue.

Your Honor, that is not the standard to order the type of relief that they seek. There has to be something more. And Your Honor had indicated that in one of your prior orders.

THE COURT: So what do you think about this: That the active registered voters this year in 2018 according to Defendant's Exhibit 1 was 6,428,581 voters. And that was roughly a million more than two years earlier. But the ballots cast were a little bit under what was -- what was before in 2016.

The turnout rate according to the data was

61.1 percent as opposed to 76.5 percent in 2016. And then we also have an increase of the actual provisional ballots. I don't know that this makes any difference or it does make a difference.

But would it suggest that there might, in fact, be -- that other people were sent away from the -- just simply sent away and didn't execute ballots?

MR. BELINFANTE: No. Because they are having their -- they are casting provisional ballots. And so I think what the numbers show is that we actually had a tremendous turnout for an off-presidential-year election. And given the numbers that we saw, which were higher than prior off-year elections, in my own math calculation -- I think you can derive this from the numbers that you have been given -- in 2016 the number of provisional ballots cast to the number of active registered voters was .003 percent and in 2018 it was .0033, an increase of .0003.

We have not had any evidence to indicate whether that small amount would be statistically significant or not. But I do think what it shows is that yes, we -- and you heard earlier that there are reasons for increased provisional ballot. Pittman Park was left open. There were a lot of voters that came out then.

There was the order in the other case before this court in front of Judge May that provided some additional

relief and means to do provisional ballots. Judge Ross, I believe, may have issued an order doing the same.

So, again, this goes to the level of speculation that the plaintiff had the burden to come forward and show that there is something going on other than citing affidavits that cite news reports.

THE COURT: So let me just -- because I don't -- we don't have endless time here, let me just focus in. I'm not so persuaded about the standing issue. But what I would like to know is basically what your thoughts are about the question -- a different perspective on the question I was asking opposing counsel, which is: All right. Let's say I don't think this is an emergency situation but that votes matter.

What would be the problem with basically the State agreeing to review these ballots, that they are the provisional ballots and see how -- and particularly this segment of the ballots, even if it is not on this timeline?

If it is not -- I mean, the Secretary of State is charged with the responsibility of the integrity of the voting process. So I mean, the point is well taken by plaintiffs. On the other hand, you make a good point that you're not trying to basically screw up the rest of the election that still has to happen here. And you don't want to put any burden on that whole process.

But if you don't think -- if it is not going to make

a difference in any of these -- I mean, it is not just the governor's race, of course. Maybe these votes would make a difference in one of those other close races. I don't know. I haven't been looking at it in those terms.

But let's say it won't. So what would be the problem with the State agreeing to do the type of review that the plaintiffs are looking for but not on an emergency basis?

MR. BELINFANTE: I think -- well, if I can understand what the Court is asking, if the Court were not to enter an order, for example, requiring the certification date to be moved to the full two period but have a commitment from the State to review the provisional ballots that count in that PR box, I mean, then yes, I think that -- that is something that is quite different from stopping the certification. Because the harm that comes to the State is if that certification is delayed.

And I think my concern, Judge, is that if the Court were to order that the certification be extended to the full time allowed by the statute, where we're going to be is in four or five weeks back here again on absentee ballot issues and early voting issues and whether there has been sufficient time for those to go forward versus here where there is -- certainly the evidence seems to indicate -- no change -- material change to the election either in the case of causing a recount or in the case of causing a runoff that will happen if the status quo

is maintained right now and the certification process

continues.  That the status quo is not halted in any way.

So I think that would be the balance to look to

there.  And, Your Honor, I mean, just if they are denied the

TRO, the complaint is still pending.  They are still seeking

challenges or at least I read it as challenges to Georgia's

provisional voting system.  That can all go forward.  And

possibly by the next election, including next year's municipal

election, we'll be in a different position based on what the

Court decides on the full merits of the case.

But for right now in this election, there's simply no

reason to grant that extraordinary relief.

THE COURT:  And you don't think I should be concerned

about the affidavit that says that Fulton County was only given

50 provisional ballots per precinct and that they ran out of

provisional ballots?

