IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| COMMON CAUSE GEORGIA, as an organization, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:18-cv-5102-AT |
| BRIAN KEMP, in his official capacity as Secretary of State of Georgia, | : | |
| | : | |
| Defendant. | : | |

## ORDER

Plaintiff Common Cause Georgia filed this action against the Georgia Secretary of State[1] seeking emergency injunctive relief to ensure that provisional ballots cast by eligible registered voters in the 2018 general election are properly counted.  According to Plaintiff's Complaint, information in the State's voter registration server, used at the polls to determine whether voters are eligible to vote, is vulnerable to multiple security breaches and exploitable by manipulation of voter data.  Plaintiff alleges that Brian Kemp, as Secretary of State, failed to

---

[1] Plaintiff filed the Complaint in the late evening hours of Monday, November 5, 2018 on the eve of the November 6th general election, against Brian Kemp in his official capacity as the Georgia Secretary of State.  On Thursday, November 8, 2018, Mr. Kemp tendered his letter of resignation to Governor Nathan Deal.  According to counsel for Mr. Kemp, Governor Deal has appointed Robyn A. Crittenden as acting Secretary of State for the State of Georgia.   Under Federal Rule of Civil Procedure 25(d), "[a]n action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending," and "[t]he officer's successor is automatically substituted as a party."  Fed. R. Civ. P. 25(d) (further providing, "Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded. The court may order substitution at any time, but the absence of such an order does not affect the substitution.").

maintain the security of voter information despite known vulnerabilities leading up to the 2018 election.  Plaintiff further alleges that the Secretary's knowing maintenance of an unsecure, unreliable voter registration database increased the risk that eligible voters have been and will be unlawfully removed from the State's voter registration database or will have their voter registration information unlawfully manipulated or mismanaged in a manner that prevents them from casting a regular ballot.  Under the State's existing provisional ballot scheme, a voter whose name is not found on the voter registration list may only vote by casting a provisional ballot, and such ballot will not be counted if the voter's eligibility cannot be verified because the voter's name is not found on the voter registration list maintained by the Secretary of State.  As a result of the Secretary's actions, Plaintiff alleges that eligible voters who have taken the required steps to register and maintain their registrations may – through no fault of their own – arrive at the polls and not be permitted to cast a regular ballot and therefore suffer disenfranchisement from the voting process.

Plaintiff seeks an injunction on the basis that the State's existing provisional balloting scheme: (1) infringes upon the fundamental right to vote and imposes an undue burden on eligible voters in violation of the due process clause of the Fourteenth Amendment; and (2) violates the Help America Vote Act ("HAVA") requiring the State to count provisional ballots if voters are eligible to vote.

However, Plaintiff seeks this relief *if* there is a statistically significant increase[2] in the percentage of the provisional ballots cast, relative to the total number of votes in the 2018 elections as compared to prior elections.

Currently pending before the Court is Plaintiff's Motion for Temporary Restraining Order and Expedited Discovery [Doc. 15] filed the day after the general election on November 7, 2018.[3]

In the motion, Plaintiff requests that the Court enter a temporary restraining order ("TRO") enjoining the rejection of any provisional ballots cast during the 2018 general election on the basis that the voter's name was not found on the voter registration list, pending a decision on the permanent relief requested in this case. In the hearing, Plaintiff clarified that the TRO request seeks very limited relief for an order preventing the final rejection of provisional ballots for the narrow class of persons whose information was not shown in the State's registration database during the State's two-week election certification timetable provided in O.C.G.A. § 21-2-499(b).   Plaintiff also seeks expedited discovery of: (1) the number of provisional ballots cast per county, and the reason for each; (2) all guidance provided by the Secretary to county officials regarding counting provisional ballots or assessing the eligibility of voters who voted by provisional ballots; and (3) all

---

[2] In other words, the increase in the provisional ballot rate must be enough where the Court could be confident that the variation was not due to natural fluctuation.

[3] Also pending before the Court is Defendant's Motion to Strike [Doc. 52] the Declarations of Michael McDonald [Doc. 46], Edgardo Cortés [Doc. 48] and Kevin Morris [Doc. 50].  Because the Court has not precluded either party from presenting relevant evidence, the Court **DENIES** Defendant's Motion to Strike [Doc. 52].

coding sheets or similar documents used in review of provisional ballots and ascertaining the eligibility of voters who voted by provisional ballots.

The Court held a hearing on Plaintiff's Motion on November 8, 2018.  At the hearing, Plaintiff presented oral argument and Defendant presented the testimony of Chris Harvey, the Secretary of State's Elections Director, and Merritt Beaver, the Secretary of State's Chief Information Officer.  The Parties offered additional evidence following the hearing.

## I.   BACKGROUND

### A.   General Overview of Georgia's Voter Registration System and the Provisional Balloting Scheme

Under the Help America Vote Act ("HAVA"), Georgia is required to implement a single centralized, computerized, statewide voter registration list containing the name and registration information of every legally registered voter in the State. 52 U.S.C. § 21083(a)(1)(A).  "ElectioNet" or "eNet" is the statewide digital data record of voter registrations used in Georgia.  When a person in Georgia registers to vote and submits a voter registration application, county election officials input the information from the application into eNet.  The burden is on the registrant to present the necessary proof required to the appropriate officials to become a Georgia voter.[4]  The following voter information is included

---

[4] The voter registration application will only be accepted as valid after the board of registrars has verified the applicant's identity. O.C.G.A. § 21-2-220.1(c). Additionally, the applicant must submit satisfactory evidence of United States citizenship. *Id.* at § 21-2-216(g)(1). To verify the applicant's identity, including citizenship, the eNet system matches the voter application information against the files of Georgia's Department of Driver Services ("DDS") and/or the Social Security Administration ("SSA"). *Id.* at § 21-2-220.1(c)(1).

in eNet: residence information, biographical information, personal identifying information (driver's license and social security numbers), districting information (House, Senate, Congress), and voting history.  Confidential voter identification data from eNet is fed directly into the "ExpressPoll" electronic pollbooks.  Poll workers access this pollbook data by computer to verify voter registration on election day (and to create the DRE Voter Access Card that activates the specific electronic ballot on the DRE machine that should be linked to the voter's address).

The Secretary of State also operates and maintains a public website ("My Voter Page" or "MVP") that can be used by voters to look up their publicly available voter information, verify their voter registration status, and modify their address.[5] According to the Secretary of State's MVP webpage, "My Voter Page provides a web-based search of data extracted from Georgia's statewide voter registration database," but it is not the official record of a voter's registration. https://www.mvp.sos.ga.gov/MVP/mvp.do.

HAVA gives voters in federal elections a right to cast "provisional" ballots. 42 U.S.C. § 15482.  Provisional ballots are cast by persons who assert they are

---

[5] "MVP is part of a suite of software from PCC Technology, Inc. called e Electio*Net* (also commonly known as "eNet". (Wallach Decl. ¶ 13. Doc. 35)   According to PPC's website, "Electio*Net* is the Voter Registration and Election Administration suite used by more states than any other solution to ensure the integrity of voter and election related data. Voter Registration, Online Voter Registration, Election Management, My Voter Portal, and Election Night Reporting modules are fully integrated, feature rich, and real-world tested, enabling PCC to maintain its position as the premier organization in the election administration industry." https://pcctechnologyinc.com/electionet/) PCC Technology's website indicates that the company provides voter registration services to 15 state clients (including Georgia) and online voter registration to six states, including Georgia.   https://pcctechnologyinc.com/client-list/. (Websites last visited November 11, 2018.)

eligible to vote but who are determined by election workers on-the-spot to be ineligible. Each provisional ballot is kept in a separate envelope and counted only if it is ultimately determined that the voter was in fact eligible to vote. HAVA additionally provides that at the time the voter casts the provisional ballot, the appropriate "State or local election official shall give the individual written information" regarding their right later to ascertain through a toll-free telephone or internet website whether his vote was counted and if not, the reason the vote was not counted. 42 U.S.C. § 15482(a)(5)(A) and (B).

Georgia has established a system for provisional voting. O.C.G.A. §§ 21-2-418, 419. The statute providing for the right to cast a provisional ballot states, in relevant part:

> (a) If a person presents himself or herself at a polling place, absentee polling place, or registration office in his or her county of residence in this state for the purpose of casting a ballot in a primary or election stating a good faith belief that he or she has timely registered to vote in such county of residence in such primary or election and the person's name does not appear on the list of registered electors, the person shall be entitled to cast a provisional ballot in his or her county of residence in this state as provided in this Code section.

> (b) Such person voting a provisional ballot shall complete an official voter registration form and a provisional ballot voting certificate which shall include information about the place, manner, and approximate date on which the person registered to vote. The person shall swear or affirm in writing that he or she previously registered to vote in such primary or election, is eligible to vote in such primary or election, has not voted previously in such primary or election, and meets the criteria for registering to vote in such primary or election. The form of the provisional ballot voting certificate shall be prescribed by the Secretary of State. The person shall also present the identification required by Code Section 21-2-417.

(c) When the person has provided the information as required by this Code section, the person shall be issued a provisional ballot and allowed to cast such ballot as any other duly registered elector subject to the provisions of Code Section 21-2-419.

O.C.G.A. § 21-2-418.[6]

Once a provisional ballot is cast, it will be counted if and only if the person is later determined to have been entitled to vote.  As set forth in O.C.G.A. § 21-2-419:

(b) At the earliest time possible after the casting of a provisional ballot, but no later than the day after the primary or election in which such provisional ballot was cast, the board of registrars of the county or municipality, as the case may be, shall be notified by the election superintendent that provisional ballots were cast in the primary or election and the registrars shall be provided with the documents completed by the person casting the provisional ballot as provided in Code Section 21-2-418. Provisional ballots shall be securely maintained by the election superintendent until a determination has been made concerning their status. The board of registrars shall immediately examine the information contained on such documents and make a good faith effort to determine whether the person casting the provisional ballot was entitled to vote in the primary or election.

