IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NORTHERN DIVISION

| | | |
|---|---|---|
| COMMON CAUSE OF GEORGIA,<br>As an organization | : : : | |
| Plaintiff, | : : | Civil Action No.<br>1:18-cv-5102-AT |
| v. | : : : : | |
| ROBYN CRITTENDEN, in her<br>Official capacity as Acting Secretary<br>Of State of Georgia, | : : : : | |
| Defendant. | : | |

## PROPOSED AMICUS BRIEF OF INVESTIGATIVE REPORTER GREG PALAST IN SUPPORT OF PLAINTIFF

**Statement of Interest**

Your Amicus, Greg Palast, has been involved in addressing matters of voter suppression and other malfeasance which prevent eligible voters from exercising their fundamental right to vote. He has been doing this for 18 years. (Exhibit A Palast Aff. ¶ 7) He has been publishing books, articles and films about the impact of voter suppression and ways in which voting rights have been denied to people eligible to exercise the franchise, and has particularly been investigating the actions of Mr. Kemp. (Exhibit A Palast Aff. ¶ 13). In the course of his investigation into voter suppression and voter purges in Georgia and based on requests for information

1

as allowed under the National Voter Registration Act (Exhibit A Palast Aff. ¶ 3) the breadth of the malfeasance has been revealed which has resulted in the situation now faced by this Court.

Your Amicus has an interest in ensuring that this Court continue its efforts to ensure that that provisional ballots which were cast by eligible voters are counted since the numbers of outstanding votes could determine if there is a runoff election or recount.

## I. THE SECRETARY OF STATE HAS WRONGLY CANCELLED THE VOTER REGISTRATIONS OF 340,134 VOTERS

As noted, Your Amicus Mr. Palast is a Plaintiff in litigation in this District. This Court may take judicial notice of the complaint and it is attached here for this Court's convenience as Exhibit B. The factual allegations most pertinent to this brief appear in paragraphs 25 to 42 in which Your Amicus summarizes his efforts to obtain from the Secretary of State the list of names and addresses of all those purged or changed to inactive in 2016 and/or 2017 and the basis for each individual being removed from the voter rolls. On September 4, 2018, Defendant Kemp provided a partial response to the NVRA request for documents. The partial response included the 2016 and 2017 registration cancellation lists, and the 2016 and 2017 lists of those voters changed from active to inactive. The below charts set forth the numbers and

reasons for the cancellations of voters in 2016 and 2017 as well as the numbers and reasons for those persons being made inactive.

## 2016 Cancellations by Reason

|  | *Removal Process* | | |
|---|---:|---:|---:|
| **Status Reason** | **System** | **Vital Process** | **Grand Total** |
| Deceased | 19,684 | 37,363 | **57,047** |
| Duplicate | 9,329 | - | **9,329** |
| Error | 639 | - | **639** |
| Felon | 10,702 | - | **10,702** |
| Hearing | 358 | - | **358** |
| Mentally Incompetent | 11 | - | **11** |
| Moved Out of County | 502 | - | **502** |
| Moved Out of State | 3,626 | - | **3,626** |
| Not Verified | 258 | - | **258** |
| Voter Requested | 847 | - | **847** |
| **Grand Total** | **45,956** | **37,363** | **83,319** |

## 2017 Cancellations by Reason

|  | *Removal Process* | | | |
|---|---:|---:|---:|---:|
| **Status Reason** | **System** | **User Action** | **Vital Process** | **Grand Total** |
| Deceased | - | 24,224 | 40,222 | **64,446** |
| Duplicate | - | 36,623 | - | **36,623** |
| Error | 2 | 281 | - | **283** |
| Felon | - | 14,021 | - | **14,021** |
| Hearing | 31 | 574 | - | **605** |
| Mentally Incompetent | - | 21 | - | **21** |
| Moved Out of County | 22 | 784 | - | **806** |
| Moved Out of State | 10 | 11,621 | - | **11,631** |
| No Activity For 2 Genl Election Cycles | 534,510 | 7 | - | **534,517** |
| Not Verified | 8 | 514 | - | **522** |
| Voter Requested | 1 | 2,201 | - | **2,202** |
| **Grand Total** | **534,584** | **90,871** | **40,222** | **665,677** |

3

**2016 Inactives**

| Status Reason | SYSTEM | USER ACTION | Grand Total |
|---|---|---|---|
| Returned Mail | 2 | 3,941 | **3,943** |
| Grand Total | 2 | 3,941 | **3,943** |

**2017 Inactives**

| Status Reason | SYSTEM | USER ACTION | Grand Total |
|---|---|---|---|
| NCOA | 116 | 101,755 | **101,871** |
| Returned Mail | 194 | 43,490 | **43,684** |
| Grand Total | 310 | 145,245 | **145,555** |

