IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| COMMON CAUSE GEORGIA, as an organization, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:18-cv-5102-AT |
| BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia, | : | |
| | : | |
| | : | |
| | : | |
| Defendant. | : | |

## ORDER

This matter is before the Court on Plaintiff's Motion for Prevailing Party Attorneys' Fees and Expenses [Doc. 119]. Plaintiff Common Cause Georgia, a non-partisan public interest organization devoted to election protection, seeks $183,592.59 in attorneys' fees and litigation expenses against the Georgia Secretary of State.

### I.   BACKGROUND

Plaintiff filed suit on November 5, 2018 seeking emergency injunctive relief to ensure that provisional ballots cast by eligible registered voters in the 2018 general election were properly counted.  Plaintiff asserted that the Secretary of State's failure to maintain the security of the State's voter registration database was preventing thousands of registered voters from casting a regular ballot  Plaintiff's

complaint asserted that Defendant's course of conduct violated the due process clause of the Fourteenth Amendment of the U.S. Constitution, the Help America Vote Act[1], and the Art. II. Sec. 1 of the Georgia Constitution.

Seven days later on November 12, 2018, upon the parties' presentation of further evidence and argument, the Court entered a temporary restraining order. The Court determined, based on the preliminary evidence offered by both parties, that Plaintiff had persuasively demonstrated: (1) there had been a statistically significant increase in the proportion of voters required to vote on provisional ballots relative to the total vote; and (2) errors in the State's voter registration database likely caused qualified voters to lose their vote or to be channeled into the provisional voting process because their registration records did not appear or had been purged from the data system. The Court in turn entered a temporary restraining order (TRO) tailored to follow the processes set by the Georgia legislature in ensuring the certification of correct and complete election results, that ordered the Secretary of State to: (a) immediately establish and publicize a hotline or website for provisional voters to determine whether their provisional ballots were counted and if not, the reason why; (b) direct each of the 159 county election superintendents to do the same; and (c) upon receipt of the certified returns from county superintendents to either, (i) direct the county election superintendents to engage in a good faith review of the eligibility of voters issued provisional ballots due to code PR ("provisional registration"), using all available

---

[1] 52 U.S.C. § 21082

registration documentation, including registration information made available by voters themselves, rather than relying solely on the registration information in the State's electronic database, or (ii)   engage in an independent review of this information itself.  And the Court enjoined the Secretary of State from prematurely certifying the results of the election before the deadline in the Georgia election code without undertaking the review ordered.   Finally, the Court granted Plaintiff's request for expedited discovery.  (Doc. 62.)

After the injunction was issued, the State agreed to comply with the relief ordered in connection with the subsequent runoff elections.  The relief Plaintiffs obtained was material, altered the legal relationship of the parties, and clearly conferred a significant benefit in protecting voters' interests in ensuring their right to cast votes that would be counted, the central goal promoted by the Plaintiff's lawsuit.

From November 2018 through mid-March 2019, the parties engaged in significant discovery practice.  During this process, the Georgia legislature enacted House Bill 316 that resulted in amendments to the State's election laws, including substantive changes to the provisional ballot process and a requirement for the promulgation of a regulation (via the Secretary of State) that establishes security protocols for voter registration information.  As a result, the parties agreed the case should be dismissed and entered a stipulation of dismissal on June 14, 2019.

Following dismissal, the Court set a briefing schedule on Plaintiff's request for attorney's fees and litigation expenses which is now pending before the Court.

## II.   DISCUSSION

Plaintiff seeks an award of attorney's fees pursuant to 42 U.S.C. § 1988 as a prevailing party in this action, having achieved the objectives of its suit by obtaining an injunction that ordered: (1) Defendant to establish a hotline or website for provisional voters to determine if their ballots were counted, and to direct county superintendents to do the same; (2) Defendant to direct county election officials to remit certified returns and engage in a good faith review of the eligibility of provisional ballot voters; and (3)  that this review use all available documentation, not merely eNet registration information, as well as any audit trails documenting modifications or alternations of registration data.

Plaintiff seeks only its fees and expenses incurred through the date of the injunction order and does not seek reimbursement of any fees related to discovery.

Defendant asserts that Plaintiff is not entitled to any fees because the Court only awarded limited relief that did not change the legal relationship between the parties. According to Defendant, Plaintiff did not obtain an "enforceable judgment" because Plaintiff "did not receive the relief sought and only received a limited scope of relief that did not change election certification deadlines" and "did not result in any change in the elections processes in use in Georgia." Alternatively, Defendant asserts that if the Court finds Plaintiff is entitled to fees, the Court should significantly discount the fees and expenses and award no more than $34,314.

### A. Whether Plaintiff is Entitled to an Award of Attorney's Fees as a Prevailing Party

Prevailing parties in civil rights actions, including actions to enforce the constitutional voting guarantees of the Fourteenth Amendment, are entitled to an award of attorney's fees pursuant to 42 U.S.C. § 1988.  *See Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983); *Brooks v. Georgia State Bd. of Elections*, 997 F.2d 857, 861 (11th Cir. 1993).  Section 1988 "is a tool that ensures the vindication of important rights, even when large sums of money are not at stake, by making attorney's fees available under a private attorney general theory."  *Farrar v. Hobby*, 506 U.S. 103, 122 (1992) (O'Connor, J., concurring).  The "purpose of the Attorney's Fees Awards Act is to ensure the effective enforcement of the civil rights laws by making it financially feasible to litigate civil rights violations." *Dowdell v. Apopka*, 698 F.2d 1181, 1189 (11th Cir. 1983). Where constitutional rights are vindicated, there is a public benefit courts must consider when assessing attorneys' fees.[2] *Popham v. City of Kennesaw*, 820 F.2d 1570, 1580 (11th Cir. 1987) (citing *City of Riverside v. Rivera*, 477 U.S. 561, 572 (1986) (finding that counsel for plaintiffs "served the public interest by vindicating important constitutional rights"); *see also Duckworth v. Whisenant*, 97 F.3d 1393, 1399 (11th Cir. 1996) (affirming district court's $162,209 attorney's fee award where plaintiff sought no injunctive relief and recovered only $500 in nominal damages and explaining that

---

[2] Defendant cites no authority for its contention that "the fact that any compensation awarded by this Court against the Secretary of State will be paid by the taxpayers of the state of Georgia is also an important consideration," in determining whether to award fees.  Because civil rights litigation is often brought against "state actors," any award of fees in those cases will be funded by taxpayers.

the "pursuit of the litigation" revealed both the unconstitutional actions of the police and the tacit condoning of such excessive force by the County and that an "acknowledgment of this pattern and practice can only inure to the benefit of those involved when redressing an officer's abuse of discretion which violates a person's constitutional rights").