MR. BELINFANTE:  Which affidavit was that, Your

Honor?  I'm sorry I just --

THE COURT:  That's all right.  We are all scurrying.

I understand.

Can you identify the name of the individual, Counsel?

Ms. Perez or Ms. Berse?

MS. PEREZ:  We're looking ourselves.

THE COURT:  It was one that was filed later on --

today that I looked at.

MR. BELINFANTE: Yeah. It appears to be Sara Henderson, Your Honor, Document Number 29.

THE COURT: Right.

MR. BELINFANTE: All right. Here would be my issue or my response.

THE COURT: It is Paragraph 25.

MR. BELINFANTE: Uh-huh (affirmative). Here would be my response to that.

THE COURT: And 24.

MR. BELINFANTE: Okay. Right. So we're talking about two precincts that ran out of provisional ballots. That 22,000 number roughly -- it is less than that -- has now gotten infinitely smaller.

Again, this goes to what is the irreparable immediate harm that warrants the relief. And this is the only one we have. I understand in preliminary injunctions and temporary restraining order hearings that hearsay evidence is admissible and the standard is much relaxed. But here again it would be helpful if those persons were to come so they could be subject to cross-examination.

Right now, we don't know the precinct. We don't know the number of people. We don't know what time this occurred. We don't know if it was remedied. This could have been an accurate statement at 11:00, and then more provisional ballots were provided at some point later in the day. I don't know if

that is feasible. I don't know if that is done.

But I certainly don't think that this four paragraphs in an affidavit involving one or two precincts in Fulton County would warrant the type of relief that the plaintiffs seek.

THE COURT: Thank you.

MR. BELINFANTE: Your Honor, I'm going to rest on our brief on the issues of whether the State is subject to the order or the counties. The superintendents have to be subject to the order. I know the Court is familiar with that.

I would want to raise one other issue though in dealing with the irreparable harm. And that is if you were to grant the order that is requested. And that is looking at -- this speaks to the just standard requirements to obtain a TRO.

On the showing of irreparable harm -- remember, this is Common Cause Georgia suing on a resource claim. The brief at Page 13 says, here there would be no remedy, monetary or otherwise, that would cure the harm suffered by eligible voters. We're not here on behalf of eligible voters. The complaint speaking of Common Cause does not mention or does not base its relief on eligible voters.

Common Cause is here based on what they would have to expend their resources to do in the next three to four days based on something that happened before.

Mr. Tyson will address the remaining issues, Your Honor. But I think I covered mine.

THE COURT: Thank you.

CLOSING ARGUMENT

MR. TYSON: Thank you, Your Honor. I'll be brief just to touch the other issues that are involved with the elements of the TRO.

First, as to Ms. Henderson's affidavit, I am very confident that Fulton County would be brought in an action before the State Election Board if they failed to provide sufficient provisional ballots and would face consequences as a result of that. And, again, Mr. Belinfante said that this is sweeping relief in seeking that.

I briefly wanted to mention associational standing. That to the extent that the plaintiff seeks to have a standing there, there needs to be some individual members because there is an individual harm.

On this likelihood of success --

THE COURT: I think they alleged they have 18,000-plus members in Georgia. So I think that kind of does it.

MR. TYSON: Yes. But the other elements from *Hunt vs. Washington State*, the members have to have standing to sue in their own right, which they would. But we need to know were their rights affected in some way. That is an individual determination. The Eleventh Circuit has said that when it is a membership organization that requires that kind of

determination you need to get the members there instead of the organization as an association.

On this likelihood of success on the merits, the only allegations in the plaintiff's TRO relate to an alleged hacking of the My Voter Page. There is no allegation regarding eNet. There's no allegations that that system was somehow compromised. So as the State's voter registration database was not affected, we don't see how there is any likelihood of success.

The plaintiffs have not brought an equal protection claim as far as disparate treatment by different counties. Each county is required to resolve the provisional ballots through a good faith effort by statute. And the procedural due process claims, there is a process in place dealing with this. And to the extent the Court needs to address or wants to look at the other claimed harms or the claimed bases for the plaintiff's claims, those can be addressed outside the emergency context.