(c)(1) If the registrars determine after the polls close, but not later than three days following the primary or election, that the person casting the provisional ballot timely registered to vote and was eligible and entitled to vote in such primary or election, the registrars shall notify the election superintendent and the provisional ballot shall be counted and included in the county's or municipality's certified election results.

---

[6] Section 21-2-418(d) also provides that in "elections in which there is a federal candidate on the ballot, in the event that the time for closing the polls at a polling place or places is extended by court order, all electors who vote during such extended time period shall vote by provisional ballot only. Such ballots shall be separated and held apart from other provisional ballots cast by electors during normal poll hours."

(2) If the registrars determine after the polls close, but not later than three days following the primary or election, that the person voting the provisional ballot timely registered and was eligible and entitled to vote in the primary or election but voted in the wrong precinct, then the board of registrars shall notify the election superintendent. The superintendent shall count such person's votes which were cast for candidates in those races for which the person was entitled to vote but shall not count the votes cast for candidates in those races in which such person was not entitled to vote. The superintendent shall order the proper election official at the tabulating center or precinct to prepare an accurate duplicate ballot containing only those votes cast by such person in those races in which such person was entitled to vote for processing at the tabulating center or precinct, which shall be verified in the presence of a witness. Such duplicate ballot shall be clearly labeled with the word "Duplicate," shall bear the designation of the polling place, and shall be given the same serial number as the original ballot. The original ballot shall be retained.

(3) If the registrars determine that the person casting the provisional ballot did not timely register to vote or was not eligible or entitled to vote in such primary or election or shall be unable to determine within three days following such primary or election whether such person timely registered to vote and was eligible and entitled to vote in such primary or election, the registrars shall so notify the election superintendent and such ballot shall not be counted. The election superintendent shall mark or otherwise document that such ballot was not counted and shall deliver and store such ballots with all other ballots and election materials as provided in Code Section 21-2-500.

Under O.C.G.A. § 21-2-418, counties have 3 days following the election to process provisional ballots to determine whether they will be counted.

As noted earlier, HAVA further mandates that any individual who casts a provisional ballot will be able to ascertain whether the vote was counted, and, if the vote was not counted, the reason that the vote was not counted.  52 U.S.C. § 21082.  Georgia's provisional ballot statute requires two methods of notification to

voters.  Section 21-2-419(d)(1) requires that the board of registrars "notify in writing those persons whose provisional ballots were not counted . . . because of the inability of the registrars to verify that the persons timely registered to vote or other proper reason."[7]  And Sections 21-2-418(e) and (f) provide:

> (e) The registrars shall establish a free access system, such as a toll-free telephone number or Internet website, by which any elector who casts a provisional ballot in a primary or election, or runoff of either, in which federal candidates are on the ballot may ascertain whether such ballot was counted and, if such ballot was not counted, the reason why such ballot was not counted. The registrars shall establish and maintain reasonable procedures necessary to protect the security, confidentiality, and integrity of personal information collected, stored, or otherwise used by such free access system. Access to such information about an individual provisional ballot shall be restricted to the elector who cast such ballot.

> (f) At the time an elector casts a provisional ballot, the poll officers shall give the elector written information that informs the elector of the existence of the free access system required by subsection (e) of this Code section by which the elector will be able to ascertain if his or her ballot was counted and, if such ballot was not counted, the reason why such ballot was not counted.

## B.    Certification of Election Results

Each county election superintendent must certify the county's consolidated election results not later than 5:00 P.M. on the Monday following the date of the election and immediately transmit the certified returns to the Secretary of State. O.C.G.A. § 21-2-493(k).  Because Monday, November 12, 2018 is a holiday, the counties have until Tuesday, November 13, 2018 to certify their returns.

---

[7] The board of registrars is also required to "notify in writing those electors who voted in the wrong precinct and whose votes were partially counted of their correct precinct." O.C.G.A. § 21-2-419(d)(2).

According to Defendant, the Office of the Secretary of State does not receive the certifications of results until the day after the deadline for certification under O.C.G.A. § 21-2-493(k) – i.e. Wednesday November 14, 2018. The Secretary of State must certify the election results not later than 5:00 P.M. on the fourteenth day following the date of the election, in this case Tuesday, November 20, 2018. O.C.G.A. § 21-2-499(b).

### C.    Summary of Evidence/Classification of Provisional Ballots

According to the information provided by the Secretary in connection with this case, a total of 21,190 provisional ballots were cast in the November 2018 general election in Georgia.  This is compared to 12,151 provisional ballots cast in 2014, and 16,739 provisional ballots cast in 2016.  Director of Elections, Chris Harvey, testified that only about 50% of provisional ballots cast will likely be counted based on past experience.[8]  According to news reports on Saturday, November 10, 2018, the number of provisional ballots cast statewide is closer to 27,000 (based on a county-by-county canvas), a difference of nearly 5,000 from the total provided to this Court by the Secretary of State's office.[9]

According to Defendant, as of 10:20 am on November 11, 2018, 92 out of Georgia's 159 counties had certified their election results.   (Doc. 57 at 2.)

---

[8] Based on the data provided by Defendant and available on the Secretary of State's website: (i) 6,913 of the 12,151 provisional ballots cast in the 2014 midterm election were counted, i.e. 56%; and (ii) 7,646 of the 16,739 provisional ballots cast in the 2016 presidential election were counted, i.e. 45%.

[9] https://www.ajc.com/blog/politics/georgia-election-weekend-clash-over-how-many-gov-votes-are-still-uncounted/dUpaJi6Yw9NXH8NxXcovbM/.

Defendant's filing on November 11, 2018 indicates that 92 of 159 counties had certified their election results.  (Doc. 57.) Four of the State's counties with the largest number of provisional ballots -- Cobb, DeKalb, Fulton, and Gwinnett -- had not yet reported their numbers to the Secretary as of November 11th.

There are a number of reasons why a voter may be given a provisional ballot. They include problems such as:   a voter's registration not showing up in the registration database or having been removed from the database; voters without photo identification, voters without proof of citizenship or with citizenship documentation that either had not been reviewed and entered into the state voter database;  voters who showed up to vote at the wrong polling precinct or county; voters who cast their ballots during extended polling hours or after the polls had closed; or problems with a signature mismatch on an absentee ballot.  When a person votes by provisional ballot, poll workers mark the ballot envelope with a code that indicates the reason for the provisional ballot.  These codes are: (1) PR - provisional registration; (2) PI  - photo identification; (3) IR -  this code is used for absentee or election-day voters who registered to vote by mail and did not provide identification with their registration[10]; (4) EH - extended hours; (5) OP  - out of precinct; (6) X - this is the code for someone flagged as a non-citizen[11]; (7) V -  this code is used when the voter was not verified by a match to DDS or SSA databases

---

[10] These voters can use more forms of identification to verify their identity than just a photo ID under O.C.G.A. 21-2-417(c), which matches the requirements contained in the Help America Vote Act.
[11] This was inadvertently referred to as CZ at the hearing.

when they registered to vote[12]; (8) Other; and (9) Sig Match - signature mismatch. Of the counties who provided information to Defendant as to the breakdown of these codes by provisional ballot, 5,751 of the 13,116 provisional ballots, roughly 44% were PR-coded ballots and 5,495 of the 13,116 provisional ballots, roughly 42% were OP-coded ballots.

### D.    Evidence of Registration Impacts on Voters

Plaintiff offered declaration evidence from a variety of sources regarding various issues with voter registration.

India Owens avers she is a United States citizen and resident of Gwinnett, County, Georgia who is eligible to vote. (Doc. 31.) She previously registered to vote using her current address and voted in the 2016 presidential election at the polling place at Union Grove Baptist Church. (*Id.* ¶ 3.) Owens has not moved or changed her address since 2016. (*Id.* ¶ 4.) On election day, on November 6, 2018, Owens went to her polling place at Union Grove Baptist Church at 7:00 a.m. to vote and was told by a poll worker that there was no record of her registration in the system. (*Id.* ¶ 5.) Owens was not provided with a provisional ballot and left the polling place without voting. (*Id.*) Owens returned to the same polling place at 5:45 pm and requested a provisional ballot. (*Id.* ¶ 6.) She was provided a provisional ballot on which she cast her votes. (*Id.*)

---

[12] If someone was in a pending verification status and did not have sufficient identification when she presented to vote, she would be assigned V status on a provisional ballot. This is essentially the same category as PI.

Rudolph C. Richter is a Georgia resident, U.S. citizen by birth, who has never been convicted of a crime, and has a valid Georgia driver's license. (Doc. 60-1.) He currently resides in Roswell, Georgia, where he has lived and been registered to vote for 17 years. Richter registered to vote decades ago in Atlanta, Georgia. He is a regular voter and rarely misses voting in federal elections. His polling place is at the Roswell United Methodist Church. Because he is a regular voter, Richter did not check his voter registration status on the Secretary of State's website prior to attempting to vote during the early voting period for the 2018 general election.

Richter attempted to vote on the first day of early voting at his regular polling place. According to Richter, the lines were long, the poll workers were flustered and having a difficult time answering the questions of the voters, and it was taking a very long time to process each individual voter due to problems with the computers failing to locate voter registration information in the system. Richter was informed by a poll worker that he could not vote because he was not registered. Richter protested, but ultimately left the polling place, and was not offered a provisional ballot. Richter called Election Protection, a non-partisan voter protection hotline, and was advised to return to his precinct with documentation.