These charts reveal that over a half a voters were automatically cancelled through the inactivity process utilized by the Georgia Secretary of State. This process is based on National Voter Registration Act's allowance for voter removals if the State discovers the voter has changed his/her residence. A voter cannot be removed solely on the basis of not voting. Mr. Palast therefore, endeavored to determine whether those 534,517 individuals cancelled in 2017 for missing 2 general elections were indeed no longer living at the address that existed on their original registration. (Exhibit A, Palast Aff. ¶ 5). The report of CohereOne attached to the Palast Affidavit as Exhibit 1 describes the process used to determine whether any of those cancelled had moved. The analysis of the data showed at least 340,134 Georgians of the 555,702 Georgians whose registrations were cancelled (or 61%) still lived at the address where they lived when they registered to vote. In other words, 61% of voters cancelled for supposedly moving are more likely than not still living precisely where they lived before the inactive-to-cancel process was started against them. The below

4

chart describes the process used to come to the conclusion that 340,134 Georgians still live at the address from which they originally registered to vote.



Your Amicus alleges these persons were wrongly removed because the NVRA requires States to ensure that their voter registration rolls are current and accurate while implementing one of the purposes of the NVRA to increase the number of registered voters, . By removing people who had not moved the Secretary of State has made the voter rolls inaccurate and not current as well has reduced the number of registered voters who still reside at their original address.

It is uncontested that none of the people whose voter registrations were cancelled in this manner were notified of their cancellation. To try to address this lack of information Your Amicus posted the list of cancelled voters on his website, and held a press conference to inform the public. Social Media sites picked up the information and from the time the list was posted until registration deadline (a period of about 4 days) over 100,000 people visited this website and approximately 2000 people contacted Mr. Palast. It is therefore fair to say that there were many Georgians who were interested in this election as so many checked to see if they

5

were registered or cancelled. Your Amicus does not know how many people who appeared on this list were able to register before the deadline or if they registered but their registration was not processed in time for the election. Therefore they would only find that they were not on the rolls when they went to vote. It is for this reason that Your amicus states that one of the reasons for the increase in the number of provisional ballots case this year is based on the massive cancellations of voters registrations without notice when they had never moved.

## II. THE SECRETARY OF STATE DID NOT INSTRUCT ALL OF ITS POLL WORKERS ON HOW TO HANDLE REQUESTS FOR PROVISIONAL BALLOTS SO THAT MANY PEOPLE WERE DENIED THE RIGHT TO HAVE A BALLOT

In addition to the registration cancellations noted above, Your Amicus observed first hand problems voters encountered with poll workers who refused people the right to vote or refused them a the right to file a provisional ballot. As noted in Exhibit A, Palast Aff. ¶ 8, Your Amicus opines that the number of provisional ballots would have been higher, possibly by many multiples, except for poll workers and officials who refused purged voters provisional ballots.

Your Amicus observed Ms. Yasmin Bakhtiari told him on video that she found her registration cancelled on Election Day.[1] <u>Her request for a provisional ballot was rejected three times</u> over a two hour wait. (Exhibit A, Palast Aff. ¶ 9)

---

[1] https://youtu.be/Xli_2b_oOKA

6

On Election Day he and his camera crew encountered <u>Ms. Christine Jordan,[2] 92-year-old cousin of Martin Luther King Jr. at an Atlanta poll who told us she was ejected</u> without a regular ballot because her registration could not be found though she had voted in the same location since 1968, 50 years. (Exhibit A Palast Aff. ¶ 10). As noted in Exhibit A Palast Aff. ¶ 11, on Election Day, he also accompanied voter Ashlee Jones who told him on camera that she had attempted twice to register in a timely manner on line through Mr. Kemp's office website but received no confirmation. Your Amicus filmed her as she attempted to obtain a regular ballot,[3] then as <u>she was refused a provisional ballot.</u> Ms. Jones did obtain the provisional only after Your Amicus intervened, contacted attorneys, and turned national television cameras on the scene. Also Your Amicus has film from his camera crew at Emory University where people standing in line at 10 pm were all given provisional ballots. (Exhibit A, Palast Aff. ¶ 12)

Your Amicus' affidavit is supplemented by the Affidavit of Rachel Garbus, a paralegal who has been working on the team with Mr. Palast since November 2017. (Exhibit C)

Ms. Garbus states from paragraph 9 through 21 as follows:

---

[2] https://youtu.be/B0f4EsFx6Ug

[3] https://m.youtube.com/watch?v=9hfuB2WtQMg&feature=youtu.be

9. I knew from my research that Georgia offers a provisional ballot to voters whose names do not appear on the list of registered electors but believe they are registered to vote. I wanted to know whether voters the cancelled by Secretary of State Kemp under the procedure employed to allegedly identify and remove voters who have moved out of the county or State, would be allowed to cast such a ballot.