Although awarding attorneys' fees is within the discretion of the trial court, such discretion is "exceedingly narrow." *Solomon v. City of Gainesville*, 796 F.2d 1464, 1466 (11th Cir. 1986) (reversing trial court's denial of attorney's fees). Despite Defendant's assertion that recovery of fees is not "automatic" – the Eleventh Circuit has held that a prevailing plaintiff under section 1988 "should be awarded fees as a matter of course."[3]  *Id.* (internal quotations and citations omitted); *see also Hensley*, 461 U.S. at 429 (stating that a prevailing party "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust").

The Supreme Court has held that when a party obtains an "enforceable judgment on the merits . . . a material alteration of the legal relationship of the parties occurs, and the test to be deemed a prevailing party has been met." *Smalbein ex rel. Estate of Smalbein v. City of Daytona Beach*, 353 F.3d 901, 907 (11th Cir. 2003) (citing to *Buckhannon*, 532 U.S. 598 (2001)).  Once a plaintiff succeeds on a "significant issue in litigation which achieve[d] some of the benefit

---

[3] A court would be justified in denying an award of attorney's fees only "where the plaintiff's success on a legal claim can be characterized as purely technical or *de minimus,*" *Smalbein*, 353 F.3d at 907 n.7 (quoting *Texas State Teachers Ass'n.*, 489 U.S. at 792).

the parties sought in bringing suit," the plaintiff has established her entitlement "to a fee award of some kind." *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791-92 (1989) (internal quotations omitted).

Consequently, "the prevailing party inquiry does not turn on the magnitude of the relief obtained." *Farrar v. Hobby*, 506 U.S. 103, 114 (1992). Instead, the "degree of success" is relevant only to the reasonableness of a fee award. *Id.; Smalbein*, 353 F.3d at 907 ("[T]he touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties … where such a change has occurred, the degree of the plaintiff's overall success goes to the reasonableness of the award … not to the availability of a fee award *vel non*.") (quoting *Texas State Teachers Ass'n.*, 489 U.S. at 792–93). A prevailing party is therefore entitled to an award of attorneys' fees even where she did not prevail on all of the contentions asserted. *Hensley*, 461 U.S. at 440.

The Eleventh Circuit and Supreme Court have held that a preliminary injunction on the merits entitles a plaintiff to prevailing party status and an award of attorney's fees. *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1356 (11th Cir. 2009); *Lefemine v. Wideman*, 568 U.S. 1, 4 (2012) ("[A]n injunction or declaratory judgment, like a damages award, will usually satisfy [the prevailing party test]."); *cf. Windsor v. United States*, 379 F. App'x 912, 916-17 (11th Cir. 2010) (stating that the standard for obtaining a temporary restraining order is identical to that of obtaining a preliminary injunction).

Because the attorneys at Paul Weiss and the Brennan Center[4] agreed to represent Common Cause on a pro bono basis, they will obtain no compensation absent the Court granting an award of attorney's fees under § 1988.

In arguing that Plaintiff did not prevail and is therefore not entitled to an award of reasonable attorney's fees, Defendant attempts to downplay and diminish the relief ordered by the Court.  According to Defendant, in contrast to the "dramatic relief" Plaintiff requested, the Court ordered "extremely limited relief" and the Court's injunction order expressly noted that the relief granted "did not actually alter any legal relationship between the parties." (Def.'s Resp. at 5-6.) This is incorrect.

First and most importantly, there is no basis for disputing that Plaintiff prevailed on the merits of its motion. In granting Plaintiff's request for a TRO, the Court found that while further evidence would be necessary in the future, based on the statistical evidence and witness declarations offered in support of the motion, "Plaintiff ha[d] shown a substantial likelihood of proving that the Secretary's failure to properly maintain a reliable and secure voter registration system has and will continue to result in the infringement of the rights of the voters to cast their vote and have their votes counted." (November 12, 2018 Order, Doc. 62 at 41-42.)

Second, Defendant's portrayal of the Court's consideration of the parties' positions and the relief issues is misleading and not supported by the actual terms

---

[4] The Brennan Center accepts voting rights cases on behalf of clients who are unable to pay for the legal services required to litigate their claims and vindicate their rights. The Brennan Center does not generally bill clients for its legal services.  (Pérez Decl. ¶ 10.)

of the Order.   Defendant asserts that because the "vast majority of the relief" ordered by the Court was "narrowly tailored and [did] not disturb the status quo for election certification deadline," the Court's order did not materially alter the parties' legal relationship.  (Def.'s Resp. at 6 (citing Order, Doc. 62 at 53)).  But Plaintiff did not ultimately seek an extension of the *State's* election certification deadline.[5]  As the Court noted in its Order granting the TRO, "[c]ontrary to Defendant's representations in its response in opposition to Plaintiff's motion [] what Plaintiff effectively [sought] [wa]s that provisional ballots be carefully reviewed and not be finally rejected prior to the statutory deadline for the Secretary of State to certify election results on November 20, 2018."[6]  (November 12, 2018 Order, Doc. 62 at 45.)  That was the precise relief ordered by the Court.