In terms of the balance of the equities and the public interest, *Benisek* from the Supreme Court has told us in the election contest that we are very disfavored in granting injunctions in this context. That is also clear when we have had a long period of time to resolve this. The plaintiffs state in their filings that they have known of issues since 2015, 2016. There are -- they filed this case on Monday but

then waited until after the election results looked like they might be dependent on provisional ballots before seeking emergency relief before --

THE COURT: They filed it like at 11:55 or something on Monday night. So let's -- I think that we'll call that Tuesday.

MR. TYSON: We'll call that Tuesday, Your Honor. And, again, Director Harvey testified, there would be just a significant impact on all of the other things that have to happen post certification if certification is delayed in all the other elections.

And on the public interest, clearly we're in a situation where the public interest is let's go forward with the runoffs. There is no reason to pull out these ballots and put them separately.

There is no unusualness about the number of absentee ballots -- provisional ballots this year on the statistics, especially when we had the number of extended polling hours, we have the number -- the additional orders from Judge May regarding treating absentee ballots as provisionals.

It is hard to make an apples-to-apples comparison to past years given the fact we have to look at how many precincts were held open and why these were voted as provisional ballots in the past year.

So, Your Honor, just -- I would also just -- the last

point, the cases cited in the plaintiff's brief regarding the granting of preliminary injunctions in the election context, those were all cases where they were brought significantly -- at least a few months before the election and there was time to address these issues.

Granting emergency relief after an election when the certification or the counting process for provisional ballots will be complete tomorrow evening is drastic relief, and we would urge the Court not to grant that relief to the plaintiffs.

THE COURT: Thank you.

CLOSING ARGUMENT

MS. PEREZ: Thank you, Your Honor. There are just a few things that I would like to just make very crystal clear. One is at no point in time have we suggested that certification should be delayed. We have purposely come in with a modest and limited request for relief that is based on a trigger that is statistically identifiable because we take very seriously the importance of getting elections done on time.

THE COURT: All right. But you haven't really addressed are we in that statistically significant range.

MS. PEREZ: Well, we did not have that data. Now we do. We -- you know --

THE COURT: You mean you are filing -- you filed it since we began the hearing?

MS. PEREZ: We filed because -- the theory of the case -- the reason why we waited on Monday was because over the weekend the Secretary took actions exacerbating whatever risk was taken. That is in the declarations of both Mr. Wallach and Mr. Geltzer. The publicization of the hacking, the accusations blew this thing up to a completely different level in terms of vulnerability.

And we intentionally -- we intentionally filed before Tuesday before we knew the results, because as a nonpartisan organization, Common Cause does not care who wins. We care about voters. We felt like the risk had gotten serious and severe because of late breaking actions brought upon the defendant. And we wanted to be in a position where we could find the existing -- work within the existing system to make sure that there were protections.

THE COURT: So you have heard obviously the defendant's evidence that you can't hack the system through.

MS. PEREZ: Right. So there's a couple of things that I think are relevant. One is that while it is true that the express use of the word eNet is not in plaintiff's complaint, what has been at its core is the voter registration database. And there has been serious allegations -- credible allegations that another system has been breached, that another system had access. And because we know because our computer scientists know, because our cyberterrorists know, that voter

registration systems are as a general rule not hardened enough
and that Georgia was one of the lists of places in which
Russian cybercriminals were trying to assess, we wanted to see
if there was data suggesting we needed something to be worried.
That data was in the hands of defendants up until just a moment
ago.  And now we have information on provisional ballots.

You do not need right now, Your Honor, to decide that
it has been hacked.  We just right now for the purposes of this
TRO want you to enter an order protecting people's rights just
so we can determine if there is a basis for moving forward and
having a full-on merits hearing within a very short time
period.

What has become incredibly clear -- what has become
incredibly clear throughout this hearing is that there's a lot
of circular reasoning here.  For example, if there is an attack
on eNet, someone will get notified.  That presupposes that
whoever is attacking isn't sophisticated enough to mess up the
notification process.  If someone is ineligible, they are -- if
someone is eligible, they'll get caught in the registration
process that uses the very database that we're worried about
manipulating.