Richter returned to vote a few days later at his same polling location with his driver's license and his Fulton County vehicle registration receipt showing his address. He waited in line for 45 minutes but was again told he was not a registered voter. He asked for and was given a provisional ballot. He did not receive any information about how to cure his provisional ballot or to determine whether it

13

will be counted.  Ricther called the Fulton County Election Board and was told there was nothing he could do to cure his registration issue because according to their records he was not registered and therefore his provisional ballot would not count.   Before November 9, and within the time to cure his provisional ballot, Richter emailed Brenda McCloud and Ralph Jones at the Fulton County Election Board and in response was informed there was no record of his ever having voted in Fulton County or the State of Georgia.

Richter is extraordinarily upset by his experience in attempting to vote in the 2018 general election.  He was disturbed to learn that his voter registration information and history has been erased despite his regular voting history for decades.  Richter joined Common Cause on November 10, 2018 after learning it was part of the Election Protection effort that had helped him with his voter registration problems.

Like Richter, Eugenia Lea Willingham is a Georgia resident, U.S. citizen by birth, who has never been convicted of a crime, and has a valid Georgia driver's license.  (Doc. 60-2.)  She currently resides in Atlanta, Georgia, where she has lived since July 2017.  On May 1, 2018, Willingham went to the Mechanicsville Public Library and registered to vote.  Willingham has been a registered voter in Georgia and North Carolina.  Willingham had moved to North Carolina in 2010, but moved back to Georgia in 2017.  Voting is important to her as a means to hold elected officials accountable to the public and she intends to vote in future elections. Willingham attempted to vote on election day, November 6, 2018, at her polling

place at the West Oakland Missionary Baptist Church.  She rearranged her work schedule in order to vote.  Poll workers told Willingham she was not registered.  When Willingham insisted she was, in fact, registered, the poll workers called the Fulton County Board of Registration and Elections.  The poll workers informed Willingham that the Board said Willingham could not vote and would not let her cast a provisional ballot.  The poll workers told Willingham that because she had not voted in the two previous elections, her "account" had been "cancelled."

Willingham left the polling place and went directly to the office of the Fulton County Board of Registration and Elections where a representative of the Board told Willingham that her registration had been cancelled because she had not voted recently.  Willingham told the representative she had registered in May.  The representative told Willingham if she wanted to vote, she would need to obtain a "declaration page" from the library in order to prove she had registered.  Willingham left and called the Secretary of State's office in order to lodge a complaint about her registration being lost.  Willingham then spoke with Melanie Frechette, the Secretary of State's Office liaison to local elections.  Ms. Frechette told Willingham she should speak with Ralph Jones at the Fulton County Board of Registration and Elections.  Willingham made several attempts to contact Mr. Jones.  Ms. Frechette also told Willingham that she could vote a provisional ballot at any precinct.  Willingham went to the precinct where she had previously voted before moving to North Carolina, the Little Five Points Community Center, where

she was able to cast a provisional ballot, even though her registration could still not be found in the pollbooks.

After Willingham was finally able to speak with Mr. Jones with Fulton County, he told her he would try to find her registration, but also told her she would need to get the declaration page from the library where she had registered. Willingham then went back to the library where she had registered and obtained a copy of the declaration page proving that she had registered in May. The library maintained a folder of all the declaration pages from everyone who had registered at that location. On Wednesday, November 7, Willingham took a copy of her declaration page to the Fulton County Board of Registration and Elections. The Board of Registration and Elections gave Willingham a voter registration card back-dated to May 1, 2018, the date of her registration at the library and told her that her provisional ballot would be counted. On Friday, November 9 at 4:50 pm, Willingham called the Board of Registration and Elections to confirm her vote was counted. She was told the Board had not yet finished counting ballots and to call back on Tuesday, November 13 to confirm. Willingham plans to do so, but she currently does not yet know with certainty that her vote will, in fact, be counted. Willingham joined Common Cause on November 11, 2018 because of its efforts to protect voters from being denied their rights.

Harrison Wood, a volunteer for the Democratic Party's Georgia voter protection hotline from October 22, 2018 through November 6, 2018, answered calls from Georgia voters who experienced problems with voting. (Doc. 27.) Wood

16

received a number of calls from voters who experienced problems with their voter registration at the polls, including voters who had registered but whose names did not appear on the list, and voters who had previously registered and voted using their current address in 2016 but were told on election day, on November 8, 2018, that their registrations were listed at an old address in a different county. (*Id.* ¶¶ 6, 10.) Many of these voters told Wood they had taken specific actions to change their voter registration addresses, in person, online, or at the Department of Motor Vehicles or other state agencies. (*Id.* ¶ 11.) In some cases, these callers indicated they had received written confirmation that their registrations had been successfully updated. (*Id.*) In assisting callers with questions regarding their voter status, Wood consulted the list of voters who were purged from the voter registration list by the Secretary of State in 2017 and 2018 for failing to vote in two prior elections. (*Id.* ¶ 9.) Some of the individuals Wood spoke with who appeared on the purged list had, in fact, voted in 2016 without a problem but were now being told they were no longer on the list of registered voters. (*Id.*) For others who called because their names were not on the voter list despite having registered, Wood was unable to find their names on the registration list at any address or on the list of purged voters though they claimed to have voted previously without issue. (*Id.* ¶ 10.)

Kathryn Grant is a registered voter in Georgia. On election day, November 6, 2018, she served as a poll watcher on behalf of the Lowndes County Democratic Party at three different precincts in Valdosta, Georgia. (Doc. 28.) Grant worked at

Precinct 3 at Northside Baptist Church from 6:00 p.m. to 8:15 p.m.  (*Id.* ¶ 6.) Another poll worker reported to her there had been a lot of confusion at this precinct.  (*Id.* ¶ 7.) At the time the doors to Precinct 3 closed, 30 to 40 people were in line to cast provisional ballots.  (*Id.* ¶¶ 8-9.)  Grant, who was standing about a foot from this provisional ballot line, overheard at least ten voters complain about issues with their voter registration that they had encountered at the polling place. (*Id.* ¶ 10.)   According to Grant, it was not clear that voters who were issued provisional ballots were provided any instructions about what they could do to track their ballot or confirm that it was counted.  (*Id.* ¶ 11.)  According to the information provided by Defendant, there were 1,174 provisional ballots cast (out of 35,090 total ballots) in Lowndes County.  (Doc. 43.)

Jordan Barry, a resident of Fulton County, Georgia, is an intern at the Joseph and Evelyn Lowery Institute, focusing on civic engagement to encourage millennials to participate in the political process by voting.  (Doc. 36.)  Barry avers that to assist in doing this work, she frequently checked her voter registration status on the Georgia My Voter Page in the weeks leading up to the election to become more familiar with the process.  (*Id.* ¶ 3.)  She checked several times and found herself listed as an active voter.  (*Id.*)  However, on one occasion closer to the election, she was unable to locate herself in the My Voter Page database.  (*Id.*) Barry spoke with election officials who instructed her on how to search using her address rather than her name.  (*Id.*)  In addition, Barry worked at the New Horizon Senior Center early voting precinct on the Thursday and Friday leading up to

election day.  (*Id.* ¶ 4.)  She personally spoke with more than 20 people who had trouble voting because their names could not be found in the voter rolls or the incorrect gender was listed.  (*Id.*)  Some of these voters were instructed to use provisional ballots.  (*Id.*)  Barry also volunteered at Morehouse College on election day, where she personally spoke with approximately 15 voters who had problems with their names not being found in the voter rolls or the wrong gender listed.  (*Id.* ¶ 5.)  Some these voters were also instructed to vote using provisional ballots.  (*Id.*)

Sara Henderson, the Executive Director of Common Cause Georgia ("CCGA"), participated in CCGA's election protection program in partnership with ProGeorgia and the Georgia Coalition for the People's Agenda.  (Doc. 29.)  CCGA monitored 110 polling locations in 22 Georgia counties through on-site shifts of volunteers.  (*Id.* ¶ 8.) On election day, November 6, 2018, Henderson worked at a command center at the Phillip Rush Center in Southeast Atlanta from 8:30 am to 10:00 pm.  (*Id.* ¶¶ 16-17.)  Henderson personally fielded calls from at least 40 voters and volunteer poll monitors in the Savannah, Southwest Georgia, Metro-Atlanta, and Athens-Clarke County areas.  (*Id.* ¶¶ 18-19.)  She also placed calls to local boards of elections to attempt to resolve the issues being reported to her.  (*Id.*)  According to Henderson, the most common reported issue was from voters who encountered problems with their voter registration at the polls.  (*Id.* ¶ 20.)  Henderson also received reports regarding problems with provisional ballots.  (*Id.* ¶ 21.)  Specifically, it was reported to Henderson that numerous people were told to vote provisionally as a result of voter registration issues.  (*Id.* ¶ 22.)  Henderson

received a report from one person who was not given the option of voting provisionally. (*Id.* ¶ 23.) In addition, Henderson received reports that two precincts in Fulton County ran out of provisional ballots. (*Id.* ¶ 24.) As a result, people who should have been offered provisional ballots were not permitted to vote. (*Id.*) Henderson spoke with a staff member at the Fulton County elections call center who informed Henderson that: (i) each precinct in Fulton County was given only 50 provisional ballots at the start of balloting; (ii) poll workers could not print provisional ballots at the polling places; (iii) provisional ballots had to be printed at a central location and delivered to each precinct; and (iv) the central location could only print 5 to 10 provisional ballots at a time, per precinct. (*Id.* ¶ 25.) Henderson also personally received complaints about long lines at polling places and received reports that throughout the day there were lines requiring two hour waits in polling places in Metro Atlanta. (*Id.* ¶ 26.)