10. On October 31, 2018, I called Georgia elections offices in three different counties: Fulton, Floyd/Rome (which share an elections office), and Bibb. I spoke with elections clerks in each county and asked them to explain the procedure for provisional ballots and whether cancelled voters could vote provisionally.

11. The result was a confusing jumble of information that was inconsistent across counties. It was clear there was no unified understanding of what a provisional ballot was or when and why it would be issued.

12. The clerk with whom I spoke in Fulton County told me provisional ballots were provided if someone felt they had been treated unfairly at the polls by being denied a traditional ballot. The voter should try and convince the poll worker to give him or her a provisional ballot instead, by explaining why they felt they had a right to vote. Once cast, the voter should then call the Fulton County elections office and continue to press

their case to have their ballot counted. When pressed on the question of whether a person could vote provisionally if they had been cancelled from the voter roll, the clerk declined to confirm or deny, again reiterating that if a voter thought s/he should be able to vote, s/he should ask for a provisional ballot.

13. The clerk with whom I spoke in Floyd/Rome counties was unequivocal: no one cancelled from the voter rolls who had not re-registered by the registration deadline could vote provisionally. She explained that the county issues provisional ballots to voters who should be registered but aren't, but she said this didn't apply to people whose registrations were cancelled without being notified. I asked what voters should do to make sure their provisional ballots are counted, and she replied that the county looks into it and decides. She did not mention that voters should contact the county office to provide information about their ballot and voter registration information.

14. When I called Bibb County and asked the clerk whether cancelled voters could vote with a provisional ballot, she had to put me on hold to ask someone else in the office. She then explained that she didn't think a cancelled voter could vote provisionally, but they could try. She also said the county elections officials decide whether to count the

provisional ballot, and did not mention whether voters needed to call and follow up to have their ballot counted.

15. Given the large number of voters cancelled without notification in 2017, our team was not surprised to hear that more Georgia voters had cast provisional ballots in the 2018 midterms than in past elections.

16. We interviewed several Georgians who were refused a regular ballot: as could be expected given the inconsistent responses I received when calling different county elections offices, voters had vastly different experiences with provisional ballots depending on where they voted. One voter, Rahiem Shabazz, was quickly offered a provisional ballot in Fulton County when his registration could not be located; another, Yasmin Bakhtiari, was denied a provisional ballot entirely in Gwinnett County after her registration was similarly missing. A third, Ashlee Jones, was repeatedly denied a provisional ballot in Dekalb County, even though she caught her cancellation in time and properly re-registered before the deadline. Ms. Jones later told us that, had it not been for Mr. Palast's advocacy in helping her obtain her provisional ballot, she probably would have been too intimidated to speak up and would have left without voting.

17. I also spoke with poll watchers in Dekalb and Fulton counties who witnessed inconsistencies in how provisional ballots were issued.

18. The poll watcher in Dekalb County said she saw a poll worker giving provisional ballots to at least two people who were registered in a different county, telling them they could vote with a provisional ballot instead of going to their proper county to vote. The poll watcher said she did not see poll workers informing voters provided with provisional ballots about how to follow up to make sure their vote was counted, although she learned later that there should have been a paper flyer with this information given to them before they left the polling station. She attempted to intervene and gather voters' information to help them cure their ballot, but they declined her assistance.

19. The poll watcher in Fulton County said the polling station used so many provisional ballots that by mid-morning they had run out, and voters had to wait for more provisional ballots to be delivered.

20. The inconsistencies described above, both in election officials' statements about provisional ballots and voters' experiences at different polling stations, suggest a process that is poorly understood by those administering it and those subject to it.

21. While it is possible to determine the number of provisional ballots cast, there is no way to know how many people were denied an opportunity to cast a provisional ballot.

22. While information is still being collected on the names of provisional voters, our data analyst is currently analyzing the names we have obtained to assess how many purged voters cast provisional ballots in the election. Early analysis suggests that a significant number of voters in several counties who may have been offered provisional ballots because they were purged from the voter rolls.

The facts provided above are provided to give the Court further information as to the extent of the malfeasance which took place during this election.

Your Amicus urges this Court to consider these facts when considering a remedy in this case consistent with or beyond the remedies already provided.

                              Respectfully submitted,

                              S/G. Brian Spears
                              GA Bar # 670113
                              Attorney for Greg Palast

1126 Ponce de Leon
Atlanta, GA 30306
(404) 872-7086
bspears@mindspring.com

                              Jeanne Mirer
                              NY Bar #4546677
                              Pro hac vice for case 18-cv-5102-AT
                              Attorney for Greg Palast

Mirer, Mazzocchi & Julien PLLC
150 Broadway, Twelfth Floor
New York, NY 10038
Tel: 212-231-2235
jmirer@mmsjlaw.com