Finally, in light of Defendant's asserted position in the litigation, the Court's order materially altered the legal relationship between the parties:

> Defendant has indicated that because of the anticipated runoff scheduled for December 4, 2018, the Secretary intends to certify the election results on Wednesday, November 14, 2018 (the day after the county deadline rather than on or closer to the November 20th

---

[5] The Court did, however, find it was not "practically feasible to grant Plaintiff's request for alteration of the original deadline for local *county* election boards to certify their results to the Secretary of State" because "the local county election officials are required to determine the eligibility of voters who cast provisional ballots within three days of the election," and "a great number of counties ha[d] already completed their certifications" at the time of the Court's order. (*Id.* at 49.)

[6] Indeed, the Court recognized in its Order granting relief that Plaintiff's requested relief was narrower than actually presented in its papers. (*See* November 12, 2018 Order, Doc. 62 at 3, 48, n. 27; *see also* November 8, 2018 Tr., Doc. 54 ("[W]e're only seeking something very limited, which is that they cannot finally reject a very narrow class of voters whose registration eligibility has been questioned in part because of the database that we believe may have been manipulated . . . They can continue to reject all of the ballots for other reasons, someone didn't have an ID . . . And ultimately we want a process for ensuring that every ballot that was rejected needed to be rejected for a reason and that there is some sort of review so that people are being deliberate and thoughtful about it.").

deadline provided for by state law).  The Secretary will not actually receive all final certifications until Wednesday, November 14th. Thus, the Secretary of State's Office effectively intends to certify the results on the same day it receives the returns from the counties, rather than taking any portion of the additional week provided under the law to fully discharge the Secretary's independent duty of review.  Georgia's electoral certification rules and timelines are expressly framed to facilitate the Secretary of State's review and canvass of the ballot count as well as the Secretary's *return* of any county's certification of a vote to the county board of registrars for further review and correction. O.C.G.A. § 21-2-499.  The Secretary's Office early-announced decision to proceed with certification of the vote on the very date of receipt of the county certified vote returns appears to suggest the Secretary's foregoing of its responsibility to confirm the accuracy of the results prior to final certification, including the assessment of whether serious provisional balloting count issues have been consistently and properly handled. *Bush v. Gore*, 531 U.S. 98 (2000).

(*Id.* at 47-48.)  The Court noted that "[t]he Secretary of State Office's planned certification timeline both has been announced on its website and via the Secretary's counsel in these proceedings." (*Id.* at 47 at n. 26.)  Therefore, the Court enjoined Defendant from carrying through with its stated intention of prematurely certifying the election results without properly considering the eligibility of all voters who were required to cast provisional ballots at the polls as a result of issues with their voter registration status.

Although the Court did not require the State to count all provisional ballots cast and did not extend the statutory deadline for the State to certify the election results, the relief ordered by the Court was significant.[7]  The significance of the

---

[7] The Court described the relief ultimately ordered as "modest" and "narrowly tailored," in direct response to Defendant's argument that "it is not in the public interest for the Court to grant Plaintiff's requested injunction" and Defendant's  accusation that "[t]he requested relief would cause a massive disruption to the Georgia election process and go against well-established Georgia

Court's relief is underscored by Defendant's argument that there would "be a 'massive' impact on every Georgia runoff election if the Court grants Plaintiff its requested relief because a 'delay of even a day in the certification of the election results will be incredibly disruptive' to the administration of the runoff election.'" (Resp. at 20-21.)  In rejecting Defendant's argument that "because more than half of Georgia's 159 counties ha[d] already certified their election results, the Court cannot enjoin what has already occurred," the Court's Order prevented the Secretary of State from shirking one of its primary duties in ensuring the validity and accuracy of the State's elections:

> The Secretary of State is responsible under Georgia's election laws for the final certification of the official results of the election. *See* O.C.G.A. § 21-2-499.  In that capacity, the Secretary of State "[u]pon receiving the certified returns of any election from the various superintendents . . . shall immediately proceed to tabulate, compute, and canvass the votes cast," prior to certifying the returns. *Id.* § 21-2-499(a).  "In the event an error is found in the certified returns presented to the Secretary of State or in the tabulation, computation, or canvassing of votes . . . the Secretary of State shall notify the county submitting the incorrect returns and direct the county to correct and recertify such returns.  Upon receipt by the Secretary of State of the corrected certified returns of the county, the Secretary of State shall issue a new certification of the results." *Id.*  The certification process required of the Secretary of State under Georgia law, on its face, is more than a mere rubber stamp.  It requires that Secretary of State to engage in the same tabulation, computation, and canvassing process undertaken by the counties as set forth in O.C.G.A. § 21-2-493 prior to final certification.  And in the event errors are discovered, the Secretary of State shall notify and direct the counties to engage in a redo.

---

law regarding the processing of provisional ballots." (*See* Def.'s Resp. to TRO Mot., Doc. 32 at 3, 19-21.)

(November 12, 2018 Order, Doc. 62 at 34-35.)  Instead of allowing the State to simply rubber stamp the county vote returns, the Court ordered that:

> all provisional ballots that have been rejected (i.e. not counted because the eligibility of the voter could not be verified by the local elections boards based on the available voter registration information) may be segregated out for additional review prior to final certification of the official results by the Secretary of State.  If ballot disposition information as legally required is actually made available to individual voters on an immediate, timely basis, this would provide Plaintiff's members and other citizens the opportunity to flag issues with Defendant's office -- *provided* Defendant does not proceed with certification on Wednesday, November 14th as currently planned.

(*Id.* at 50.)[8]  Absent this Court's Order, it was clear that Defendant would have proceeded with certifying the election results the same day it was to receive final certifications from the counties, rather than taking any time under the additional week provided under the law to fully discharge its independent duty of review under Georgia's election code.  (*Id.* at 51) (considering the balance of potential harms, and unique challenges and circumstances surrounding an election at this late stage, and finding that "the Court's remedy follows the processes set by the Georgia legislature in ensuring the certification of correct and complete election results").