The request that -- the relief that we're requesting
right now is incredibly narrow.  It can be done within the time
period.  It does not have to mess up the certification.  We
actually heard record testimony that 50 percent of the ballots

are rejected. 50 percent of provisional ballots are rejected. So that must mean that 50 percent of everybody that tries to go to the polls and get stuck with provisional ballots are either not eligible or there's some mistake in the system. There's human error somewhere because either poll workers made a mistake in coding it, some canvassing board took some shortcuts, or something is wrong with the database.

We know that eNet is the primary way that people use to establish whether or not a registration was proper. And so we get in that loop that I'm worried about. Someone doesn't get a regular ballot because eNet says that they are not eligible, and then they go back and look at eNet to see whether or not they are eligible.

If that has been manipulated, if there is a problem in the data, the voter is in a loop of disenfranchisement through their no making. But what I thought was super important is that even if eNet is the primary method the counties have other methods. And that is what the ultimate relief that we're seeking is, that for people not to get rejected solely on the basis of what is in eNet but rather to look at other information.

THE COURT: So supposedly, at least, according to the statute, you are supposed to get a call, aren't you? You're not supposed to get the call. But you can call if you had submitted a provisional ballot and find out the basis of your

being excluded.

Do you have any information that people -- that some of the people that you are concerned about have called and basically been -- and what the evidence is in connection with that, or is that a system that is on paper but doesn't actually happen?

MS. PEREZ: What we do know, Your Honor, is that some people are not getting provisional ballots at all so that the provisional ballot rate is going to be an undercount. It has not been submitted, but it would be very easy for me to submit information in evidence saying that information to how to get your provisional ballots counted is very spottily distributed to voters -- very, very spottily distributed.

THE COURT: How do you call back to find out?

MS. PEREZ: How do you even know that you have a method for checking it? I mean, I have a personal story in New Jersey. When I called, the system wasn't even set up. Like the call-in number wasn't --

THE COURT: Well, I can believe all that. I just don't have that evidence.

MS. PEREZ: No, you don't have that evidence, Your Honor, at this moment. But we believe that if there are not ballots that are rejected right now we could produce that later, if it is even warranted, which is something that we have not had the ability to assess it.

THE COURT: So I do understand, you know, the gravity of the concerns you have. Absolutely. And obviously -- I think that lots of people are very concerned about the provisional ballots. But that still is different from the question of emergency relief. I mean, that --

MS. PEREZ: If you're -- I mean, we are interested in making sure that voters who cast provisional ballots through no mistake of their own are able to cast a ballot that counted. Right now, the mechanism for doing that is set up through the provisional balloting process. And there is a certification issue.

If we got a representation that we could revisit this, we would be -- we are willing -- we are trying to find something that works. We are very, very sensitive to the fact that there is a lot going on and that election administrators are there. Right now because of the certification deadline, it is my understanding that if we do this after that they are effectively not counted if there was a mistake.

THE COURT: Well, they may effectively not be counted. But if the objective is to fix it ultimately --

MS. PEREZ: Well, the objective is to fix it and to give -- not make voters the victims of manipulation or problems that was not through their own making. Right. So I mean, it is -- there would be a good done irrespective of that. And if defendant's counsel was -- we would be willing to talk. We are

very interested in trying to figure out something that is workable.

This system that we set up, as I mentioned before, was something we had set up in another state. And we managed to make it. I mean, you heard, Your Honor, you know, testimony that if this judge ordered there to be a process where they didn't rely on eNet, they were told that they had a certain time period, the State had to review them, everybody would figure out a way to get it done because that is what election administrators do.

I want to note that they are indeed segregatable. They do communicate with counties. This is a narrow and doable ultimate relief that we're suggesting. And right now it is extraordinarily narrow because all we're saying is don't reject somebody with any finality for the time being until we are able to get more.

I want to talk a little bit about standing just because it matters a lot to my client. There were two kinds of standings assessed, both organizational and associational. In organizational, we have already established that our injury has occurred. It will be exacerbated if in the future it turns out that there was more activity that needs to be done.

But you can look on Ms. Henderson's affidavit in 12, 14, 15, 21, 22 -- I'm probably missing some -- of where they have already had to divert their resources. They have already

had their mission frustrated, and it may not have been through eNet. It may be because of MVP.