Jennifer Flanagan, Vice President for State Operations at Common Cause, worked a national voter protection hotline in Washington, D.C. on November 6, 2018. (Doc. 30.) According to Flanagan's declaration, the hotline command center received multiple complaints of problems in Georgia, including that eligible voters could not be located on the voter rolls, and reports that voters were checking their registration and voting location online but when they showed up to vote, they were being told they were at the wrong location. (*Id.* ¶¶ 6-8.) Georgia voters also reported complaints about voting machines not working, misinformation from poll workers, and polling places running out of provisional ballots. (*Id.* ¶¶ 7-8.) The

problems most frequently discussed were long lines, the high use of provisional ballots, and the fact that a number of polling places all over the state ran out of provisional ballots.  (*Id.* ¶ 8.)  Flanagan reports that the hotline received "an exceptionally high volume of calls from Georgia as compared to other states." (*Id.* ¶ 7.)

### E.    Statistical Evidence Regarding Provisional Ballots Reported for 2018 Election

At the Court's request, Defendant provided information at the TRO hearing on the number of provisional ballots cast in the 2018, 2016, and 2014 elections statewide and by county.  This information (current apparently as of the morning of November 8, 2018) was included in a table attached as Exhibit A to the Declaration of Chris Harvey.  Statewide, the Secretary of State's Office reports that in the 2018 election there were 21,190 provisional ballots cast out of 3,930,890 total ballots cast, for a provisional ballot rate of 0.54 percent.  In 2016, there were 16,739 provisional ballots cast out of 4,165,405 total ballots cast for a provisional ballot rate of 0.40 percent.  In 2014, there were 12,151 provisional ballots cast out of 2,596,947 total ballots cast, for a provisional ballot rate of 0.47 percent.  This data is summarized in the table below.

|  | **2018** | **2016** | **2014** |
|---|---|---|---|
| **Provisional Ballots Cast** | 21,190 | 16,739 | 12,151 |
| **Total Ballots Cast** | 3,930,890[13] | 4,165,405 | 2,596,947 |
| **Provisional Ballot Rate** | 0.54% | 0.40% | 0.47% |

As Plaintiff's request for injunctive relief hinged on the statistical significance of the increase in the number of provisional ballots, the Court ordered Plaintiff to submit an analysis of this data from a qualified statistician.  The Court gave Defendant the opportunity to do the same.

In response to the Court's Order, Plaintiff provided the declaration of Michael P. McDonald, Ph.D., Associate Professor at the University of Florida, who is widely regarded as a leading expert on United States elections and has published extensively in peer-reviewed journals on election turnout rate issues.   (Doc. 46.) According to Dr. McDonald, statewide, the provisional ballot rate has been increasing over time and there were 4,451 more provisional ballots cast in 2018 than in 2016, which had a higher turnout rate.  The change in the provisional ballot rate from 2016 to 2018 increased by 0.14 percentage points and the provisional ballot rate from 2014 to 2018 increased by 0.07 percentage points.[14]   (*Id.* at 4.) From a statistical standpoint, Dr. McDonald concludes that these changes are

---

[13] However, as of November 11, 2018 at 10:07 am, the unofficial results published on the Secretary of State's website reports that the total number of ballots cast has increased to 3,940,255.
[14] Dr. McDonald reviewed the data provided by Defendant at the hearing in addition to more updated data published on the Secretary of State's website.

"unusually high" and are significant in that they "describe the actual observed changes, and are not a function of random sampling." (*Id.* at 5.)  Based on Dr. McDonald's statistical analysis, he determined that the provisional ballot rate, which is defined as the share of the total ballots that were cast as provisional ballots, increased from 2014 to 2018 at a statistically significant rate "at conventional levels of statistical significance, i.e., the *p*-value for this coefficient is 0.045, which is less than the widely accepted .05 critical value." (*Id.* at 6.)  In other words, the percent of total ballots that were cast provisionally was significantly higher in 2018 than in 2014, and the likelihood of that higher rate occurring by chance is less than 5 percent.  Dr. McDonald also found that midterm elections are the most comparable elections, and the balance of the evidence suggests the provisional ballot rate across Georgia counties was higher in 2018 compared to 2014 or 2016.[15]  (*Id.* at 7.)

Defendant provided the declaration of John Alford, Ph.D., an Associate Professor at Rice University, who has testified as an expert in litigation in the State

---

[15] Defendant suggested at the hearing that the increase in the percentage of provisional ballots cast in the 2018 election might be explained by the fact that there were extended voting hours in some counties.  McDonald and Kevin Morris, a quantitative Researcher at the Brennan Center for Justice, have analyzed the data from Fulton and Gwinnett, the two counties with extended polling hours, and concluded that the provisional ballot rates in these counties did not increase substantially in 2018 such that it is not reasonable to conclude that the increase in the provisional ballot rate is attributable to those extended hours.  (Morris Decl., Doc. 50 ¶¶ 7-16.)  Put simply, "the increase in the provisional ballot rate that Dr. McDonald describes in his declaration cannot be explained by the extended hours in Fulton and Gwinnett counties."  (Morris Decl. ¶ 16.)  In addition, Dr. McDonald explains that the increase in provisional ballot rate is evident in one of Georgia's largest counties, DeKalb County, where the rate more than doubled from 0.4469 percent in 2014 to 0.97 percent in 2018.  (McDonald Decl. at ¶ 5.)  Dr. McDonald noted that DeKalb County did not have extended voting hours.

of Georgia.  (Doc. 45.)  He reviewed the ballot data provided by Defendant at the TRO hearing to determine whether there was a statistically significant increase in the percentage of provisional ballots.  (*Id.* ¶¶ 4-5.)  Dr. Alford opined only that "the data provided is too narrow to determine whether the increase in provisional ballots between the 2018 election and the 2014 election and the 2018 election and the 2016 election is statistically significant."  (*Id.* ¶ 6.)  Dr. Alford's one sentence conclusion did not indicate the basis for this determination.

According to Defendant, the total number of provisional ballots cast is not enough to swing the gubernatorial election.  Plaintiff, on the other hand, has offered declaration evidence that this may not in fact be the case, and that the provisional ballots may impact the result of the election for other candidates in the general election.  To illustrate these points, Plaintiff offers the declaration of Edgardo Cortés, the former Chairman of the U.S. Election Assistance Commission Standards Board who currently serves as Election Security Advisor to the Brennan Center for Justice at NYU School of Law.  (Doc. 48.)  Mr. Cortés avers that the uncounted provisional ballots could prove pivotal, for a number of reasons, in determining whether the contest for governor, among other contests, might be forced to go into a runoff.  (*Id.* ¶ 3.)  According to Mr. Cortés, Mr. Kemp's unofficial vote total is close enough to the 50% threshold for a runoff.  (*Id.* ¶ 4.)  At the time of Mr. Cortés's declaration, the unofficial results listed on the Secretary of State's website, as of November 9, 2018 at 12:26 pm, was 1,973,935, or 50.33% of the vote total.  (*Id.* ¶ 5.)  However, as of November 12, 2018 at 5:38 p.m., the unofficial

results published on the Secretary of State's website reports that Mr. Kemp has 1,976,614, or 50.26%, compared to 1,918,847 votes, or 48.79% for Ms. Abrams.  Mr. Cortés explains that in his experience as an election administrator at the local and state level, canvasses frequently turn up three kinds of anomalies in tabulating unofficial results prior to local certification.  (*Id.* ¶¶ 8-9.)  First, poll workers often fail to add up the totals from every machine at a polling place so that vote totals from entire machines are initially uncounted.  (*Id.* ¶ 10.)  Second, errors can occur in transcribing unofficial results so that the numbers are flipped, i.e. "148 votes" is read as "841 votes."  (*Id.* ¶ 11.)  Third, vote totals for a precinct or polling place can be reversed, so that candidate X is marked as receiving the totals for candidate Y, and vice-versa.  (*Id.* ¶ 12.)  According to Mr. Cortés, "in races where the critical margin is less than 0.5%, these [types] of errors can flip results" between the time of the unofficial results forecasted on election night and the completion of the vote canvass.  (*Id.* ¶ 13.)  In addition, Mr. Cortés has noticed one other factor that leads him to believe that the final canvass could result in altered numbers that could prove critical in determining whether a runoff will be required.  (*Id.* ¶ 14.)  The total votes cast for the governor's race is more than 10,300 votes less than the total number of votes cast in the general election.  (*Id.*)  In his experience, Mr. Cortés opines that this discrepancy is a high undervote for the first race on the ballot and the highest profile race in the election.  (*Id.*)

Plaintiff has also offered an additional declaration from its Executive Director, Sara Henderson, which explains that based on the unofficial results as of

November 10, 2018 at 12:00 pm, there were three State Representative elections that had a margin between the two candidates of less than 300 votes. (Doc. 56.) These races are for House District 37 in Cobb County, House District 50 in Fulton County, and House District 108 in Gwinnett County. (*Id.* ¶¶ 6-13.) In each of these races, there are significantly more provisional ballots outstanding than the vote differential between the candidates, such that there is a reasonable likelihood that the provisional ballots yet to be counted could be outcome-determinative in each of the races. (*Id.* ¶¶ 8-16.) The data for each of these races is summarized in the table below.[16]

|  | House District 37 | House District 50 | House District 108 |
|---|---|---|---|
| **Difference in vote total between candidates** | 145 | 291 | 246 |
| **Reported number of provision ballots cast in county** | 2,202 | 3,670 | 2,427 |

## II.  DISCUSSION

The standard for obtaining a temporary restraining order ("TRO") is identical to that of obtaining a preliminary injunction. *Windsor v. United States*,

---

[16] Common Cause Georgia emphasized at the TRO hearing that it is a non-partisan public interest organization and that ultimately, the results of any specific electoral contest is not its concern. Instead, Plaintiff articulated its central concern as being the need to protect every citizen's right to cast a vote under our nation's governance system and to ensure that voter participation is not compromised by the government's failure to maintain the integrity and transparency of the voter registration as well as the voting process and count.