For these reasons, the Court finds that Plaintiff's motion succeeded on a "significant issue in litigation which achieve[d] some of the benefit the parties

---

[8] Defendant's argument that "[t]he Court's order did not actually alter the legal relationship because the review of the data provided did not result in any change in the elections processes in use in Georgia" is not persuasive.  As Plaintiff points out in its motion, Georgia's election code was subsequently amended to include provisional ballot processing and review provisions that substantially mirror the review ordered by this Court.

sought in bringing suit." *Tex. State Teachers Ass'n*, 489 U.S. 782, 791-92; *Hensley*, 461 U.S. at 440; *see also Brooks v. Georgia State Bd. of Elections*, 997 F.2d 857, 868 (11th Cir. 1993) (rejecting State's argument that the district court should have reduced the total amount of the award because the plaintiff's "degree of success in this case has been somewhat limited," and finding that as a result of the plaintiff's efforts: "the court held that the challenged changes were covered by Section 5 and ordered the State to seek preclearance, something the State had contended it was not required to do . . . We agree with the district court that Brooks achieved excellent results on the Section 5 claims at issue here . . . The object of Brooks' Section 5 claim, the only claim litigated, was to block continued application of the challenged changes absent preclearance. Because this was, in fact, the ultimate result in this case, the district court's refusal to reduce Brooks' fee award for limited success was not an abuse of discretion").

Accordingly, Plaintiff is entitled to an award of attorney's fees as a prevailing party under § 1988 because of the necessity of the litigation to alter the legal relationship between the parties and to obtain an injunction providing significant relief to prevent the irreparable harm to the rights of Georgians who sought to cast their votes and have them counted. *See Dillard v. City of Greensboro*, 213 F.3d 1347, 1354 (11th Cir. 2000) (recognizing that "[i]n the context of an injunction, a party need not obtain relief identical to the relief that it specifically demanded, as long as the relief obtained is of the same general type").

**B. Whether the Amount of Attorneys' Fees Requested is Reasonable**

The starting point for calculating a reasonable attorney's fee award is the determination of "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 433 (1983); *see Norman v. Hous. Auth.*, 836 F.2d 1292, 1299 (11th Cir. 1988). The product of this formula is the "lodestar." *Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir. 1994) (per curiam). The method for determining this amount is clearly established:

> A reasonable hourly rate is the "prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." The district court is "itself an expert" on the reasonableness of hourly rates and "may consider its own knowledge and experience" on the topic. Further, the fee applicant must provide the district court with detailed evidence about the reasonable hourly rate, as well as records to show the time spent on the different claims and the general subject matter of the time expenditures set out with particularity. In addition, a "well-prepared fee petition also would include a summary, grouping the time entries by the nature of the activity or stage of the case."

*Dial HD, Inc. v. ClearOne Commc'ns*, 536 F. App'x. 927, 930-31 (11th Cir. 2013) (quoting *ACLU v. Barnes*, 168 F.3d 423, 427 (11th Cir. 1999) and *Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir. 1994)). At the same time, however, Defendant has an obligation in opposing the Plaintiff's fee application to make specific and "reasonably precise" objections and proof concerning hours Defendant wants excluded from any award. *See ACLU v. Barnes*, 168 F.3d 423,

428 (11th Cir. 1999); *Yule v. Jones*, 766 F. Supp. 2d 1333, 1341 (N.D. Ga. 2010) (citing *Hensley*, 461 U.S. at 428).

There is no precise rule or formula the Court must follow in determining what is a reasonable fee award.  "When a district court finds the number of hours claimed is unreasonably high, the court has two choices: it may conduct an hour-by-hour analysis or it may reduce the requested hours with an across-the-board cut."  *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1350 (11th Cir. 2008).  In determining reasonable attorney hours and fees, the Court must bear in mind "that the measure of reasonable hours is determined by the profession's judgment of the time that may be consciably billed . . . not the least time in which it might theoretically have been done."  *Norman*, 836 F,2d at 1303 at 1306.

Plaintiff's motion and reply requests attorney's fees in the amount of $179,065.00, based on 433 hours billed.[9]  Plaintiff also seeks reimbursement for $4,527.59 in litigation costs and expenses.  Defendant contends any award must be reduced to no more than $34,314, which does not take into account the additional fees Plaintiff seeks in connection with its fee motion (as detailed in its Reply).

Plaintiff was represented by attorneys from the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP (Paul Weiss) and by attorneys from the Brennan

---

[9] Plaintiff's motion sought fees up through the date of the TRO Order for 244.4 hours billed totaling $139,480 in attorney's fees and "and its fees in an amount to be determined later in connection with the Fee Motion." As detailed in the Reply, the fees incurred in connection with the fee motion totaled $39,585 for 100.4 hours billed.

Center for Justice (Brennan Center). Plaintiff's motion provided a breakdown of hourly rates and hours sought by attorney through the date of TRO, as well as a breakdown of hours categorized by the nature of the activity/stage of the case. Chart A provides a breakdown for the attorneys from Paul Weiss, Chart B provides a breakdown for the attorneys from the Brennan Center.[10]

**Chart A**

| PAUL WEISS ATTORNEY HOURS & RATES THROUGH TRO | | | | | |
|---|---|---|---|---|---|
| **Attorney** | **Year of Admission** | **Hours Sought** | **Customary Rate** | **Reduced Rate** | **Total Fees** |
| Robert Atkins | 1988 | 3.6 | $1,560 | $700 | $2,520 |
| Farrah Berse | 2003 | 43.7 | $1,160 | $600 | $26,220 |
| Makiko Hiromi | 2012 | 58.5 | $920 | $400 | $23,400 |
| William Freeland | 2016 | 18.1 | $920 | $400 | $7,240 |
| Melina Meneguin Layerenza | 2017 | 29.7 | $735 | $300 | $8.910 |
| Jessica Fhurman | 2019 | 43.2 | $640 | $250 | $10,800 |
| Kyle Sieber | Not yet admitted[11] | 47.6 | $640 | $250 | $11,900 |
| **TOTAL** | | **244.4** | | | **$90,990** |

---

[10] These breakdowns exclude the hours billed in connection with the fee motion. Plaintiff separately provided billing information for the fee motion in its Reply brief.