But for the purposes of standing and what they are trying to do, it actually doesn't matter. It is vulnerabilities in the system that voters fear and are causing them work. That is thwarting what it is that their mission is supposed to do and making them divert resources from other important things.

In Jenny Flanagan's declaration, you can take a look at 8, 9, 10, 11. This is not a speculative injury. This is not an injury that depends upon being able to present somebody. They have been injured in their own behalf and on their own right. And I think their standing is very clear.

Ultimately I would urge this Court to consider the modesty of what it is that we are asking in terms of emergency relief. We want a very limited and segregatable and identifiable number of ballots to not be rejected. And ultimately we want a process for ensuring that every ballot that was rejected needed to be rejected for a reason and that there is some sort of review so that people are being deliberate and thoughtful about it.

Other states have done it. We can do it in this place. And to the extent to which in the Court's judgment something else that looks like this makes more sense, we would certainly be open to it.

THE COURT: So thank you. If there's any authority you want to submit in response to -- there was extensive discussion about this was not sufficient -- I'm very familiar with associational standing. You know, there is some -- a different twist of the argument here. You don't have any individuals here.

MS. PEREZ: Right. So the organization -- we're more -- our primary -- Common Cause usually asserts organizational standing as opposed to associational standing. But even given this compressed time frame, I feel confident that we could -- we could present members. We just don't have them right now.

THE COURT: If there's -- if there is any authority you want to send us this evening, you are welcome to do so.

MS. PEREZ: We're certainly happy to do that.

THE COURT: I want to just ask the State a question. I'm using the cutoff of having 200 provisional ballots. There's a lot obviously fewer places or counties than if you are looking at this whole list.

Does Mr. Harvey know how many of the counties actually have roughly completed their process?

MR. HARVEY: Your Honor, as of this morning, I believe six or maybe seven counties have completed the process.

THE COURT: And do you have any information as to how they -- what a normal process looks like in terms of -- for

instance, Cobb County where for its 2002 provisional ballots -- it has had a lot of provisional ballots in the past. This is the most. But how they sort them? Do they just take them -- how do they review those?

MR. HARVEY: Every county does it a little bit differently. But they generally take the cases I guess that they deem to be the more complex and they give them to the more experienced people. That has been my experience, especially in the metro area.

Gwinnett County tends to have a lot too. I have spoken directly with their election director. And she reserves her most expert staff to do the ones that have the most issues. I mean, for example, if somebody is in another county and they are asserting that they moved but then they transferred their registration, that is certainly more complicated than somebody that simply says there is absolutely no evidence that they have ever been registered. So it really depends a little bit based on the circumstances.

THE COURT: Somebody who just was the PR code, is that generally considered an easy code then? Because they can't find them on the data or they might have only looked at precinct database and so all they have to really do is look at --

MR. HARVEY: To some extent, those are sometimes the easiest and sometimes the most difficult too. It is easy if

there is absolutely no record. Usually if there is no record of that voter in eNet, they would often go to paper files. And they would check the paper copies.

And they also would generally check the applications that came in after the deadline. Because it may be that the voter is asserting that they registered to vote but they registered after the deadline and they could come in and they could say, here is your application. It was filed -- it was submitted a week after the deadline. So the voter to that extent is right in their own mind in believing they're registered. However, they don't realize there was a deadline.

THE COURT: Okay. Thank you. Well, you know, it is five after 5:00. I still actually have to have a pretrial conference in a criminal case I'm going to hear. So I'm going to end this at this time.

I guess the only question I really have is can you-all agree basically to -- that in terms of holding off on accepting a final certification at least until the completion of Friday -- of tomorrow? Because there's only so many hours I want to stay up tonight. It has been a long week for me too.

MR. TYSON: Your Honor, the certification -- the provisional balloting process will be complete tomorrow. But the certification from the counties will not happen until Tuesday. So the period ends for voters to come back and present an ID to --

THE COURT: Tomorrow?

MR. TYSON: -- tomorrow.

THE COURT: But they are not going to make a final determination on that until Tuesday?