379 F. App'x 912, 916-17 (11th Cir. 2010). "To support a preliminary injunction, a district court need not find that the evidence positively guarantees a final verdict in plaintiff's favor." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995). Instead, it must determine whether the evidence establishes: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction were not granted; (3) that the threatened injury to the plaintiff outweighs the harm an injunction may cause the defendant; and (4) that granting the injunction would not be adverse to the public interest. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is "appropriate given the character and objectives of the injunctive proceeding." *Levi Strauss & Co.*, 51 F.3d at 985 (quoting *Asseo v. Pan American Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). "A request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief . . . in order to assure the availability of permanent relief." *Levi Strauss & Co.*, 51 F.3d at 987; *Federal Trade Commission v. United States Oil and Gas Corp.*, 748 F.2d 1431, 1433–34 (11th Cir. 1984) (holding that a district court may exercise its full range of equitable powers, including a preliminary asset freeze, to ensure that permanent equitable relief will be possible). However, a preliminary injunction "is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden

of persuasion' as to the four prerequisites." *McDonald's Corp.*, 147 F.3d at 1306 (internal citations omitted).

### A.   Standing

Defendant challenges Plaintiff's standing to pursue the requested relief. Plaintiff must demonstrate three elements to establish standing under Article III. First, Plaintiff must have suffered, or must face an imminent and not merely hypothetical prospect of suffering, an invasion of a legally protected interest resulting in a "concrete and particularized" injury. *United States v. Hays*, 515 U.S. 737, 742-43 (1995) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)); *Common Cause/Georgia v. Billups*, 554 F.3d 1340,1349 (11th Cir. 2009) (quoting *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1159 (11th Cir. 2008)). Second, the injury must have been caused by Defendant's actions. *Hays*, 515 U.S. at 742-43; *Billups*, 554 F.3d at 1349.  Third, Plaintiff's injury, or threat of injury, must likely be redressed by this Court decision.  *Hays*, 515 U.S. at 743; *Billups*, 554 F.3d at 1349.

Plaintiff asserts it has organizational standing and standing on behalf of its 18,785 members in Georgia.  (Compl., ¶¶ 2-4; *see generally*, Henderson and Flanagan Declarations.)  Plaintiff couches the harm suffered in the absence of emergency relief as the infringement of the fundamental right to vote and the excessive burdens that have been and will continue to be placed on Common Cause Georgia in its mission to support its Georgia membership and Georgia voters in the exercise of their right to vote. (Flanagan Decl. ¶ 2.)

It is well established that an organization can establish standing to sue on its own behalf where it can show the defendant's acts resulted in an impediment to the organization's mission or diversion of its resources. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (holding that an organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts); *Billups*, 554 F.3d at 1350 (holding that NAACP established an injury sufficient to confer standing to challenge voter ID statute where evidence showed that the NAACP "uses [its] resources to maximize the ability to mobilize voters and educate voters and register voters," and that the statute would impact the NAACP's voter registration efforts "because it would have to divert volunteers and resources from "getting [voters] to the polls" to helping them obtain acceptable photo identification"); *Browning*, 522 F.3d at 1158, 1164-66 (holding that organizations had standing to challenge a voting requirement in Florida because the organizations "reasonably anticipate[d] that they [would] have to divert personnel and time to educating volunteers and voters on compliance" with the new voting requirements "and to resolving the problem of voters left off the registration rolls on election day").

An association or organization, in appropriate circumstances, has standing to assert claims based on injuries to itself or its members if that organization or its members are affected in a tangible way. *See United Food and Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544 (1996). More

specifically, an organization can "enforce the rights of its members 'when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Arcia v. Fl. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014) (quoting *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 181, (2000)); *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

Common Cause Georgia ("CCGA") is a non-partisan citizen lobby devoted to electoral reform and the protection and preservation of the rights of all citizens to vote in national, state, and local elections.  (Henderson Decl. ¶ 3; Flanagan Decl. ¶ 2 ("As part of [its] mission, Common Cause is committed to ensuring that every eligible American, and every eligible Common Cause member, has the right to vote and the opportunity to exercise that right.").  CCGA has 18,875 members and supporters in Georgia and a history of working on voting rights in the State.  (*Id.* ¶¶ 4-5.)

In the last several years, CCGA has increased its efforts in the areas of election protection, voter education, and grassroots mobilization involving voting rights issues.  (*Id.* ¶ 5.)  These efforts include, among other things: (i) education around maintenance of the voter registration list; (ii) social media and digital campaigns urging voters to report their issues with maintenance of the voter registration list; (iii) engagement with various media channels to educate voters

on how to check their voter registration status; and (iv) organizing additional chapters on two college campuses at Spelman College and Morehouse College to raise awareness regarding voting and democracy issues among students.  (*Id.*)

In connection with the 2018 election, CCGA developed and implemented an election protection program, consisting of the following activities: (i) CCGA's "Save Our Democracy" Tour of 14 cities across Georgia to educate voters on election protection and election administration issues; (ii) CCGA's collaboration with the Coalition for the People's Agenda, the ACLU of Georgia, and ProGeorgia to recruit and train poll monitors; and (iii) CCGA's monitoring of 110 polling locations in 22 Georgia counties.  (*Id.* ¶ 8.)  CCGA plans to publish an in-depth report in early 2019 detailing the results of the election protection program. (*Id.*)

As part of Common Cause's election protection program, Common Cause promoted and staffed a national voter protection hotline to address questions from voters during the election.  (Flanagan Decl. ¶ 4.)  This year during the November election, "Georgia received, by far, the greatest amount of attention" at the voter hotline command center.  (*Id.* ¶ 6.)  The problems encountered during the Georgia election described above lead Common Cause to divert its limited resources at the hotline command center away from voter issues arising in other states.  (Flanagan Decl. ¶ 9.)  In addition, Common Cause's social media and on-the-ground teams were forced to shift the focus of its "get-out-the-vote" message generally to a more targeted effort to inform voters about the right to vote by provisional ballot in Georgia.  (*Id.* ¶¶ 10-11.)  The security problems with the voter registration database

required Common Cause to send additional staff members to work on the ground in Georgia in advance of the election, resulting in the understaffing of its efforts in other states and at the command center.  (*Id.* ¶ 12.)

According to the CCGA's Executive Director, Sara Henderson[17], as a result of the Secretary's failure to maintain a secure voter registration system, "CCGA has been and will continue to be required to divert resources toward a variety of efforts to combat or mitigate the harmful consequences."  (*Id.* ¶ 11.)  For example, CCGA "has had to divert resources to educate voters about what to do if they encounter registration problems at the polls and CCGA has also had to divert resources to answer voters' questions about the security of the state's voting systems" and "will likely have to educate voters regarding the risk of voter list vulnerability and manipulation and the potential need to re-register to vote."  (*Id.*)  In addition, according to Henderson, the cost of CCGA's election protection work is likely to increase significantly in response to the increased number of registered voters who have faced problems at the polls as a result of the Secretary's actions.  As part of its Election Day protection program, CCGA staff and volunteers expended considerable time assisting eligible voters who could not be found on the voter registration list.  (*Id.* ¶ 12.) With the inevitability of a runoff for at least two statewide races in Georgia, CCGA will have to redouble these efforts.  Many of these voters who voted by provisional ballot during the general election, but who are

---

[17] Ms. Henderson is CCGA's only paid staff member in Georgia.  As a result, CCGA relies significantly on the work of its volunteer members.  (Henderson Decl. ¶ 13.)

unaware that their ballots were rejected, may likely attempt to vote in the runoff election only to encounter the same registration obstacles.   This situation may be heightened because the evidence of  intense confusion and difficulties surrounding casting of votes and provisional ballots in some counties suggests a likelihood that a range of voters were never given the legally required written instructions in connection with their right to acquire information as to the treatment of their provisional ballot.

In sum, Plaintiff has offered evidence that the Secretary's failure to maintain a reliable voter registration system has likely adversely affected and will continue to adversely affect CCGA's "mission of increasing voter engagement, enhancing voting rights, and improving democracy." (Henderson Decl. ¶ 9; Flanagan Decl. ¶¶ 7-15.)   In addition, Plaintiff's Complaint and Ms. Henderson's declaration represent that Defendant's widely published allegation in an official SOS press release on the Sunday before the election that the Democratic Party had attempted to hack the state's voter registration system[18] created further public confusion and anxiety at the polls.   (Compl. ¶¶  22-30.)   According to Plaintiff, the confusion among voters about their registration status, and the perception that voters are being prevented from exercising their right to vote thwarted CCGA's work to enhance participation in the political process and voter's trust in the democratic

---

[18]  This occurred just one day after Plaintiffs' counsel in *Curling v. Kemp,* Civil Action No. 1:17-cv-2989-AT, 2018 WL 4625653, ---F. Supp. 3d --- (N.D.  Ga. Sept. 17, 2018) had confidentially alerted Defendant's counsel regarding a specific data system vulnerability concern.  (Compl. ¶¶ 22-29.)

system of government. (Henderson Decl. ¶ 14; Flanagan Decl. ¶ 15.)  According to Henderson, combating these effects will have "a substantial and concrete impact on [CCGA's] finances, operations, and mission."  (*Id.* ¶ 13.)

Defendant's claim that the Secretary cannot redress Plaintiff's injury fails because the Secretary of State is the state official in charge of enforcing Georgia's election laws.  *Grizzle v. Kemp*, 634 F.3d 1314, 1316 (11th Cir. 2011) ("As the Secretary of State is the chairperson of the State Election Board and the State Election Board is charged with enforcing Georgia's election code under state law....").  Given Defendant's role as the chief election official of the state, a ruling by the Court directed at Defendant can redress Plaintiff's injuries.

Defendant also contends that because more than half of Georgia's 159 counties have already certified their election results, the Court cannot enjoin what has already occurred and Plaintiff's request for emergency relief is therefore moot. The Secretary of State is responsible under Georgia's election laws for the final certification of the official results of the election. *See* O.C.G.A. § 21-2-499.  In that capacity, the Secretary of State "[u]pon receiving the certified returns of any election from the various superintendents . . . shall immediately proceed to tabulate, compute, and canvass the votes cast," prior to certifying the returns.  *Id.* § 21-2-499(a).  "In the event an error is found in the certified returns presented to the Secretary of State or in the tabulation, computation, or canvassing of votes . . . the Secretary of State shall notify the county submitting the incorrect returns and direct the county to correct and recertify such returns.  Upon receipt by the

34

Secretary of State of the corrected certified returns of the county, the Secretary of State shall issue a new certification of the results." *Id.* The certification process required of the Secretary of State under Georgia law, on its face, is more than a mere rubber stamp. It requires that Secretary of State to engage in the same tabulation, computation, and canvassing process undertaken by the counties as set forth in O.C.G.A. § 21-2-493 prior to final certification. And in the event errors are discovered, the Secretary of State shall notify and direct the counties to engage in a redo. Accordingly, Plaintiff's claim for emergency relief regarding processing and counting of provisional ballots is not moot.

The Court finds that CCGA has an organizational interest in supporting voters through the course of the election, including the runoff (and beyond), and that the alleged conduct by the Secretary has and will continue to cause harm to CCGA's mission and voter protection and education efforts. CCGA has made a sufficient showing of an imminent concrete injury based on the evidence that it has already and reasonably anticipates having to further divert personnel and resources to resolving the problem of voters left off the registration rolls on election day. *See Browning*, 522 F.3d at 1165 ("The fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury."). The Court further finds that Plaintiff has standing to assert the rights of its members who voted by provisional ballot in the November 2018 general election. *E.g., Arcia v. Fl. Sec'y of State*, 772 F.3d at 1342.

### B.    Likelihood of Success on Merits

Plaintiff seeks an injunction on its claims that Defendant's actions impede an eligible voter's fundamental right to vote by failing to remedy vulnerabilities in the State's voter registration system.   Plaintiff's claims assert violations of due process under the Fourteenth Amendment and HAVA.

When deciding whether a state election law violates the Fourteenth Amendment, the Court must weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary.  *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).  "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).  Voting is, indisputably, a right "'of the most fundamental significance under our constitutional structure.'" *Burdick*, 504 U.S. at 433 (quoting *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)).  The right to vote includes "the right of qualified voters within a state to cast their ballots and have them counted." *United States v. Classic*, 313 U.S. 299, 315 (1941) (emphasis added).  State and local laws that unconstitutionally burden that right are impermissible. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008). As explained below, the Secretary's

failure to maintain the voter registration database and properly implement the provisional balloting scheme unnecessarily burdens the rights of Georgia voters.

Congress sought to protect the right to vote by adopting the provisional voting section of HAVA.  *See* 42 U.S.C. §§ 15482(a)&(b)(2)(E); *Florida Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1078 (N.D. Fla. 2004) ("HAVA speaks directly of individual voters, not just of actions required of elections officials, and HAVA even refers explicitly to the 'right' of voters to cast a provisional ballot."). The purpose of HAVA's provisional voting section is to ensure that voters are allowed to vote (and to have their votes counted) when they appear at the proper polling place and are otherwise eligible to vote.  *Hood*, 342 F. Supp. 2d at 1079. The person who claims eligibility to vote, but whose eligibility to vote at that time and place cannot be verified, is entitled under HAVA to cast a provisional ballot, as well as to have that vote counted if they are duly registered.[19]  42 U.S.C. §§ 15482(a), 15482(a)(4) ("If the appropriate State or local election official to whom the ballot or voter information is transmitted under paragraph (3) determines that the individual is eligible under State law to vote, the individual's provisional ballot shall be counted as a vote in that election in accordance with State law.")

This case bears the earmarks of having been brought on an emergency TRO basis.  The evidence is preliminary and clearly subject to further development and

---

[19] Under HAVA, a person cannot be denied the right to cast a provisional ballot based on an on-the-spot determination by election workers that the person is at the wrong polling place. *Hood*, 342 F. Fupp. 2d at 1081.  "Election workers, like all of us, make mistakes, and the voting rolls are not infallible. That is why provisional balloting exists." *Id.*

explanation.  Plaintiff initially proceeded predominantly on the basis that the voter registration data system was susceptible to malicious manipulation and had been mismanaged, resulting in citizens' exclusion from casting counted ballots and deprivation of their fundamental constitutional interest in voting, the casting of unusually high numbers of provisional ballots, and injury to Plaintiff's non-partisan mission of promoting the essential process of voting in our nation's democracy.  Plaintiff contended that relief should be granted in the event of a statistically significant increase in the casting of provisional ballots, as such would be a reliable indicator of a serious problem in the registration/provisional ballot process outside of natural voting fluctuations.

A variety of affidavits from Common Cause representatives engaged in the election voter support process in Georgia as well as some additional declaration evidence were presented prior to the TRO hearing.  Three, including two from SOS representatives, were presented during the hearing.  Subsequent to the TRO hearing, both parties submitted expert declarations regarding the provisional voting data the Secretary of State had presented at the hearing.  Plaintiff submitted multiple supplemental sworn declarations in the ensuing three days through November 11, 2018.  Defendant in turn filed a notice of suggestion of mootness on November 11th.  This stream of evidence and developments inevitably caused the Court to take additional time in the consideration of the issues and drafting of this Order.

This evidence included statistical evidence as well as additional sworn declarations of poll watchers and voters intended to convey the real life experience of voters who faced hurdles in their registration status and even in obtaining the opportunity to cast provisional ballots at the polls after they were affirmatively told they were not on the registration rolls, despite having voted from the same home in the recent past or affirmatively represented they had timely registered and were regular voters. The Court finds that Plaintiff's evidence is sufficient to show, under the exigent circumstances presented that:

(1) Comparing the 2018 election and the last non-presidential election in 2014, there has been a statistically significant increase in the proportion of voters required to vote on provisional ballots relative to the total vote.

(2) Repeated inaccuracies were identified in the voter registration system that caused qualified voters likely to lose their vote or to be channeled at best into the provisional voting process because their registration records did not appear or had been purged from the data system.  For example, there was evidence from voters that they were registered but were told they were not in the registration system; there was evidence that voters were sometimes refused provisional ballots or if provided provisional ballots, sometimes had to return to the polls to insist on this. Similarly, there was evidence from Common Cause poll monitors and hotline workers to the same effect.

(3) There was evidence that certain counties and precincts stintingly provided provisional ballots to voters despite the volume of individuals facing registration issues at the polls.

(4) The evidence concerning the operation of the computerized registration system was more sparse, but relied in part on the extensive expert evidence introduced in connection with the preliminary injunction hearing in *Curling,* which addressed the major reliability and security problems of the electronic voting system and interfacing voter registration data system.

Defendant's Chief Information Officer testified that any change or manipulation of data on the MVP voter portal and system cannot impact the related computerized voter registration data system because the feed between the eNet system and MVP is supposed to be uni-directional from eNet to MVP solely. Therefore, Defendant contends that any data corruption or systemic data vulnerabilities in the MVP interface will not feed back into the eNet voter registration data system, which in turn supplies the electronic pollbooks used at the polls for voter identification.  Cyber engineer Logan Lamb's declarations in this case and in *Curling*[20] however, identify a central limitation in this analysis.  First, most concretely, Lamb has identified the broad scope of the exposure of voter databases with personal information[21] that had already occurred before his

---

[20] *See* 1:17-cv-2989, Lamb Decl., Doc. 258-1 at 129-131,133 and attachments thereto.
[21] This includes information required for modifying voter registration information.  Doc. 258-1 at 129, ¶ 4.

persistent whistle-blowing finally led the Secretary of State to assume management of the databases from Kennesaw State University in late 2017.  Lamb has explained how this means that voter data erasures and manipulation that improperly occurred in the last years can still continue.  Other critical software and password information also was openly accessible on the Kennesaw site until the near end of 2017, with similar repercussions.[22]  Second, Lamb indicates why he believes that the data feed is not strictly uni-directional.  This evidence needs more development from both sides at a lengthier hearing with more expert testimony. Still, the real-world experience reflected in citizens' credible statements regarding  the deletion or corrosion of their registration data, when they have regularly voted for years at the same location or have other registration documentation or verification must carry some weight in tandem with the statistical evidence on this issue.

In summary, while further evidence will be necessary in the future, the Court finds that the combination of the statistical evidence and witness declarations in the record here (and the expert witness evidence in the related *Curling* case which the Court takes notice of) persuasively demonstrates the likelihood of Plaintiff succeeding on its claims.  Plaintiff has shown a substantial likelihood of proving that the Secretary's failure to properly maintain a reliable and secure voter

---

[22] See *also Curling v. Kemp,* Civil Action No. 1:17-cv-2989-AT, 2018 WL 4625653, at *4-8.  At the September 12, 2018 Preliminary Injunction hearing in *Curling*, the SOS representatives could provide no information as to how this major data, software, passwords, or other critical information exposure was addressed by the Secretary's office after it assumed control.  *Id.* at *4, 13.  However, at the TRO hearing in this case, Defendant provided information relating to another matter.

registration system has and will continue to result in the infringement of the rights of the voters to cast their vote and have their votes counted.

###    C.    Irreparable Harm

Defendant argues that Plaintiff cannot demonstrate irreparable harm absent the grant of a temporary restraining order and has only demonstrated the potential for harm to individuals outside of this lawsuit.  However, as the Court has already found[23], Common Cause Georgia has more than 18,000 members in Georgia whose interest in unburdened exercise of the right to vote it seeks to protect, in addition to its broader interest in advancing the right to vote of Georgia citizens at large.  Plaintiff's members also included those from their specially organized chapters at the Spelman College and Morehouse College Chapters -- students who may have never voted before and therefore, due to inexperience, may be more vulnerable to the confusion and mishaps created by erroneous registration information and mismanagement of such at the polls.  Similarly, its members include voters who it has assisted in the voting process.[24]  Accordingly, the harm alleged by Common Cause Georgia to its organizational interests is coterminous with the harms suffered by its citizen members.

Defendant further asserts that "'courts have frequently considered delay in initiating an action where preliminary injunctive relief has been requested' and held that 'delay is suggestive of a lack of irreparable harm.'" (Resp. at 16 (quoting

---

[23]  *See generally*, Declarations of Flanagan and Henderson.
[24]  *See* Declarations of Richter and Willingham.

*Calhoun v. Lillenas Publg.*, 298 F.3d 1228, 1235 (11th Cir. 2002)).   Defendant

contends that Plaintiff's delay is evidenced by the following: (i) Plaintiff has been

aware of complaints and the alleged problems with Georgia's voter registration

system since 2015 and 2016; (ii) Georgia's provisional ballot process has been in

use since 2002; and (iii) early voting has been underway in Georgia since October

15, 2018, during which time voters whose names do not appear on the registration

list have been able to vote by provisional ballot.   Thus, Defendant argues that:

> Despite weeks of early voting where voters utilized provisional ballots
> and Plaintiff having access to the information it alleges supports its
> complaint for years, Plaintiff filed this action the day before the
> election, [Doc. 1], and then waited.   Only after learning the outcome
> of the election did Plaintiff move for emergency relief regarding the
> treatment of provisional ballots.   [Doc. 15]. . . . In other words, Plaintiff
> filed its complaint, then waited to see if provisional ballots would be
> an issue.   As soon as it saw those ballots might decide one of the races
> in the 2018 election, Plaintiff filed this request to halt the orderly
> processing of provisional ballots by county officials."

(Resp. at 18-19.)

The Court disagrees.   First, Plaintiff's claims are centrally linked to there

being a statistically significant increase in the number of provisional ballots cast in

the 2018 election, as compared to the last off-presidential cycle election in 2014.

The claim is necessarily based on the actual number of reported provisional ballots

in the election, a number that was unknown until after the close of voting on

election day November 6, 2018 -- and in fact, not known until November 8, 2018

when Defendant presented county and statewide data at the TRO hearing.   Second,

while some amount of evidence would have been available to Plaintiff about the

experience of voters during the early voting period, it is clear that the overwhelming number of issues encountered by voters related to the provisional ballot issue appears to have occurred on election day.   Accordingly, the Court finds that Plaintiff did not unreasonably delay in asserting its claims here.   *See Georgia Coalition of the People's Agenda v. Kemp*, Civil Action No. 1:18-cv-4727-ELR, 2018 WL 5729058 at *11, --- F. Supp. 3d --- (N.D. Ga. Nov. 2, 2018) (rejecting Secretary Kemp's argument that plaintiffs' delay in bringing suit until the early voting had already commenced indicated an absence of irreparable harm, and finding that the plaintiffs' facts developed over time, including gathering evidence as to the experience of voters, which would have been unknown to plaintiffs until the voters attempted to cast ballots and that plaintiffs had no other way of knowing whether the Secretary was actually implementing the citizenship verification procedure at the polls as  claimed until that procedure was tested); *Martin v. Kemp*, Civil Action No. 1:18-cv-4776-LMM, 2018 WL 5276242 at *6,   --- F. Supp. 3d --- (N.D. Ga. Oct. 24, 2018) (finding plaintiffs' alleged delay was not inexcusable, where they contended that they filed suit in response to recent news article highlighting the apparent magnitude of the absentee ballot issue in Gwinnett County and the surge of applications for absentee ballots in the wake of the recent and highly-publicized litigation over the reliability of the DRE voting system, thereby highlighting and exacerbating the purported issues).   Accordingly, under these specific factual circumstances, the Court cannot find unwarranted delay on Plaintiff's part.

### D.    Balance of Harm, Equities, and Public Interest

Having considered the electoral administrative issues advanced by Defendant, the Court finds the balance of equities and the public interest support the limited, modest injunctive relief directed here.

First, the Court finds that the threatened injury to Plaintiff as an organization and the individuals who cast provisional ballots as a result of irregularities in their voter registration status outweighs any harm to Defendant from the imposition of the ordered injunctive relief.

Contrary to Defendant's representations in its response in opposition to Plaintiff's motion, Plaintiff does not seek an order preventing the Secretary (or counties) from processing or reviewing provisional ballots ahead of the final certification deadline.  Instead, what Plaintiff effectively seeks is that provisional ballots be carefully reviewed and not be finally rejected prior to the statutory deadline for the Secretary of State to certify election results on November 20, 2018.

Defendant asserts that the implementation of a remedy that would modify the procedures for processing and counting provisional ballots would place an incredible burden on the State's election system in the face of a looming runoff election. Moreover, Defendant notes that voters who believe they were improperly forced to cast a provisional ballot despite being a properly registered eligible voter "can contact his or her board of registrars regarding their provisional ballot," in an attempt to cure any issues with their registration and eligibility to vote.  (Resp. at

20 (citing O.C.G.A. § 21-2-419(c) (providing that "[i]If the registrars determine that the person casting the provisional ballot did not timely register to vote or was not eligible or entitled to vote in such primary or election *or shall be unable to determine within three days following such primary or election whether such person timely registered to vote and was eligible and entitled to vote* in such primary or election, the registrars shall so notify the election superintendent and such ballot shall not be counted") (emphasis added))).

Defendant's argument ignores that it is the responsibility of the election administration officials to provide written notification to voters about whether their provisional ballots were counted and to set up a free access system from which voters can ascertain whether their provisional ballots were rejected and the reason for the rejection.[25]  42 U.S.C. § 15482(a)(5)(A) and (B); O.C.G.A. § 21-2-419(d).  However, the Court takes judicial notice that there is no indication of the required free access hotline number being posted on the Secretary of State's website or many (or very possibly any) of the county or county election sites as of this date.·  And there is no indication of an interactive confidential website for individualized provisional balloting disposition information to voters as of this date.  As a result, if a voter was incorrectly advised during the balloting process that he or she was not registered or did not register on a timely basis before the

[25]  The scope of voter confusion and mass of calls to Plaintiff's hotline from voters during the election might reasonably suggest that the written instructions required by HAVA regarding voters' right to ascertain this information were at best inconsistently provided to individuals required to vote by provisional ballots.

general election, such a voter is unlikely to appear at the runoff election, or at very least, maybe dissuaded from going anew through the aggravating challenge of voting.  Additionally, some voters may not have received any information as to why they were required to take a provisional ballot and, in the absence of written instructions, may well not understand what actions they need to take to address their registration status for the future.

Defendant has indicated that because of the anticipated runoff scheduled for December 4, 2018, the Secretary intends to certify the election results on Wednesday, November 14, 2018  (the day after the county deadline rather than on or closer to the November 20th deadline provided for by state law).[26]   The Secretary will not actually receive all final certifications until Wednesday, November 14th. Thus, the Secretary of State's Office effectively intends to certify the results on the same day it receives the returns from the counties, rather than taking any portion of the additional week provided under the law to fully discharge the Secretary's independent duty of review.  Georgia's electoral certification rules and timelines are expressly framed to facilitate the Secretary of State's review and canvass of the ballot count as well as the Secretary's *return* of any county's certification of a vote to the county board of registrars for further review and correction.  O.C.G.A. § 21-2-499.  The Secretary's Office early-announced decision to proceed with certification of the vote on the very date of receipt of the county

---

[26]  The Secretary of State Office's planned certification timeline both has been announced on its website and via the Secretary's counsel in these proceedings.

certified vote returns appears to suggest the Secretary's foregoing of its responsibility to confirm the accuracy of the results prior to final certification, including the assessment of whether serious provisional balloting count issues have been consistently and properly handled. *Bush v. Gore*, 531 U.S. 98 (2000).

Defendant asserts there will be a "massive" impact on every Georgia runoff election if the Court grants Plaintiff its requested relief because a "delay of even a day in the certification of the election results will be incredibly disruptive" to the administration of the runoff election.[27] (Resp. at 20-21.) Defendant relies on the declaration of Chris Harvey, stating that:

> Timely certification is critically important because a number of other processes cannot happen until counties certify their election results. The Secretary of State cannot certify results until all of the counties certify first. Election challenges and recount requests also require the county superintendent to certify first. *See* O.C.G.A. §§ 21-2-495(c) and 21-2-524(a). Finally, with any potential runoff election set by law for 28 days after the election, certified results are needed in order for ballots and voting machine databases to be built for any runoff. O.C.G.A. § 21-2-501(a).

> Early voting begins as soon as possible prior to a runoff from a general election. O.C.G.A. § 21-2-385(d). Any delay in certification, even a day, will have a direct impact on the number of early voting days provided for a runoff.

(Harvey Decl. ¶¶ 13-14.)

---

[27] Defendant also asserts that Plaintiff's request seeks to have the State presume all provisional ballots are valid unless shown otherwise. While Plaintiff's complaint seeks a variation of that request as part of the permanent remedy sought on the merits, Plaintiff's request for a TRO is significantly more narrow and does not seek such relief. Thus, Defendant's assertion that Plaintiff's remedy "introduces the serious possibility of fraudulent ballots being counted and included in election totals" is unfounded and unsupported by any evidence of such fraudulent ballots being cast.

Yet the State Legislature contemplated a host of these and other contingencies in providing the Secretary a full week to review and address deficiencies in the ballot counting process and results prior to the Secretary's certification of the vote. And the statutory provisions (O.C.G.A. §§ 21-2-49 and 21-2-499) expressly anticipate the potential need for a county to take additional corrective steps and resubmit its vote tally to the Secretary of State after the Secretary's remission of the original certification with questions.   While the Court takes the State's concerns seriously, it also notes current computer electronic capacities have made the extant short timelines more manageable and that the modest relief directed here falls completely within the state statutory timelines and framework as well as meets the requirements of HAVA.

That said, the Court finds it is not practically feasible to grant Plaintiff's request for alteration of the original deadline for local county election boards to certify their results to the Secretary of State. As explained, the local county election officials are required to determine the eligibility of voters who cast provisional ballots within three days of the election, i.e. Friday, November 9, 2018.   County officials in the most populous counties are now in the process of counting all verified ballots and processing all remaining absentee and overseas ballots in anticipation of the certification deadline of Tuesday, November 13, 2018.  And as already discussed, a great number of counties have already completed their certifications.

Thus, all provisional ballots that have been rejected (i.e. not counted because the eligibility of the voter could not be verified by the local elections boards based on the available voter registration information) may be segregated out for additional review prior to final certification of the official results by the Secretary of State.  If ballot disposition information as legally required is actually made available to individual voters on an immediate, timely basis, this would provide Plaintiff's members and other citizens the opportunity to flag issues with Defendant's office -- *provided* Defendant does not proceed with certification on Wednesday, November 14th as currently planned.  The statistical evidence of the increase in the provisional ballot rate for the 2018 general election is of a sufficient degree of significance that the Court can conclude with confidence that the variation was not due to natural fluctuation, but was instead reasonably likely to have been the result of persistent problems and/or errors in the State's voter registration system and ineffective administration of the provisional balloting scheme.  In light of this finding and the irreparable harm to the rights of Georgians who have sought to cast their votes and have them counted, but also the preliminary nature of these findings, the Court finds limited injunctive relief within the bounds of Georgia's statutory framework warranted.  Additionally, as both parties in part acknowledge in their briefs, the Court finds it will be more effectively able to review the deeper voter registration software, database operation and administration issues raised in this case through expediting discovery as well as holding a preliminary or final trial on the merits on an expedited basis.

In light of all of the above, the Court **GRANTS** modest relief, narrowly tailored to the circumstances and considers the balance of potential harms, and unique challenges and circumstances surrounding an election at this late stage. The Court recognizes that the State has a critically important interest in the orderly conduct of elections.  However, the Court's remedy follows the processes set by the Georgia legislature in ensuring the certification of correct and complete election results. *See Florida Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1258 (N.D. Fla. 2016) (finding that it would be nonsensical to prioritize the state's self-imposed voter registration deadlines over the right to vote under circumstances where the aspiring voters, through no fault of their own, would be barred from registering to vote); *Martin v. Kemp*, 2018 WL 5276242 at *10 (rejecting Secretary Kemp's hardship argument that it would be unduly burdensome to employ a new absentee ballot procedure so close to the election and that changes to the procedures imperil the integrity of the election process, finding instead that "assuring that all eligible voters are permitted to vote [does not] undermine [the] integrity of the election process. To the contrary, it strengthens it"); *Georgia Coalition of the People's Agenda v. Kemp*, 2018 WL 5729058 at *12 (recognizing administrative burden on Secretary of State to make changes to its process of verifying citizenship for voters, disseminating  information and training poll managers was minimal compared to the potential loss of a right altogether and that it would be in the public's interest to ensure that there is a procedure in place to allow every eligible Georgia citizen to register and vote).

As an appropriate, tailored remedy under the circumstances, the Court **GRANTS THE FOLLOWING RELIEF**:

(1)  Pursuant to HAVA, 52 U.S.C. § 21082, and O.C.G.A. § 21-2-418, the Court **ORDERS** the Secretary of State's Office to immediately establish and publicize on its website a secure and free-access hotline or website for provisional ballot voters to access to determine whether their provisional ballots were counted and if not, the reason why.  The Court further **ORDERS** the Secretary of State to direct each of the 159 county election superintendents to similarly publicize the availability of the hotline or secure website on the county and county election websites.

(2) The Court **ENJOINS** the Secretary of State from certifying the results of the election prior to **FRIDAY, NOVEMBER 16 AT 5:00 P.M.**  *See* O.C.G.A. § 21-2-499 (providing that the Secretary of State shall certify the votes cast not later than 5:00 p.m. on the fourteenth day following the date of the general election, i.e. Tuesday, November 20, 2018).  The Court **ORDERS** the Secretary of State, upon receipt of the certified returns from the county superintendents to **either**:

(i) direct the county election superintendents to remit certified returns to all counties with 100 or more provisional ballots and to engage in a good faith review of the eligibility of voters issued provisional ballots due to code PR ("provisional registration"), using all available registration documentation.[28]  Such documentation should include registration information made available by voters

---

[28] If there are issues with counties with fewer than 100 provisional ballots, the Court expects the Secretary will take similar action.

themselves, rather than relying solely on the registration information in eNet, and should also include any audit trails documenting modifications or alterations of registration data that Merritt Beaver, the SOS Chief Information officer, testified exists to show changes regarding a voter's registration status in the electronic database; **or**

(ii) engage in an independent review of this information using documentation available to the Secretary of State and the information referenced above. *See* O.C.G.A. §§ 21-2-419(c); 21-2-499. To avoid any delay in the final certification process, the Secretary of State should engage in this review on a rolling basis as certified results from the local county superintendents are received. This remedy does not require the extension of any mandated elections deadlines provided under Georgia's election regime or the creation of any entirely different processes outside the parameters of the current procedures in place that govern the actions of the local elections officials or the Secretary of State in verifying voter eligibility, tabulating, computing, or canvassing votes, and verifying the accuracy of the voter returns. *See* O.C.G.A. 21-2-419(c); 21-2-493; 21-2-499.

This remedy is necessary and warranted, based on the nature of the evidence in the record, the fundamental importance of the interest of the voters that cannot be remedied after final certification, and the urgency of the situation. The remedy has been narrowly crafted and does not disturb the status quo for election certification deadline.

Accordingly, the Court **GRANTS IN PART** Plaintiff's Motion for Temporary Restraining Order [Doc. 15].

### E.    Plaintiff's Request for Expedited Discovery and Hearing

In order to determine the full extent of the relief necessary, Plaintiff requests the Secretary produce, or cause to be produced, the following information to Plaintiff: (1) documents sufficient to show the number of provisional ballots cast in each county during the November 2018 general election; (2) for each provisional ballot cast in the November 2018 general election, documents sufficient to show the reason why that voter was required to use a provisional ballot[29]; (3) all guidance provided by the Defendant to county officials regarding the counting of provisional ballots or assessing the eligibility of voters who voted by provisional ballots; and (4) all coding sheets or similar documents used in the review of provisional ballots and ascertaining the eligibility of voters who voted by provisional ballots.   Defendant has not offered any substantive response in opposition to Plaintiff's request for expedited discovery but has noted the confidentiality of certain voter records.

Defendant has already provided documentation showing the number of provisional ballots cast by county.  To the extent the information is no longer

---

[29] It is unclear whether Plaintiff is requesting copies of the actual provisional ballots and confidential voter documentation.  To the extent Plaintiff is requesting such documents, the Court is concerned with privacy issues related to the provision of these documents, even pursuant to the terms of a protective order, and has serious doubts about whether redacted copies of these documents could be provided on a timely basis to be useful in the determining a final remedy to the extent feasible prior to final certification of the election results.

accurate and requires updating based on the actual certifications provided by the counties over the course of the weekend, the Secretary is **DIRECTED** to provide the updated information on a rolling basis and **NO LATER THAN WEDNESDAY, NOVEMBER 14, 2018 AT 10:00 AM**.  Defendant has also provided a breakdown of the total number of provisional ballots by the code indicating the reason for the determination that the voter was not eligible to cast a regular ballot.  To the extent the information is no longer accurate and requires updating based on the actual certifications provided by the counties over the course of the weekend, the Secretary is **DIRECTED** to provide the updated information on a rolling basis and **NO LATER THAN WEDNESDAY, NOVEMBER 14, 2018 AT 10:00 AM**.  For those provisional ballots that were actually rejected in the PR category and not counted based on the county's inability to verify the voter's eligibility, the Secretary is **DIRECTED** to provide a list of the number of those ballots, by county, and a description of the reason to the extent available for the rejection on a rolling basis and **NO LATER THAN WEDNESDAY, NOVEMBER 14, 2018 AT 10:00 AM**.  Finally, the Secretary is **DIRECTED** to provide the guidance documents and coding sheets described by Plaintiff **NO LATER THAN TUESDAY, NOVEMBER 13, 2018 AT 12:00 P.M.**

Counsel are **DIRECTED** to confer **NO LATER THAN TUESDAY, NOVEMBER 20, 2018** regarding a proposed plan and schedule for expediting other relevant discovery and addressing whether Plaintiff will seek a preliminary

injunction hearing prior to a trial on the merits, and if so, Plaintiff's proposed schedule for such.  Counsel **SHALL FILE** a scheduling report with the Court reflecting the results of this conference **NO LATER THAN NOVEMBER 26, 2018**.

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** Plaintiff's Motion for Temporary Restraining Order and Expedited Discovery [Doc. 15] and **DENIES** Defendant's Motion to Strike [Doc. 52] the Declarations of Michael McDonald [Doc. 46], Edgardo Cortés [Doc. 48] and Kevin Morris [Doc. 50].

**IT IS SO ORDERED** this 12th day of November, 2018.


_____
**Amy Totenberg**
**United States District Judge**