[11] Although at the time of the fee petition, Mr. Sieber had not been admitted to the New York bar, he had passed the bar exam.

**Chart B**

| BRENNAN CENTER ATTORNEY HOURS & RATES THROUGH TRO | | | | |
|---|---|---|---|---|
| **Attorney** | **Year of Admission** | **Hours Sought** | **Hourly Rate** | **Total Fees** |
| Lawrence Norden | 1997 | 24.7 | $600 | $14,820 |
| Myrna Pérez | 2003 | 34.6 | $600 | $20,760 |
| Sean Morales-Doyle | 2007 | 9.0 | $550 | $4,950 |
| Maximillian Feldman | 2014 | 19.9 | $400 | $7,960 |
| **TOTAL** | | **88.2** | | **$48,490** |

According to the Reply declarations, counsel from Paul Weiss spent an additional 89.3 hours and attorney Feldman of the Brennan Center spent an additional 11.1 hours in connection with research and drafting the fee motion and reply. (Berse Supp. Decl, Ex. 1; Pérez Supp. Decl. ¶ 5; Pérez Supp. Decl. Ex. 1.)

Chart C provides the breakdown of hours sought grouped by the specific task performed/phase of the case, including the additional 100.4 hours billed in connection with the fee motion.

**Chart C**

| HOURS BILLED BY TASK PAUL WEISS AND BRENNAN CENTER COMBINED | | | |
|---|---|---|---|
| **Phase/Activity** | **Firm** | **#of Hours** | **$ of Fees Sought** |
| Preparing and drafting complaint | Paul Weiss (46.9) | 71.5 | $30,225 |
| | Brennan Center (24.6) | | |
| Preparing and filing TRO Motion | Paul Weiss (75.2) | 89.2 | $35,210 |
| | Brennan Center (14.0) | | |
| Oral Argument (including preparation of declarations requested by the Court) | Paul Weiss (45.8) | 68.8 | $33,980 |
| | Brennan Center (23.0) | | |
| Post-Argument Briefing | Paul Weiss (76.5) | 103.1 | $40,065 |
| | Brennan Center (26.6) | | |
| Preparing and drafting Motion for fees and Reply | Paul Weiss (89.3) | 100.4 | $39,585 |
| | Brennan Center (11.1) | | |

According to the Plaintiff's initial brief (Doc. 119 at 20) and declarations of Myrna Pérez and Farrah Berse, counsel took steps to avoid seeking any fees that might be deemed excessive: (1) Plaintiff is not seeking reimbursement of the approximately $683,700 in fees incurred conducting extensive discovery after entry of the TRO;[12] (2) Plaintiff's local counsel is not seeking reimbursement of any fees or expenses; and (3) in the interest of billing judgment, Plaintiff's counsel excluded time that was deemed duplicative, excessive, insufficiently documented, or primarily administrative. (Pérez Decl. ¶ 12; Berse Decl. ¶¶ 20–21, 26.)

Counsel from Paul Weiss deducted 23.1 hours of time billed by the seven attorneys between November 5 and 11, 2018.  (Berse Decl. ¶ 21.)  Nor does Paul Weiss seek fees in connection with 18 hours of research billed by a visiting attorney from the United Kingdom or the 35.6 hours of paralegal and support staff time incurred in connection with the case.  (*Id.* ¶ 22.) These deductions are summarized in Chart D:

### Chart D

| PAUL WEISS DEDUCTIONS | | | |
|---|---|---|---|
| **Attorney** | **Hours Billed** | **Hours Sought** | **Hours Deducted** |
| Robert Atkins | 3.8 | 3.6 | 0.2 |
| Farrah Berse | 120.3 | 43.7 | 76.6 |
| Makiko Hiromi | 181.4 | 58.5 | 122.9 |
| William Freeland | 78.2 | 18.1 | 60.1 |
| Melina Meneguin Layerenza | 152.6 | 29.7 | 122.9 |
| Jessica Fhurman | 209.9 | 43.2 | 166.7 |

[12] According to Pérez and Berse, Plaintiff's counsel expended well over an additional 1,000 hours litigating this case in discovery after the Court's TRO order through June 18, 2019. (Pérez Decl. ¶ 12; Berse Decl. ¶¶ 17, 26.)

| PAUL WEISS DEDUCTIONS | | | |
|---|---|---|---|
| **Attorney** | **Hours Billed** | **Hours Sought** | **Hours Deducted** |
| Kyle Sieber | 168.3 | 47.6 | 120.7 |
| Other Attorneys/Support | 372.8 | 0 | 372.8 |
| **TOTAL** | 1,287.3 | 244.4 | 1,042.9 |

Paul Weiss reduced the customary hourly rates of its counsel in this case to be consistent with the hourly rates for attorneys at major law firms in the Atlanta area. (Berse Decl. ¶ 25; Brackett Decl. ¶ 17.)[13]

The Brennan Center does not seek reimbursement for all the time charged by its personnel who worked on this matter, including time spent by Wendy Weiser a Vice President of the Brennan Center, and Makeda Yohannes, a Research and Program Associate who worked on the case. (Pérez Decl. ¶ 12.)  Attorney Pérez carefully reviewed the Brennan Center's time entries and excluded approximately 74.5 hours billed after November 11, 2018.  (*Id.*)

Defendant objects to both the hourly rates charged by Plaintiff's attorneys and to the number of hours sought in connection with the motion up to the date of the TRO.[14]

---

[13] Using the firms' standard rates, the billing records reflect a total value of $941,565.00 for 1,287.3 hours in billable time devoted to the case through June 18, 2019.  (Berse Decl. ¶ 26.)

[14] As Defendant did not seek to file a Sur-reply, it does not appear that Defendant objects to the amount of fees requested in connection with Plaintiff's fee motion, as supplemented in the Plaintiff's Reply brief, except to the extent that it relies on its general objection that Plaintiff should not be deemed a prevailing party.   Plaintiff is entitled to recover fees for time spent litigating the award of a section 1988 fee. *See Thompson v. Pharmacy Corp. of Am., Inc.*, 334 F.3d 1242, 1245 (11th Cir. 2003); *Jackson v. State Bd. of Pardons & Paroles*, 331 F.3d 790, 799 (11th Cir. 2003); *Williams v. City of Atlanta*, No. 1:17-cv-1943-AT, 2018 WL 2284374, at *14 (N.D. Ga. Mar. 30, 2018).

### 1. Plaintiff's Counsels' Hourly Rates

With respect to the hourly rates, Defendant recommends that the Court reduce Plaintiff's counsels' hourly rates by 25%. Defendant contends that counsels' hourly rates should be reduced because: (1) Plaintiff only supports their proposed rates with declarations that provide "conclusory or otherwise unsupported evidence" that those rates are in line with other rates in the Atlanta market for attorneys with similar skill; (2) even counsel's "reduced" rates are excessive compared to what other "similarly situated attorneys in the Atlanta market could reasonably charge" and are "outside the norms for election law cases;" and (3) two of the factors that justify a downward adjustment of the lodestar under *Johnson v. Georgia Highway Express, Inc.* – the lack of difficulty of the questions presented and the skill requisite to perform the legal services – apply here.

The Court can dispose of these arguments easily.

In addition to the declarations of Farrah Berse from Paul Weiss and Myrna Pérez from the Brennan Center, Plaintiff submitted a detailed declaration from David Brackett, a partner at Bondurant Mixson & Elmore LLP, with over twenty years of experience representing both plaintiffs and defendants in complex commercial litigation and public interest lawsuits including voting rights matters. (Brackett Decl. ¶¶ 3-5, 9.) Brackett compared the rates sought here by Plaintiff's counsel to eight recent attorney's fee awards in this district where the range of rates approved by the court was $200 - $350 for junior associates, $395 - $425 for mid-level and senior associates, and $550 - $750 for partners. (*Id.* ¶ 10.) Based on his

extensive experience, review of the billing records and pleadings in the case, and his "high level" of familiarity with hourly rates in the Atlanta market and with the legal standard for determining a reasonable attorney fee award, Brackett attests that Plaintiff's rates are reasonable and are reflective of comparable market rates. (*Id*. ¶¶ 13-17.)  As Plaintiff notes, Defendant did not provide any opposing evidence regarding prevailing rates in the Atlanta legal market.

The Court finds Plaintiff's evidence is sufficient to establish that counsels' hourly rates are commensurate with the prevailing Atlanta market rates, with one minor tweak.[15]  *See Blum v. Stenson*, 465 U.S. 886, 895 & n. 11 (1984) (stating that prevailing market rates are those rates that are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation); *Dillard v. City of Greensboro*, 213 F.3d 1347, 1354–55 (11th Cir.2000) ("What [the attorney] charges clients is powerful, and perhaps the best evidence of his market rate; that is most likely to be what he is paid 'as determined by supply and demand.'"); *Duckworth v. Whisenant*, 97 F.3d 1393, 1396–97 (11th Cir. 1996) (noting that a fee applicant also may provide opinion evidence of reasonable rates, which is commonly done by submitting affidavits of other attorneys in the relevant legal community); *Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988) ("Evidence of rates may be

---

[15]  While Ms. Fhurman and Mr. Sieber's rates fall within the scope of the rates charged for associates in the Atlanta metropolitan area according to Mr. Brackett's affidavit, they both had not been admitted to the bar at the time of the litigation in 2018, a time at the onset of their legal careers.  The Court therefore reduces the hourly rate to $225 per hour for each of these attorneys.

adduced through direct evidence of charges by lawyers under similar circumstances or by opinion evidence [and] in line with the goal of obtaining objectivity, satisfactory evidence necessarily must speak to rates actually billed and paid in similar lawsuits.").

Defendant asserts that because this case involved a "straightforward" legal issue – "whether the state should be allowed to reject provisional ballots on the basis that a voter's name was not found on the electronic voter registration list" – a reduction in the Plaintiff's hourly rates is warranted.  Defendant points to *Ga. State Conf. of the NAACP v. Kemp* – in which Judge Timothy Batten reduced the plaintiff's hourly rates by 25% – as a similar case.

Defendant mischaracterizes the nature of the legal issues presented by Plaintiff's complaint here and understates the complexity of the evidence and analysis involved in evaluating those issues on a compressed time schedule.  This case involved a challenge to Georgia's provisional balloting scheme in light of the security issues and associated data reliability problems with the state's online voter registration systems.[16] Plaintiff's requested relief also hinged on a statistical analysis of the increase in the number of provisional ballots cast in the 2018, 2016, and 2014 elections statewide and by county that required the consideration of expert testimony, individual voter affidavits, and additional evidence regarding whether the increase in the provisional ballot rate could also prove outcome

---

[16] Plaintiff's counsel included Lawrence Norden, a member of the U.S. Election Assistance Commission's Board of Advisors who also serves as Vice Chair of the EAC's Security Committee. (Pérez Decl. ¶ 6.)

determinative.  These issues are not at all similar to the singular question before the Court in *Ga. State Conf. of the NAACP v. Kemp*[17] – whether to extend the voter registration deadline for a runoff election to bring Georgia's voter registration laws in compliance with the National Voter Registration Act.

The Court finds that due to the complexity of the issues involved in this constitutional challenge and the specialized skill of the attorneys involved in handling the case, no reduction in the hourly rates of Plaintiff's counsel is warranted except the minor modification noted in footnote 15.  *See Bird v. Sumter County Sch. Dist.*, 2014 U.S. Dist. LEXIS 71601, *5, 2014 WL 2196084 (S.D. Ga. May 27, 2014) (Sands, J.) ("As noted by other district courts, voting rights litigation is 'an extremely complex and intimidating area of the law.'") (citing *Martin v. Augusta-Richmond Cnty., Ga., Comm'n*, 2012 U.S. Dist. LEXIS 169099, *8, 2012 WL 5950408 (S.D. Ga. Nov. 28, 2012)).  As a result of the reduction of Ms. Fhurman's and Mr. Sieber's billable rates from $250 to $225, the Court deducts $2,270 from the total amount of fees requested.[18]

### 2.    Plaintiff's Number of Hours Billed

Defendant requests a 75% reduction in Plaintiff's hourly fees because the 300 plus hours – which is equal to 8.4 weeks of attorney time – billed by eleven attorneys in the course of a one-week period shows a lack of billing judgment.

---

[17]  *Ga. State Conf. of the NAACP v. Kemp*, 1:17-cv-1397-TCB, Order on Fees (ND. Ga. April 11, 2018).

[18] This amounts to a deduction of $1,080 from Ms. Fhurman's billing (43.2 x $25) and $1,190 from Mr. Sieber's billing (47.6 x $25).

Specifically, Defendant asserts that the Court should reduce the award to account for: (1) Plaintiff's limited success in obtaining relief on its claims; (2) Plaintiff's counsel's excessive use of block billing; and (3) counsels' excessive time spent drafting the complaint, duplication of effort by attorneys on the same task, and work related to responding to a motion to strike and preparing declarations in support of its motion.

Plaintiff acknowledges that it seeks reimbursement for a significant number of attorney hours billed by multiple attorneys, but contends this was reasonable and "necessitated by the complex, emergency, and time-sensitive nature of this matter" under the deadlines imposed by Georgia law for the certification of the election results.  In the course of one week, from November 5 through November 12, Plaintiff's counsel filed a Complaint, the TRO motion, seven briefs and eighteen fact and expert declarations on a rolling basis, and appeared for an in-person hearing three days after filing their Compliant and TRO motion.

With one exception, the Court disagrees with Defendant's characterization that the time billed by Plaintiff's counsel was excessive.

First, as the Eleventh Circuit has recognized, "[t]here is nothing inherently unreasonable about a client having multiple attorneys, and they may all be compensated if they are not unreasonably doing the same work and are being compensated for the distinct contribution of each lawyer." *Norman*, 836 F.2d at 1302.  Defendant has not pointed to any particular instances of duplicative billing or specific examples of where it was unreasonable for more than one attorney to

contribute to a particular task.  Based on the Court's review of the billing records, it appears that lead counsel delegated a large portion of work to attorneys who billed at a lower rate which resulted in a reduction of the overall amount of attorneys' fees incurred.

Second, Plaintiff's success was not limited as Defendant contends.  To the contrary, as explained above, the Court found that Plaintiff had demonstrated a substantial likelihood of succeeding on the merits of its claims as presented in the context of the TRO motion and granted Plaintiff substantially the relief it requested.  Thus, there is no basis to reduce Plaintiff's fee request on a theory of limited success.

Third, Defendant's objection to Plaintiff's unreasonable use of block billing is unsubstantiated by the examples Defendant provides.  The Eleventh Circuit has held that counsel should maintain "records to show the time spent on different claims, and the general subject matter of the time expenditures to be set out with sufficient particularity so that the district court can assess the time claimed for each activity." *Norman*, 836 F.2d at 1303. Generally, "[b]lock billing occurs when an attorney lists all the day's tasks on a case in a single entry, without separately identifying the time spent on each task." *Ceres Envtl. Servs., Inc. v. Colonel McCrary Trucking, LLC*, 476 F. App'x 198, 203 (11th Cir. 2012).   But the "mere fact that an attorney has included more than one task in a single billing entry is not, in itself, evidence of block billing. When those tasks are intertwined, including a thorough description of the activities performed *clarifies*, rather than obscures,

the record." *Williams v. R.W. Cannon, Inc.*, 657 F. Supp. 2d 1302, 1312 (S.D. Fla. 2009) (emphasis added).   Block billing is, instead, the "practice of logging hours whereby activities are grouped together without regard to their similarity, thus rendering a review for reasonableness as to distinct activities impossible or impracticable." *Bird v. Sumter Cty. Sch. Dist.*, 2014 WL 2196084, at *2.

In the handful of examples Defendant points to, counsels' billing entries describe the performance of interrelated tasks in connection with a discrete motion or proceeding. For example, Defendant objects to the following time entries, claiming it is unable to determine how much of the attorney's time was spent on the case:

| Date | Attorney | Description | Hours |
|------|----------|-------------|-------|
| 11/7/2018 | Farrah Berse | Drafting, revising and filing TRO papers; prepare for hearing on same | 10.8 |
| 11/8/2018 | Kyle Sieber | Legal research re: issue of standing. Compile research for standing brief requested by the court today at hearing.  Revise, edit, and citecheck standing brief for filing. | 12.1 |
| 11/10/2018 | Melina Meneguin Layerenza | Reviewed filings for compliance with local rules, prepared necessary certificates, and coordinated with Managing Attorney's Office for the filing of Plaintiff's Supplemental Submission in Support of Motion for Temporary Restraining Order and of the Supplemental Declaration of Sara Henderson | 2.1 |
| 11/11/2018 | Kyle Sieber | "Assist with editing, formatting, and filing of declarations, exhibits, and supplemental brief regarding standing.  Prepare documents declarants to sign.  Review defendant's supplemental filing. | 3.1 |

26

| Date | Attorney | Description | Hours |
|------|----------|-------------|-------|
|  |  | Search for news articles relevant to motion |  |

These entries, however, describe work devoted to a single motion or brief and are not so vague or confusing that it makes it impossible to determine how the time was spent or whether the time was reasonable.  Defendant also objects to two entries as evidence of "questionable block billing" that in fact encompass small increments of time and describe a single, discrete task:

| Date | Attorney | Description | Hours |
|------|----------|-------------|-------|
| 11/6/2018 | Jessica Fuhrman | Meeting with Georgia Team to research potential motion | 0.4 |
| 11/10/2018 | William Freeland | Attention to team emails and documents | 0.6 |

Having reviewed Plaintiff's time records, the Court finds that it is not necessary to reduce the fee award due to excessive block billing.

Fourth, Defendant's vague objection that Plaintiff's fee award should be reduced because Plaintiff's counsel spent a "significant" amount of time responding to a motion to strike and preparing declarations in support of its TRO motion is meritless.  Defendant has failed to explain what it means by "significant" or how many hours such a description entails.  "Significant" is not synonymous with "excessive" or "unreasonable."   By complaining generally about the amount of time spent by Plaintiff on these tasks, without substantiating their claim that the time is excessive or identifying the reasons why the time was excessive under the circumstnaces, Defendant asks the Court to shoulder Defendant's burden of scouring the record to find and tally objectionable billing entries.

From the Court's calculation, it appears Plaintiff spent about 6 hours successfully responding to the motion to strike. The motion to strike was not meritorious, and Plaintiff's response was crisp and to the point.  As Plaintiff notes, Defendant's argument that Plaintiff should not be reimbursed for this time simply because the Court disposed of the motion in a footnote, "[s]uch a rule would set a perverse precedent: that a defendant could bring a motion, lose, and then argue that a plaintiff should not be compensated for attorneys' fees for responding to that motion because it was denied."  (Reply at 17.)   While the Court believes the response could have been drafted in less than 6 hours, it is not prepared to find that 6 hours was unreasonable.  A properly chiseled response brief can be of greater assistance to a court than one that rambles on – and in turn, take more time to edit and frame.

The Court does not agree with Defendant's suggestion that Plaintiff should only be compensated for the time spent preparing declarations that were expressly referenced in the Court's TRO Order.  As should be clear from the order, though the Court may have only specifically described some of the evidence in detail, the Court relied on the combination of all the statistical evidence and witness declarations in the record in reaching its conclusion that Plaintiff was entitled to emergency injunctive relief.

Finally, however, the Court agrees with Defendant that the 71.5 hours billed by Plaintiff's counsel in connection with preparing and drafting the complaint is unreasonable under the circumstances.  Plaintiff's twenty-six page Complaint was

not particularly lengthy, was based extensively on news reports and another lawsuit pending before the undersigned challenging the security of Georgia's voting system and voter registration database, and unlike the subsequent TRO motion did not rely on documentation of specific voter experiences or statistical evidence on which the theory of the claims was based.  Accordingly, the Court finds that under the circumstances and based on the somewhat skimpy nature of the allegations, the 70 plus hours devoted to the preparation and drafting of the Complaint was overkill.  The Court will cut 35 hours from the amount of fees sought in connection with the Complaint for a deduction in attorney's fees of $15,112.50.

### C. Whether Plaintiff's Requested Expenses are Reasonable

Plaintiff also seeks reimbursement of litigation expenses in the amount of $4,527.59 incurred in connection with the TRO Motion.  These expenses include: (1) costs associated with filings and court reporting services, which total $892.10; (2) travel expenses associated with travel to Atlanta to participate in the hearing on the TRO motion, which total $1,500.49; and (3) costs incurred by experts in connection with the TRO motion, which total $2,135.00.  Plaintiff has provided copies of receipts and invoices documenting these expenses.

Other than "routine office overhead normally absorbed by the practicing attorney, all reasonable expenses incurred in case preparation, during the course of litigation, or as an aspect of settlement of the case may be taxed as costs under section 1988," and "the standard of reasonableness is to be given a liberal

interpretation." *NAACP v. City of Evergreen*, 812 F.2d 1332, 1337 (11th Cir.1987) (quoting *Dowdell v. City of Apopka*, 698 F.2d 1181, 1192 (11th Cir. 1983)).

Defendant concedes that Plaintiff's expenses "include the required documentation and most do not appear to be for categories of expenses that are unrecoverable." (Resp. at 19.) Defendant only disputes a single expense sought by Plaintiff: a $134.76 taxi fare from LaGuardia Airport to the home of one of the Brennan Center attorneys on the return trip following the TRO hearing. Defendant contends that the fare does not appear to be reasonably necessary as it is far in excess of the similar taxi fare sought by the Paul Weiss attorney for $20.17.[19] (*Id.*)

Plaintiff responds that the two referenced taxi fares "were not actually similar. The $20.17 fare was for transportation from LaGuardia Airport to Astoria, Queens, a roughly three-mile trip that can take approximately ten minutes without traffic. By contrast, the interstate trip from LaGuardia Airport to Jersey City is approximately 13 miles, requires travel across multiple bridges and/or tunnels, some of which are tolled, and can take more than an hour." (Reply at 18) (citing driving directions on Google Maps, http://maps.google.com).

Based on its own experience, the Court finds that the taxi fare incurred by Plaintiff's counsel was a reasonable and necessary travel expense. Accordingly, the

---

[19] Defendant also contends that the fare exceeds the amount a State of Georgia employee would be eligible to seek for reimbursement under Georgia's State Travel Policy. The Court questions the relevance of this contention and notes that Defendant did not point to any authority that the State of Georgia's travel reimbursement policy applies to determining a reasonable expense award under § 1988.

Court finds that Plaintiff is entitled to an award of the full amount it its litigation expenses totaling $4,527.59.

### III.   CONCLUSION

After thoroughly reviewing all of the documents, billing records, and evidence filed in connection with the fee motion, the Court finds that a reduction of Plaintiffs' fees in the amount of $15,112.50 is warranted.  *See Norman*, 836 F.2d at 1303 ("[W]here the time or fees claimed seem expanded . . . the court may make the award on its own experience.").  Accordingly, for the foregoing reasons, the Court awards Plaintiff $161.682.50 in attorney's fees and $4,527.59 in expenses, for a total award of $166,210.09.[20]

**IT IS SO ORDERED** this 29th day of May, 2020.

Amy Totenberg
**United States District Judge**

---

[20] The Court reduced Plaintiff's requested fee of $179,065 by $17,382.50 as explained above ($2,270 + $15,112.50).