MR. TYSON: Tuesday is when the results will be certified. Mr. Harvey may have more --

MR. HARVEY: In some cases, Your Honor, they will -- the counties will certify on Friday if they are -- again, if somebody just had, say, two PI and the voter doesn't come in and they have got everything else ready at 5:00, some counties may certify Friday afternoon. Some counties meet Saturday and certify on Saturday. So --

But Tuesday is the deadline. I think many counties will certify on Tuesday. But I believe some counties will certify Friday and maybe some more on Saturday.

THE COURT: Well --

MR. TYSON: And there is one other kind of logistical piece. It does require a public meeting of the board of elections that has been noticed. There will be those kinds of things that go with that. So it is not like -- I'm not sure we can say stop certifying before Tuesday.

THE COURT: Well, I guess the question is is anyone certifying tomorrow is my question or tomorrow night.

MR. HARVEY: I believe some will, Your Honor. Although I can't give you any specifics. I know that does

happen.

THE COURT: Well, would you be so kind then as to update me by 10:00 in the morning --

MR. HARVEY: Yes, ma'am.

MR. TYSON: Yes, Your Honor.

THE COURT: -- as to those and determine whether there is actually a public meeting that has been scheduled for tomorrow.

I don't know how they would do that if the voter has until Friday -- how you -- unless they only had a few and therefore they heard from everybody.

MR. TYSON: I mean, Your Honor, they can go ahead and notice the meeting ahead of time and say we'll meet at 5:30 on Friday, for example. Then if nobody comes in, they are ready to proceed.

THE COURT: Well, I'm assuming -- I mean, it is very interesting thinking about anyone in public life having meetings at 5:30 on a Friday. But that is -- you know, that is another matter. I don't mean that in a critical way. I just mean it in a reality way.

So if there is anyone that should be in that position, I would be grateful to know. Because, otherwise, we would be able to work in a little more rational way tomorrow and tonight. I would like to hear from you. Maybe we could -- the -- if there is some errant one, then maybe we'll just live

with that.

MR. TYSON: Yes, Your Honor. We would have to contact each county to ask them if they have a meeting scheduled, which we can undertake that with the election staff. But that is what we can do.

THE COURT: Right. That is what I'm looking for.

All right. Let me know. Thank you.

Are there any other affidavits coming in? I know I gave you leave to give any more authority on those associational issues.

MS. BERSE: Just the two affidavits I mentioned earlier -- summarized earlier. We'll do our best to get those from the -- from those two voters.

THE COURT: I just wanted to know whether we should be looking. That is all.

Thank you very much. Thank you everyone for working on a very short time frame. I appreciate it. And that concludes this proceeding. And depending on what I hear, you'll hear from me at some point likely tomorrow or tomorrow evening.

All right. Very good.

COURTROOM SECURITY OFFICER: All rise. Court stands in recess.

**(There was a brief pause in the proceedings.)**

THE COURT: I just -- is the plaintiff's claim based

on -- is it solely tied to the -- basically the concern about the hacking of the database, or is it also based on election officials' human errors or mode of operation or all two or three?

MS. PEREZ: Okay. Your Honor, the ballots we are concerned about as a result of the hacking are folks that are not on the registration list. And we do believe that human error and lack of guidance, being busy, all sorts of other things are going to make the provisional balloting process as it currently exists an inadequate catch or an inadequate remedy, which will make it a hollow fail-safe.

So it is not -- right now we're not alleging anything because some poll worker checked ID when they needed to check something else. But we do think that human error and the speed and the guidance that has gotten beforehand and the reliance on eNet and all of those sorts of things are going to lead to voters who have been improperly impacted not having any relief.

THE COURT: All right. Thank you.

MS. PEREZ: Thank you.

**(The proceedings were thereby concluded at 5:10 P.M.)**

C E R T I F I C A T E

UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA

I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of the United States District Court, for the Northern District of Georgia, Atlanta Division, do hereby certify that the foregoing 123 pages constitute a true transcript of proceedings had before the said Court, held in the City of Atlanta, Georgia, in the matter therein stated.

In testimony whereof, I hereunto set my hand on this, the 9th day of November, 2018.

Shannon R. Welch

SHANNON R. WELCH, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT